| Fill in this information to identify the case: |
| --- |

United States Bankruptcy Court for the:

_____ District of __Delaware__
(State)

Case number (*If known*): _____ Chapter __11__

❑ Check if this is an
amended filing

### Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/19

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

**1. Debtor's name**

FTD Companies, Inc.
_____

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as* names

_____
_____
_____
_____
_____

**3. Debtor's federal Employer Identification Number** (EIN)

3 2 – 0 2 5 5 8 5 2

**4. Debtor's address**

**Principal place of business**

3113        Woodcreek Drive
Number      Street

_____

Downers Grove            IL        60515
City                    State    ZIP Code

DuPage
_____
County

**Mailing address, if different from principal place of business**

_____
Number      Street

_____
P.O. Box

_____
City            State        ZIP Code

**Location of principal assets, if different from principal place of business**

_____
Number      Street

_____
City            State        ZIP Code

**5. Debtor's website** (URL)

www.ftdcompanies.com

**6. Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
❑ Partnership (excluding  LLP)
❑ Other. Specify: _____

| Debtor | FTD Companies, Inc. | Case number (if known) |
|---|---|---|
| | Name | |

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

4  5  3  1

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply*:

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625 (amount subject to adjustment on 4/01/22 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ■ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No

☐ Yes. District _____ When _____ Case number _____
                               MM / DD / YYYY

        District _____ When _____ Case number _____
                               MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

■ Yes. Debtor See Schedule 1 Attached    Relationship Affiliate

      District Delaware                When Date Hereof
                                            MM / DD / YYYY

      Case number, if known Pending

Debtor    FTD Companies, Inc.
_____    Case number (if known)_____
Name

**11. Why is the case filed in *this district*?**    *Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

Where is the property? _____
                       Number        Street

_____

_____
City                                              State          ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

| ■ | **Statistical and administrative information** |
|---|---|

**13. Debtor's estimation of available funds**    *Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☐ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☑ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

**15. Estimated assets**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☑ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

Debtor    FTD Companies, Inc.
_____    Case number (if known)_____
          Name

**16. Estimated liabilities**

☐ $0-$50,000                ☐ $1,000,001-$10 million          ☐ $500,000,001-$1 billion
☐ $50,001-$100,000          ☐ $10,000,001-$50 million         ☐ $1,000,000,001-$10 billion
☐ $100,001-$500,000         ☐ $50,000,001-$100 million        ☐ $10,000,000,001-$50 billion
☐ $500,001-$1 million       ☐ $100,000,001-$500 million       ☐ More than $50 billion

---

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING** --  Bankruptcy fraud is a serious crime.  Making a false statement in connection with a bankruptcy case can result in fines up to
          $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

■   The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

■   I have been authorized to file this petition on behalf of the debtor.

■   I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   06   03   2019
           MM / DD / YYYY

✘ /s/ Scott D. Levin                                    Scott D. Levin
_____               _____
Signature of authorized representative of debtor        Printed name

Title   President and CEO

**18. Signature of attorney**

✘ /s/ Daniel J. DeFranceschi                Date   06   03   2019
_____                      MM / DD / YYYY
Signature of attorney for debtor

Daniel J. DeFranceschi
_____
Printed name
Richards Layton & Finger, P.A.
_____
Firm name
920        North King Street
_____
Number     Street
Wilmington                              DE         19801
_____
City                                    State      ZIP Code

(302) 651-7700                          defranceschi@rlf.com
_____
Contact phone                           Email address

2732                                    DE
_____
Bar number                              State

---

## SCHEDULE 1

On the date hereof, each of the affiliated entities listed below, including the debtor in this chapter 11 case (collectively, the "Debtors"), filed a petition in this Court for relief under chapter 11 of title 11 of the United States Code.  Contemporaneously with the filing of their petitions, the Debtors filed a motion requesting that the Court consolidate their chapter 11 cases for administrative purposes only.

Bloom That, Inc.
Florists' Transworld Delivery, Inc.
FlowerFarm, Inc.
FSC Denver LLC
FSC Phoenix LLC
FTD Companies, Inc.
FTD Group, Inc.
FTD Mobile, Inc.
FTD, Inc.
FTD.CA, Inc.
FTD.COM Inc.
Giftco, LLC
Provide Cards, Inc.
Provide Commerce LLC
Provide Creations, Inc.

*[If debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11 of the Bankruptcy Code, this Exhibit "A" shall be completed and attached to the petition.]*

# United States Bankruptcy Court

District Of _____Delaware_____

In re  ___FTD Companies, Inc.___,          Case No.

          Debtor                                   _____

                                                    Chapter  11

## Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11

1. If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is __001-35901__.

2. The following financial data is the latest available information and refers to the debtor's condition on April 30, 2019.

a. Total assets                                    $312.7 million

b. Total debts (including debts listed in 2.c., below)        $374.9 million

c. Debt securities held by more than 500 holders

|  |  |  |  |  |  | Approximate number of holders: |
|---|---|---|---|---|---|---|
| secured ☐ | unsecured ☐ | subordinated ☐ | $ _____ | | | 0 |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ _____ | | | _____ |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ _____ | | | _____ |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ _____ | | | _____ |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ _____ | | | _____ |

d. Number of shares of preferred stock                0
e. Number of shares common stock                  30,753,532

Comments, if any: _____
_____
_____

3. Brief description of debtor's business: _____
 FTD Companies, Inc., together with its subsidiaries, provides floral, specialty food, gift and related products and services to consumers, retail florists, and other retail locations and companies.

4. List the names of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:

Nantahala Capital Management, LLC, Wilmot B. Harkey, and Daniel Mack (14.0%); Travertine Creek, Inc. (12.0%); Diamond Investment Group, LLC (12.0%); FTD 50 LLC (12.0%); Dimensional Fund Advisors  (7.7%); and Mauricio Jaramillo (5.1%)

# FTD COMPANIES, INC.
## (a Delaware Corporation)

### Officer's Certificate

### June 2, 2019

I, Scott D. Levin, do hereby certify, on behalf of FTD Companies, Inc., a Delaware corporation (the "Company"), and not individually, that I am the duly appointed and acting President and Secretary of the Company, and that, as such, I am authorized to execute and deliver this certificate.

I further certify, on behalf of the Company and not individually, as of the date hereof, that attached hereto as Exhibit A is a true, correct, and complete copy of the resolutions duly adopted by the Company's Board of Directors at a duly held meeting authorizing the Company to, among other things:  (a) file a voluntary petition for relief under chapter 11 of title 11 of the United States Code; (b) enter into and incur any obligations under a new debtor in possession financing facility or facilities, including use of cash collateral, and any associated documents and consummate the transactions contemplated therein; and (c) enter into a services agreement with AP Services, LLC, a Michigan limited liability company, to provide interim management services to the Company.  Such resolutions or any Company actions taken pursuant thereto have not been amended, superseded, modified, or rescinded, and such resolutions are in full force and effect on the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand on the date first written above.

By: Scott D. Levin
Name:  Scott D. Levin
Title:    President and Secretary

**EXHIBIT A**

**FTD COMPANIES, INC.**
**(a Delaware Corporation)**

**Board Resolutions**

**June 2, 2019**

**WHEREAS**, the members of the Board of Directors (the "Board") have (a) regularly and carefully reviewed the materials and other information presented by the Company's management and advisors regarding the Company's business conditions, the Company's operations, its current and projected financial position, and other relevant information; (b) thoroughly evaluated the Company's strategic alternatives, including a possible restructuring; (c) conferred extensively with the Company's management and advisors regarding these matters; (d) determined that the filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") is in the best interests of the Company, its subsidiaries and affiliates, and its stakeholders; (e) determined that the entry into Financing Transactions (as defined herein) is in the best interests of the Company, its subsidiaries and affiliates, and its stakeholders; and (f) determined that entering into a Services Agreement (the "Services Agreement") with AP Services, LLC ("APS"), a Michigan limited liability company, to provide interim management services to the Company is in the best interests of the Company, its subsidiaries and affiliates, and its stakeholders;

**NOW THEREFORE, BE IT:**

**RESOLVED**, that in the judgment of the Board it is desirable and in the best interests of the Company and its stakeholders that the Company seek relief under the Bankruptcy Code, enter into Financing Transactions, and enter into the Services Agreement;

**FURTHER RESOLVED**, that the Company shall be, and it hereby is, authorized to file a voluntary petition (the "Petition") for relief under the Bankruptcy Code (the "Chapter 11 Case"), in the United States Bankruptcy Court for the District of Delaware or such other court as each "Authorized Person" (as defined below) of the Company shall determine to be appropriate (the "Bankruptcy Court") and perform any and all such acts as are reasonable, advisable, expedient, convenient, proper, or necessary to effect the foregoing, the performance of such acts to constitute conclusive evidence of the reasonableness, advisability, expedience, convenience, appropriateness, or necessity thereof;

**FURTHER RESOLVED**, that each Authorized Person shall be, and each of them hereby is, authorized, directed, and empowered, in the name and on behalf of the Company, to: (a) execute, acknowledge, deliver, and verify the Petition and all other ancillary documents, and cause the Petition to be filed with the Bankruptcy Court and make or cause to be made prior to execution thereof any modifications to the Petition or ancillary documents as any such Authorized Person, in such person's discretion, deems necessary, desirable, or appropriate to carry out the intent and accomplish the purposes of

these resolutions; (b) execute, acknowledge, deliver, verify, and file or cause to be filed all petitions, schedules, statements, lists, motions, applications, and other papers or documents necessary or desirable in connection with the foregoing; (c) execute, acknowledge, deliver, and verify any and all other documents necessary, desirable, or appropriate in connection therewith and to administer the Company's Chapter 11 Case in such form or forms as any such Authorized Person may approve, and the actions of any Authorized Person taken pursuant to this resolution, including the execution, acknowledgment, delivery, and verification of the Petition and all ancillary documents and all other agreements, certificates, instruments, guaranties, notices, and other documents, shall be conclusive evidence of such Authorized Person's approval and the necessity, desirability, or appropriateness thereof; and (d) take any action as may be deemed necessary, desirable, or appropriate to carry out the intent of this resolution, including the filing of the Petition and any ancillary documents.

**FURTHER RESOLVED**, that the Authorized Persons shall be, and each of them individually hereby is, authorized, directed, and empowered, in the name and on behalf of the Company, to retain:  (a) Jones Day; (b) Richards, Layton & Finger, P.A.; (c) Moelis & Company; (d) Piper Jaffray Companies; (e) Omni Management Group; (f) APS; and (g) such additional professionals, including attorneys, accountants, financial advisors, investment bankers, actuaries, consultants, agents, or brokers (together with the foregoing identified firms, the "Professionals"), in each case as in any such Authorized Person's judgment may be necessary, desirable, or appropriate in connection with the Company's Chapter 11 Case and other related matters, on such terms as such Authorized Person or Authorized Persons shall approve and such Authorized Person's retention thereof to constitute conclusive evidence of such Authorized Person's approval and the necessity, desirability, or appropriateness thereof;

**FURTHER RESOLVED**, that the law firms of Jones Day and Richards, Layton & Finger, P.A. and any additional special or local counsel selected by the Authorized Persons, if any, shall be, and hereby are, authorized, empowered, and directed to represent the Company, as debtor and debtor in possession, in connection with any Chapter 11 Case commenced by or against it under the Bankruptcy Code;

**FURTHER RESOLVED**, that the Company, as debtor and debtor in possession under chapter 11 of the Bankruptcy Code, shall be, and it hereby is, authorized to: (a) enter into and incur any obligations under a new debtor in possession financing facility or facilities, including use of cash collateral, and any associated documents and consummate the transactions contemplated therein (collectively, the "Financing Transactions") with such lenders and on such terms as may be approved by any one or more of the Authorized Persons, as may be necessary, desirable, or appropriate for the continuing conduct of the affairs of the Company; and (b) pay related fees, incur (or guarantee, as applicable) the debt and other obligations and liabilities contemplated by the Financing Transactions, and grant security interests in and liens upon some, all, or substantially all of the Company's assets in each case as may be deemed necessary, desirable, or appropriate by any one or more of the Authorized Persons in connection with the Financing Transactions;

**FURTHER RESOLVED**, that:  (a) the Authorized Persons shall be, and each of them individually hereby is, authorized, directed, and empowered, in the name and on behalf of the Company, as debtor and debtor in possession, to take such actions and execute, acknowledge, deliver, and verify such certificates, instruments, guaranties, credit agreements, pledge agreements, security agreements, promissory notes, letter of credit applications, mortgages, intellectual property security agreements, account control agreements, other collateral documents or security instruments, instruments, notices, and any and all other agreements or documents arising in connection with the Financing Transactions as the Authorized Persons may deem necessary, desirable, or appropriate to facilitate the Financing Transactions, in each case including any amendment, amendment and restatement, supplements, or other modifications to the foregoing (collectively, the "Financing Documents"); (b) Financing Documents containing such provisions, terms, conditions, covenants, warranties, and representations as may be deemed necessary, desirable, or appropriate by the Authorized Persons are hereby approved; and (c) the actions of any Authorized Person taken pursuant to this resolution, including the execution, acknowledgement, delivery, and verification of all such Financing Documents, shall be conclusive evidence of such Authorized Person's approval and the necessity, desirability, or appropriateness thereof;

**FURTHER RESOLVED**, that the Authorized Persons shall be, and each of them individually hereby is, authorized, directed, and empowered, in the name and on behalf of the Company, as debtor and debtor in possession, to negotiate, execute, deliver, and perform on behalf of, and take such actions and execute, acknowledge, deliver, and verify such agreements, certificates, instruments, guaranties, notices, and any and all other documents as the Authorized Persons, or any of them, may deem necessary, desirable, or appropriate to facilitate the transactions contemplated by the foregoing resolution including, but not limited to, any certificates, instruments, guaranties, credit agreements, pledge agreements, security agreements, promissory notes, letter of credit applications, mortgages, intellectual property security agreements, account control agreements, other collateral documents or security instruments, instruments, notices, and any and all other agreements or documents arising in connection with the Financing Documents, containing such provisions, terms, conditions, covenants, warranties, and representations as may be deemed necessary, desirable, or appropriate, and any modifications or supplements thereto, all such materials to be in the form approved by one or more of the Authorized Persons and the execution, acknowledgement, delivery, and verification thereof by such Authorized Person or Authorized Persons to be conclusive evidence of such approval and the necessity, desirability, or appropriateness thereof;

**FURTHER RESOLVED**, that:  (a) the Board authorizes entry into the Services Agreement, a copy of which is attached hereto; (b) Alan D. Holtz, Managing Director of AlixPartners, LLP, shall serve as the Chief Restructuring Officer; (c) Scott Tandberg, Director of AlixPartners, LLP, shall serve as the Associate Chief Restructuring Officer; and (d) APS is authorized to assign APS personnel to serve in various capacities with the Company and to perform other services required of APS;

**FURTHER RESOLVED**, that the Authorized Persons shall be, and each of them individually hereby is, authorized, directed, and empowered to take any and all such action necessary or desirable to effect the terms of the Services Agreement;

**FURTHER RESOLVED**, that, in addition to the specific authorizations heretofore conferred upon the Authorized Persons, each Authorized Person shall be, and hereby is, authorized with full power of delegation, in the name and on behalf of the Company, to take or cause to be taken any and all such further actions and to execute and deliver or cause to be executed or delivered, and to amend, supplement, or otherwise modify from time to time, any and all such agreements, documents, certificates, instruments, statements, notices, undertakings, amendments, and other writings, and to incur and to pay or direct payment of all such fees and expenses, including filing fees, as in the judgment of the Authorized Person shall be necessary, desirable, or appropriate to effectuate the purpose and intent of any and all of the foregoing resolutions adopted herein;

**FURTHER RESOLVED**, that all acts lawfully done or actions lawfully taken by any Authorized Person, or at the direction of an Authorized Person, or by any of the Professionals at the direction of an Authorized Person, in connection with the Chapter 11 Case or any proceedings related thereto, or any matter related thereto, be, and hereby are, adopted, ratified, confirmed, and approved in all respects as the acts and deeds of the Company;

**FURTHER RESOLVED**, that any and all lawful actions done and transactions undertaken by any Authorized Person, or at the direction of an Authorized Person, for and on behalf and in the name of the Company with respect to any transactions contemplated by the foregoing resolutions, including in connection with the Financing Transactions, before the adoption of the foregoing resolutions be, and they hereby are, ratified, authorized, approved, adopted, and consented to in all respects for all purposes;

**FURTHER RESOLVED**, that the Board and any Authorized Person hereby are authorized and directed to certify and/or attest these resolutions, certificate of incumbency, and such other documents or instruments that the Secretary of the Company may deem necessary or appropriate in connection with the foregoing matters; <u>provided</u>, <u>however</u>, that such certification and/or attestation shall not be required for any document, instrument, or agreement to be valid and binding on the Company; and

**FURTHER RESOLVED**, that for the purposes of these resolutions, the term "<u>Authorized Person</u>" shall mean and include the President, Chief Executive Officer, Chief Restructuring Officer, Associate Chief Restructuring Officer, Chief Financial Officer, Executive Vice President, Secretary, Assistant Secretary, and Interim General Counsel, or any designee of any of them**.**

**AP**Services

Scott Levin, Esq.                                                                                           May 31, 2019
President & CEO
FTD Companies, Inc.
3113 Woodcreek Dr.
Downers Grove, IL 60515

**Re:       Agreement for the Provision of Interim Management Services**

Dear Scott:

This letter, together with the attached Schedule(s), Exhibit and General Terms and Conditions, sets forth the agreement ("Agreement") between AP Services, LLC ("APS"), and FTD Companies, Inc. and certain of its affiliates and subsidiaries (the "Company") for the engagement of APS to provide certain temporary employees to the Company to assist the Company in its restructuring as described below.

All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedule(s), Exhibit and General Terms and Conditions. The Company and APS are each a "party," and together the "parties."

The engagement of APS, including any APS employees who serve in Executive Officer positions, shall be under the supervision of the Board of Directors of the Company.

**Objectives and Tasks**

Subject to APS's (i) internal approval from its Risk Management Committee, (ii) confirmation that the Company has a Directors and Officers Liability insurance policy in accordance with Section 7 of the General Terms and Conditions regarding Directors and Officers Liability Insurance coverage, (iii) and a copy of the signed Board of Directors' resolution (or similar document as required by the Company's governance documents) as official confirmation of the appointment, APS will provide Mr. Alan Holtz to serve as the Company's Chief Restructuring Officer ("CRO"), reporting to the Company's Board of Directors, and Mr. Scott Tandberg to serve as the Company's Associate Restructuring Officer. Mr. Holtz and Mr. Tandberg, working collaboratively with the senior management team, the Board of Directors, the Company's counsel and other Company professionals, will perform the ordinary course duties of a CRO, including:

- Preparing budgets and 13-week cash forecasts and evaluating variances thereto, as required by the Company's lenders.
- Identifying and implementing near-term cost reduction opportunities.
- Implementing operational restructuring initiatives.
- Managing vendors, including negotiation of vendor terms.
- Overseeing communications with the Company's various constituencies.
- Overseeing the Company's asset sale process.
- Preparing the statement of financial affairs, schedules and other regular reports required by the Bankruptcy Court, as well as a Disclosure Statement and Plan of Reorganization, if applicable.

**AP**Services

FTD Companies, Inc.
May 31, 2019
Page 2 of 11

- Assisting with the preparation of the Company's motions to be filed with the Bankruptcy Court ("Motions") or the Company's response to Motions filed by other parties-in-interest.
- Assisting with the design, negotiation and implementation of a restructuring strategy.
- Providing testimony before the Bankruptcy Court on matters that are within the scope of this engagement and within APS's area of testimonial competencies, if applicable.
- Assisting with such other matters as may be requested that fall within APS's expertise and that are mutually agreeable.

**Staffing**

APS will provide the Company with the individuals set forth on Exhibit A ("Temporary Staff"), subject to the terms and conditions of this Agreement, with the titles, pay rates and other descriptions set forth therein.

The Temporary Staff may be assisted by or replaced by other professionals at various levels, as required, who shall also become Temporary Staff. APS will keep the Company informed as to APS's staffing.

**Timing, Fees and Retainer**

APS will commence this engagement on or about June 3, 2019 after receipt of a copy of the executed Agreement accompanied by the retainer, as set forth on Schedule 1, confirmation of the Company's compliance with the requirements set forth in the first paragraph of the Objective and Tasks section and upon the Company's filing of a Chapter 11 bankruptcy petition.

The Company will promptly apply to the Bankruptcy Court to obtain approval of this Agreement. APS acknowledges that its retention and the terms thereof are subject to Bankruptcy Court approval.

The Company shall compensate APS for its services, and reimburse APS for expenses, as set forth on Schedule 1.

\* \* \*

**AP**Services

FTD Companies, Inc.
May 31, 2019
Page 3 of 11

If these terms meet with your approval, please sign and return a copy of this Agreement and wire transfer the amount to establish the retainer.

We look forward to working with you.

Sincerely yours,

AP SERVICES, LLC

Alan D. Holtz
Managing Director

Acknowledged and Agreed to:

FTD COMPANIES, INC.

By:  Scott Levin

Its:  President and CEO

Dated:  June 2, 2019



**AP Services, LLC**

**Exhibit A**

Temporary Staff

Individuals with Executive Officer Positions

| Name | Description | Hourly Rate | Commitment Full[1] or Part[2] Time |
|------|-------------|-------------|------------------------------------|
| Alan Holtz | Chief Restructuring Officer | $1,140 | Full Time |
| Scott Tandberg | Associate Restructuring Officer | $  895 | Full Time |

Additional temporary staff

| Name | Description | Hourly Rate | Commitment Full[1] or Part[2] Time |
|------|-------------|-------------|------------------------------------|
| Jason Muscovich | Chapter 11 Reporting | $945 | Full Time |
| Job Chan | Asset Sales | $665 | Full Time |
| Bassaam Fawad | Cash Management | $615 | Full Time |
| J.C. Chang | Cash Management | $565 | Full Time |

The parties agree that Exhibit A can be amended by AP Services, LLC from time to time to add or delete staff, and the Monthly Staffing Reports shall be treated by the parties as such amendments.

[1] Full time is defined as substantially full time.

[2] Part time is defined as approximately two to three days per week, with some weeks more or less depending on the needs and issues facing the Company at that time.



**Schedule 1**

**Fees and Expenses**

1.  **Fees:** APS's fees will be based on the hours spent by APS personnel at APS's hourly rates, which are:

| | |
|---|---|
| Managing Director | US$990 – US$1,165 |
| Director | US$685 – US$945 |
| Senior Vice President | US$460 – US$725 |
| Vice President | US$430 – US$600 |
| Consultant/Associate | US$160 – US$435 |
| Paraprofessional | US$285 – US$305 |

APS reviews and revises its billing rates on January 1 of each year.

2.  **Success Fee:** APS does not seek a success fee in connection with this engagement.

3.  **Expenses:** In addition to the Fees set forth in this Schedule, the Company shall pay directly, or reimburse APS upon receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging and meals.

4.  **Break Fee:** APS does not seek a break fee in connection with this engagement.

5.  **Retainer:** The Company shall pay APS a retainer of US$300,000 to be applied against Fees and expenses as set forth in this Schedule and in accordance with Section 2 of the General Terms and Conditions.

6.  **Payment:** APS will submit semi-monthly invoices for services rendered and expenses incurred. All invoices shall be due and payable immediately upon receipt.



**Data Protection Schedule**

**Processing, Personal Data and Data Subjects**

In connection with this Agreement, APS will not be receiving any Personal Data subject to the General Data Protection Regulation ((*EU) 2016/679*) (the "GDPR") or any applicable legislation implementing any provisions of the GDPR as may be enacted time to time (together the "Data Protection Legislation").

| AP Services, LLC |
| General Terms and Conditions |

These General Terms and Conditions ("Terms") are incorporated into the Agreement to which these Terms are attached. In case of conflict between the wording in the letter and/or schedule(s) and these Terms, the wording of the letter and/or schedule(s) shall prevail.

## Section 1. Company Responsibilities

The Company will undertake responsibilities as set forth below:

   1. Provide reliable and accurate detailed information, materials, documentation and

   2. Make decisions and take future actions, as the Company determines in its sole discretion, on any recommendations made by APS in connection with this Agreement.

APS's delivery of the services and the fees charged are dependent on (i) the Company's timely and effective completion of its responsibilities; and (ii) timely decisions and approvals made by the Company's management.

## Section 2. Retainer, Billing, Payments and Taxes

**Retainer.** Upon execution of the Agreement, the Company shall promptly pay APS the agreed-upon advance retainer as set forth on Schedule 1. Invoices shall be offset against the retainer. Payments of invoices will be used to replenish the retainer to the agreed-upon amount. Any unearned portion of the retainer will be applied against the final invoice or returned to the Company at the end of the engagement.

**Billing and Payments.** All payments to be made to APS shall be due and payable upon delivery of invoice via check or wire transfer to APS's bank account, as shown on the invoice. All amounts invoiced are based on services rendered and expenses incurred to date and are not contingent upon future services or Work Product (as defined below), or the outcome of any case or matter. "Fees," as used in this Agreement, shall include all amounts payable by the Company to APS in accordance with Schedule 1, including any success fee or break fee, but excluding reimbursable expenses.

**Taxes.** APS's fees are exclusive of taxes or similar charges, which shall be the responsibility of the Company (other than taxes imposed on APS's income generally). If APS's fees are subject to any taxes, such as State sales tax, Goods and Services Tax/Harmonized Sales Tax or Value Added Tax, then APS will include such taxes on its invoices as separate line items.

## Section 3. Relationship of the Parties

The parties intend that an independent contractor relationship will be created by the Agreement. As an independent contractor, APS will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business. Employees of APS will not be entitled to receive from the Company any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. APS will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business.

APS is not an accounting firm and does not give accounting advice or guidance. While APS's work may involve analysis of accounting, business and other related records, this engagement does not constitute an audit in accordance with either generally accepted auditing standards or the standards of the Public Company Accounting Oversight Board or any other similar governing body.

APS is not authorized to practice law or provide legal advice. No services provided under this Agreement are intended to be, nor should be construed to be, legal services.

## Section 4. Confidentiality

Subject to Section 13 hereof, each party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party during the performance of APS's services hereunder (the "Confidential Information"), and neither party will disclose any Confidential Information to any other person or entity. "Confidential Information" includes the terms of this Agreement, non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, APS from making such disclosures of Confidential Information that APS reasonably believes are required by law or any regulatory requirement or authority to clear client conflicts. APS may also disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information as it relates to the services being provided under this Agreement, provided APS is responsible for any breach of these confidentiality obligations by any such parties. In addition, APS will have the right to disclose to any person that it provided services to the Company or its affiliates and a general description of such services, but shall not provide any other information about its involvement with the Company. The obligations of the parties under this Section 4 shall survive the end of any engagement between the parties for a period of three (3) years.

**AP Services, LLC**
General Terms and Conditions

Work Product (as defined in Section 5) may contain APS proprietary information or other information that is deemed to be Confidential Information for purposes of this Agreement, and the parties may not want to make public. Therefore, the parties acknowledge and agree that (i) all information (written or oral), including advice and Work Product (as defined in Section 5), generated by APS in connection with this engagement is intended solely for the benefit and use of the Company in connection with this Agreement, and (ii) no such information shall be used for any other purpose or disseminated to any third parties, or, quoted or referred to with or without attribution to APS at any time in any manner or for any purpose without APS's prior approval (not to be unreasonably withheld or delayed), except as required by law. The Company may not rely on any draft or interim Work Product.

### Section 5. Intellectual Property

All analyses, final reports, presentation materials, and other work product (other than any Engagement Tools, as defined below) that APS creates or develops specifically for the Company and delivers to the Company as part of this engagement (collectively known as "Work Product") shall be owned by the Company and shall constitute Company Confidential Information as defined above. APS may retain copies of the Work Product and any Confidential Information necessary to support the Work Product subject to its confidentiality obligations in this Agreement.

All methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, templates, models, utilities and other intellectual property that APS has created, acquired or developed or will create, acquire or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive property of APS. The Company shall not acquire any interest in the Engagement Tools other than a limited worldwide, perpetual, non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product.

The Company acknowledges and agrees, except as otherwise set forth in this Agreement, that any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

### Section 6. Framework of the Engagement

The Company acknowledges that it is retaining APS solely to assist and advise the Company as described in the Agreement. This engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement.

### Section 7. Indemnification and Other Matters

The Company shall indemnify, hold harmless and defend APS and its affiliates and its and their partners, directors, officers, employees and agents (collectively, the "APS Parties") from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with the engagement of APS that is the subject of the Agreement. The Company shall pay damages and expenses as incurred, including reasonable legal fees and disbursements of counsel.

In addition to the above indemnification, APS employees serving as directors or officers of the Company or affiliates will receive the benefit of the most favorable indemnification provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.

APS will notify the Company of receipt of actual notice of commencement of any actual or threatened action, claim, suit, investigation or proceeding (an "Action") against an APS Party with respect to which indemnity is sought hereunder if the Company is not a party to such Action, provided that the failure to so notify the Company will not relieve the Company from any liability that the Company may have on account of this indemnity or otherwise, except to the extent the Company shall not have otherwise learned of such Action and such failure results in the loss of material defenses. The Company shall have the right to assume the defense of any such Action, including the employment of counsel reasonably satisfactory to APS. APS shall have the right to employ separate counsel in any such Action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of APS, unless (i) the Company shall have failed promptly to assume the defense thereof and employ counsel as provided above or (ii) the named parties to any such Action (including impleaded parties) include an Indemnified Person and the Company, and APS shall have been advised by counsel that there may be one or more legal defenses available to such Indemnified Person that are different from or in addition to those available to the Company, provided that the Company shall not in any event be responsible hereunder for the fees and expenses of more than one firm of separate counsel in connection with any Action in the same jurisdiction, in addition to any local counsel.

The Company shall specifically include and cover APS employees and agents serving as directors or officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees ("D&O insurance"). Prior to APS accepting any officer position, the Company shall, at the request of APS, provide APS with a copy of its current D&O policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as APS may reasonably request evidencing the appointment and coverage of the indemnitees. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include APS employees

| **AP Services, LLC** |
| General Terms and Conditions |

and agents under the Company's policy or does not have first dollar coverage acceptable to APS in effect for at least $10 million (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), APS may, at its option, attempt to purchase a separate D&O insurance policy that will cover APS employees and agents only. The cost of the policy shall be invoiced to the Company as an out-of-pocket expense. If APS is unable or unwilling to purchase such D&O insurance, then APS reserves the right to terminate the Agreement.

The Company's indemnification obligations in this Section 7 shall be primary to, and without allocation against, any similar indemnification obligations that APS may offer to its personnel generally, and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by APS or otherwise). APS is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third party products or services are against the third-party vendor and not against APS is instrumental in procuring such third-party product or service.

### Section 8. Governing Law and Arbitration

The Agreement is governed by and shall be construed in accordance with the laws of the State of New York with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each party shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in New York, New York under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, either party may proceed directly to a court of competent jurisdiction to enforce the terms of this Agreement for any claim in connection with (i) the non-payment of Fees or expenses due under this Agreement, or (ii) the non-performance of obligations under Section 7.

In any court proceeding arising out of this Agreement, the parties hereby waive any right to trial by jury.

### Section 9. Termination and Survival

The Agreement may be terminated at any time upon 30 days' written notice by one party to the other; provided, however, that notwithstanding such termination APS will be entitled to any Fees and expenses due under the provisions of the Agreement (for fixed fee engagements, fees will be pro rata based on the amount of time completed). Such payment obligation shall inure to the benefit of any successor or assignee of APS.

Additionally, unless the Agreement is terminated by the Company due to APS's material breach (and such material breach continues after 30 days' written notice thereof and opportunity to cure) APS shall remain entitled to the success fee(s), if any, that otherwise would be payable during the 12 months after the date of termination of the Agreement.

Sections 2, 4, 5, 7, 8, 9, 10, 11, 12, 13 and 14 of these Terms, the provisions of Schedule 1 and the obligation to pay accrued fees and expenses shall survive the expiration or termination of the Agreement.

### Section 10. Non-Solicitation of Employees

The Company acknowledges and agrees that APS has made a significant monetary investment recruiting, hiring and training its personnel. During the term of this Agreement and for a period of two years after the final invoice is rendered by APS with respect to this engagement (the "Restrictive Period"), the Company and its affiliates agree not to directly or indirectly hire, contract with, or solicit the employment of any of APS's Managing Directors, Directors, or other employees/ contractors.

If during the Restrictive Period the Company or its affiliates directly or indirectly hires or contracts with any of APS's Managing Directors, Directors, or other employees/contractors in violation of the preceding paragraph, the Company agrees to pay to APS as liquidated damages and not as a penalty the sum total of: (i) for a Managing Director, $1,000,000; (ii) for a Director, $500,000; and (iii) for any other employee/contractor, $250,000. The Company acknowledges and agrees that liquidated damages in such amounts are (x) fair, reasonable and necessary under the circumstances to reimburse APS for the costs of recruiting, hiring and training its employees as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that APS has made in its Managing Directors, Directors, and other employees/ consultants; and (y) appropriate due to the difficulty of calculating the exact amount and value of that investment.

### Section 11. Limitation of Liability

THE APS PARTIES SHALL NOT BE LIABLE TO THE COMPANY, OR ANY PARTY ASSERTING CLAIMS ON BEHALF OF THE COMPANY, EXCEPT FOR DIRECT DAMAGES FOUND IN A FINAL DETERMINATION TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE, BAD FAITH, SELF-DEALING OR WILLFUL MISCONDUCT

ON THE PART OF ANY APS PARTY. THE APS PARTIES SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, LOST PROFITS, LOST DATA, REPUTATIONAL DAMAGES, PUNITIVE DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY CIRCUMSTANCES, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE APS PARTIES' AGGREGATE LIABILITY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, IS LIMITED TO THE AMOUNT OF FEES PAID TO APS FOR SERVICES UNDER THIS AGREEMENT (OR IF THE CLAIM ARISES FROM AN ADDENDUM TO THIS AGREEMENT, UNDER THE APPLICABLE ADDENDUM) (THE "LIABILITY CAP"). The Liability Cap is the total limit of the APS Parties' aggregate liability for any and all claims or demands by anyone pursuant to this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by APS pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the APS Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the APS Parties pursuant to this Agreement exceed the Liability Cap.

## Section 12. General

**Equitable Remedies.** Each party acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of the Agreement. Each party agrees that the non-breaching party shall have the right to seek a restraining order and/or an injunction for any breach of the Agreement. If any provision of the Agreement is found to be invalid or unenforceable, then it shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable.

**Severability.** If any portion of the Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent possible.

**Entire Agreement.** This Agreement, including the letter, the Terms and the schedule(s), contains the entire understanding of the parties relating to the services to be rendered by APS and supersedes any other communications, agreements, understandings, representations, or estimates among the parties (relating to the subject matter hereof) with respect to such services. The Agreement, including the letter, Terms and the schedule(s), may not be amended or modified in any respect except in a writing signed by the parties. APS is not responsible for performing any services not specifically described herein or in a subsequent writing signed by the parties.

**Related Matters.** If an APS Party is required by applicable law, legal process or government action to produce information or testimony as a witness with respect to this Agreement, the Company shall reimburse APS for any professional time and expenses (including reasonable and documented external and internal legal costs and e-discovery costs) incurred to respond to the request, except in cases where an APS Party is a party to the proceeding or the subject of the investigation.

**Joint and Several.** If more than one party signs this Agreement, the liability of each party shall be joint and several. In addition, in the event more than one entity is included in the definition of Company under this Agreement, the Company shall cause each other entity which is included in the definition of Company to be jointly and severally liable for the Company's liabilities and obligations set forth in this Agreement.

**Third-Party Beneficiaries.** The APS Parties shall be third-party beneficiaries with respect to Section 7 hereof.

**Notices.** All notices required or permitted to be delivered under the Agreement shall be sent, if to APS, to:

AlixPartners, LLP
2000 Town Center, Suite 2400
Southfield, MI 48075
Attention: General Counsel

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General Counsel, or to such other name or address as may be given in writing to APS. All notices under the Agreement shall be sufficient only if delivered by overnight mail. Any notice shall be deemed to be given only upon actual receipt.

## Section 13. Bankruptcy Related Matters

Notwithstanding any to the contrary in these Terms, in the event the Company files for protection under the U.S. Bankruptcy Code, the following provisions will prevail:

The Company shall promptly apply to the Bankruptcy Court for approval of the Company's retention of APS under the terms of the Agreement. The form of retention application and proposed order shall be reasonably acceptable to APS. APS shall have no obligation to provide any further services if the Company becomes a debtor under the U.S. Bankruptcy Code unless APS's retention under the terms of the Agreement is approved by a final order of the Bankruptcy Court reasonably acceptable to APS. The Company shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to APS's fee and expense matters.

The Company and APS agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement.

APS will have the right to obtain independent legal counsel to obtain advice with respect to its services under this engagement. The Company will reimburse

| AP Services, LLC |
| --- |
| General Terms and Conditions |

APS's for the reasonable fees and expenses of such independent legal counsel.

APS acknowledges that, during the pendency of any Bankruptcy Court approved retention, the indemnification provisions and Liability Cap set forth above may be subject to modification as stated within the Bankruptcy Court's retention order.

Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the date of filing, APS may have incurred but not billed fees and reimbursable expenses which relate to the prepetition period. APS will seek Bankruptcy Court approval to apply the retainer to these amounts.

If APS finds it desirable to augment its consulting staff with independent contractors (an "I/C") in this case, (i) APS will file, and require the I/C to file, 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in this case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that APS is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in this case during the time APS is involved in providing services to the Company. APS's standard practice is to charge for an I/C's services at the rate equal to the compensation provided by APS to such I/C.

**Section 14. Data Protection**

All capitalized terms used in this Section and not otherwise defined in this Agreement shall have the meanings given to them in the General Data Protection Regulation ((EU) 2016/679) (the "GDPR") and all applicable legislation implementing any provisions of the GDPR as may be enacted from time to time (together the "Data Protection Legislation").

The parties acknowledge and agree that, in performing services pursuant to this Agreement, APS may from time to time be required to Process certain Personal Data on behalf of the Company. In such cases: (1) the Company will ensure that it is lawfully permitted to transfer the Personal Data to APS for the purposes of APS performing services under this Agreement; and (2) APS shall (i) act as the Company's Processor for the purposes of the Data Protection Legislation; (ii) only Process such Personal Data in accordance with the Company's written instructions (including when making an international transfer of Personal Data) unless required to do so by law; (iii) implement appropriate technical and organisational measures to reasonably protect that Personal Data against unauthorized or unlawful Processing and accidental, unauthorized or unlawful loss, destruction, alteration, damage, disclosure or access; and (iv) obtain commitments from all APS's personnel who have access to and/or Process such Personal Data to keep such Personal Data confidential.

If APS is Processing Personal Data relating to

individuals located in the EU or otherwise subject to the Data Protection Legislation, (x) APS and the Company shall each comply with all relevant provisions of the Data Protection Legislation, and (y) the nature and extent of such Processing shall be set out in the GDPR Data Protection Schedule of this Agreement. APS shall, in relation to any Personal Data processed by APS in connection with this Agreement: (1) at the Company's cost, assist the Company in complying with its obligations as the Controller (or as Processor, as the case may be) of the Personal Data, to respond to requests from Data Subjects exercising their rights set out in Articles 12 to 22 of the GDPR; (2) notify the Company without undue delay on becoming aware of a Personal Data Breach; (3) upon termination or expiration of this Agreement, at the written direction of the Company either delete or return any Personal Data and any copies thereof to the Company (except to the extent APS is required by law to retain such Personal Data, and except for Personal Data located on APS's disaster recovery or backup systems where it will be destroyed upon the normal expiration of the backup files); and (4) maintain appropriate records to demonstrate compliance with this Section.

APS is part of an international business, headquartered in the United States of America ("US"). APS may in the ordinary course of its business, including the performance of the services under this Agreement, transfer Personal Data received outside the US to its US-based affiliates. APS's US-based affiliates are certified under the EU-US Privacy Shield framework and any transfer of Personal Data from outside the US to its US-based affiliates will be transferred subject to, and in accordance with, the Privacy Shield requirements. APS's entities located in the EU have also entered into standard data protection clauses (in accordance with Article 46.2 (c) of the GDPR) with their non-EU-based affiliates. The Company acknowledges and agrees that APS, as reasonably required for the performance of the services pursuant to this Agreement, be permitted to transfer Personal Data to its affiliates, subject to, and in accordance with, the Privacy Shield requirements and/or the aforementioned standard data protection clauses. Except as allowed above, APS shall not transfer any Personal Data received in the EU and subject to the Data Protection Legislation outside of the European Economic Area without the prior written consent of the Company.

The Company consents to APS appointing third party Processors of Personal Data under this Agreement. APS confirms that it will enter into a written agreement with any third-party Processor prior to supplying them with the Personal Data, incorporating terms which are substantially similar to those set forth in this Section. As between the Company and APS, APS shall remain fully liable for all acts or omissions of any third-party Processor appointed by APS pursuant to this paragraph.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FTD Companies, Inc., et al.,[1] | : | Case No. 19-_____ (___) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

## CONSOLIDATED LIST OF CREDITORS
## HOLDING 30 LARGEST UNSECURED CLAIMS

FTD Companies, Inc. ("FTD") and certain of its direct and indirect domestic subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), in the above captioned cases each filed a petition in this Court on the date hereof for relief under chapter 11 of title 11 of the United States Code. Contemporaneously with the filing of their petitions, the Debtors are hereby filing a consolidated list of the 30 largest unsecured creditors of the Debtors (the "Top 30 List") in lieu of a separate list for each Debtor, consistent with the relief requested in the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and File a Consolidated Creditor Matrix and (B) File a Consolidated List of Top 30 Unsecured Creditors, (II) Approving the Master Service List, (III) Approving the Form and Manner of Notice of the Commencement of the Debtors' Chapter 11 Cases, (IV) Waiving Requirements to File a List of Equity Security Holders and Provide Notice of Commencement to Equity Security Holders, and (V) Granting Related Relief,* filed contemporaneously herewith. The Top 30 List is based on the Debtors' books and records as of May 31, 2019 and was prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure for filing in the Debtors' chapter 11 cases. The Top 30 List does not include: (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101(31); or (2) secured creditors (including major secured creditors with unsecured deficiency claims). The information presented in the Top 30 List shall not constitute an admission by, nor is it binding on, the Debtors.

---

[1]    The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): FTD Companies, Inc. (5852); Bloom That, Inc. (9936); Florists' Transworld Delivery, Inc. (6960); FlowerFarm, Inc. (2852); FSC Denver LLC (7104); FSC Phoenix LLC (7970); FTD, Inc. (1271); FTD.CA, Inc. (7556); FTD.COM Inc. (4509); FTD Group, Inc. (9190); FTD Mobile, Inc. (7423); Giftco, LLC (5832); Provide Cards, Inc. (3462); Provide Commerce LLC (0019); and Provide Creations, Inc. (8964). The Debtors' noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

**Fill in this information to identify the case and this filing:**

Debtor Name  FTD Companies, Inc., et al.

United States Bankruptcy Court for the: District of Delaware

Case Number (*if known*): _____

☐ Check if this is an
amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases:
## List of Creditors Who Have the 30 Largest  Unsecured Claims and Are Not Insiders

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, AND EMAIL ADDRESS OF CREDITOR CONTACT | NATURE OF THE CLAIM (for example, trade debts, bank loans, professional services, and government contracts) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, OR DISPUTED | AMOUNT OF UNSECURED CLAIM If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in  total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | TOTAL CLAIM, IF PARTIALLY SECURED | DEDUCTION FOR VALUE OF COLLATERAL OR SETOFF | UNSECURED CLAIM |
| 1 | UPS Supply Chain Solutions, Inc. 28013 Network Place Chicago, IL 60673-1280 | Tel: (502) 485-2244 | Trade | | | | $23,221,882.79 |
| 2 | Alorica, Inc. 5 Park Plaza, Suite 1100 Irvine, CA 92614 | Tel: (305) 883-7781 Fax: (305) 883-9321 | Professional Services | | | | $5,151,623.12 |
| 3 | Sun Valley Floral Farms 3160 Upper Bay Road Arcata, CA 95521-9690 | Tel: (707) 826-8700 | Trade | | | | $3,155,966.23 |
| 4 | Veritiv Operating Company 3568 Solutions Center Chicago, IL 60677-3005 | Tel: (877) 298-1277 | Trade | | | | $2,911,515.35 |
| 5 | Ad Results Media, LLC 6110 Clarkson Lane Houston, TX 77055 | Tel: (713) 375-0056 Fax: (281) 596-4509 | Professional Services | | | | $2,883,417.40 |
| 6 | Elite Exports Inc. S.A. 3200 NW 67th Ave. Bldg. 2, Suite 290 Miami, FL 33122 | Tel: (800) 662-5351 Fax: (786) 269-2353 | Trade | | | | $1,903,249.45 |

| | Name of Creditor and Complete Mailing Address, Including Zip Code | Name, Telephone Number, and Email Address of Creditor Contact | Nature of the Claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if Claim is Contingent, Unliquidated, or Disputed | Amount of Unsecured Claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total Claim, if Partially Secured | Deduction for Value of Collateral or Setoff | Unsecured Claim |
| 7 | Google Affiliate Network Inc. 1600 Amphitheatre Parkway Mountain View, CA 94043 | Tel: (650) 253-8909 | Professional Services | | | | $1,792,759.33 |
| 8 | R&M Consulting Chicago LLC 205 N. Michigan Ave. Suite 2660 Chicago, IL 60601 | Tel: (312) 326-9200 Fax: (312) 926-9201 ltillman@rmc-chi.com | Professional Services | | | | $1,603,017.30 |
| 9 | Packaging Corp Of America 2155 42nd Street Northwest Winter Haven, FL 33881 | Tel: (863) 965-2500 Fax: (863) 965-1676 | Trade | | | | $1,502,821.57 |
| 10 | Atlas Flowers Inc. 2600 NW 79th Ave. Miami, FL 33122 | Tel: (305) 599-0193 Fax: (305) 477-0616 | Trade | | | | $1,299,515.09 |
| 11 | Holex Flower B.V. Postbus 1190 1430 BD Aalsmeer The Netherlands | Tel: +31 (0)297 381 050 Fax: +31 (0)297 381 070 info@holex.com | Trade | | | | $841,486.65 |
| 12 | Adobe System Inc. 345 Park Ave. San Jose, CA 95110 | Tel: (408) 536-5412 | Professional Services | | | | $704,829.70 |
| 13 | Coyote Logistics, LLC 960 North Point Parkway Alpharetta, GA 30005 | Tel: (773) 799-2312 ryan.mumford @coyote.com | Trade | | | | $659,605.58 |
| 14 | Syndicate Sales, Inc. 2025 North Wabash Kokomo, IN 46901 | Tel: (765) 457-7277 | Trade | | | | $648,139.93 |
| 15 | ADS Alliance Data Systems, Inc. 30699 Russell Ranch Road Suite #250 Westlake Village, CA 91362 | Toll Free Tel: (877) 361-3316 Tel: (818) 575-4500 Fax: (818) 575-4501 | Professional Services | | | | $626,753.95 |
| 16 | Randstad Horizons, L.P. 10940 Wilshire Blvd. #1910 Los Angeles, CA 90024 | Tel: (877) 273-8963 Fax: (865) 240-2933 | Professional Services | | | | $598,562.29 |

**List of Creditors Who Have the 30 Largest Unsecured Claims**

| | NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, AND EMAIL ADDRESS OF CREDITOR CONTACT | NATURE OF THE CLAIM (for example, trade debts, bank loans, professional services, and government contracts) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, OR DISPUTED | AMOUNT OF UNSECURED CLAIM If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | TOTAL CLAIM, IF PARTIALLY SECURED | DEDUCTION FOR VALUE OF COLLATERAL OR SETOFF | UNSECURED CLAIM |
| 17 | Rocky Mountain Chocolate Factory Inc. 265 Turner Drive Durango, CO 81303-7941 | Tel: (970) 247-4943 Fax: (970) 247-9593 | Trade | | | | $591,621.21 |
| 18 | Amerisource Funding, Inc. Assignee For Baronhr LLC 7225 Langtry Street Houston, TX 77040 | Tel: (619) 840-7971 Fax: (713) 462-8631 | Professional Services | | | | $578,882.08 |
| 19 | Farmstead Gourmet LLC 515 North Reading Road Ephrata, PA 17522 | Tel: (209) 365-2340 | Trade | | | | $544,400.99 |
| 20 | Guittard Chocolate Company 10 Guittard Road Burlingame, CA 94010 | Tel: (650) 697-4227 Fax: (650) 692-2761 | Trade | | | | $509,584.81 |
| 21 | Legacy Staffing Solutions 226 Westinghouse Blvd. Ste. 301 Charlotte, NC 28273 | Tel: (704) 919-0346 Fax: (980) 201-9533 evelin @legacystaffingnc.com | Professional Services | | | | $427,787.75 |
| 22 | Surestaff Inc. 7083 Solution Center Chicago, IL 60677-7000 | Tel: (847) 640-1300 Fax: (847) 640-0940 | Professional Services | | | | $404,567.96 |
| 23 | GKG Fulfillment LLC 111 Kerry Lane Wauconda, IL 60084 | Tel: (847) 201-4383 Fax: (847) 305-5889 | Trade | | | | $385,140.66 |
| 24 | Rainforest Farmlands Kenya Limited P.O. Box 2522 – 00606 Sarit Centre, Nairobi Kenya | Tel: +254724012159 info@fleurafrica.com | Trade | | | | $382,522.65 |
| 25 | Premier Packaging, LLC 3254 Reliable Parkway Chicago, IL 60686 | Tel: (800) 518-6305 Fax: (502) 935-8330 lhagan@prempack.com | Trade | | | | $375,700.46 |

NAI-1506909337v1

| | Name of Creditor AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | Name, telephone NUMBER, AND EMAIL ADDRESS OF CREDITOR CONTACT | Nature of THE CLAIM (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if CLAIM IS CONTINGENT, UNLIQUIDATED, OR DISPUTED | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total CLAIM, IF PARTIALLY SECURED | Deduction FOR VALUE OF COLLATERAL OR SETOFF | Unsecured CLAIM |
| 26 | Farm Direct Corporation 9500 S. Dadeland Blvd. Suite 508 Miami, FL 33156 | Tel: (305) 670-3211 kgauchier @equatoroses.com | Trade | | | | $333,211.09 |
| 27 | Stephen Gould Corporation 35 South Jefferson Road Whippany, NJ 07981 | Tel: (704) 587-6100 kgcamp @stephengould.com | Trade | | | | $314,690.00 |
| 28 | California Fruit Exchange, LLC 6011 East Pine Street Lodi, CA 95240 | Tel: (209) 365-2300 ar@agiftinside.com | Trade | | | | $305,581.42 |
| 29 | C.I. Flores Ipanema LTDA Carrera 13 No. 97-51 OFC.202 Bogota, Columbia | Tel: +57 1 635 1519 | Trade | | | | $302,826.90 |
| 30 | Commission Junction Inc. 530 East Montecito Street Suite 106 Santa Barbara, CA 93103 | Tel: (805) 730-8000 | Professional Services | | | | $300,018.61 |

NAI-1506909337v1

**Fill in this information to identify the case and this filing:**

Debtor Name ___FTD Companies, Inc.___

United States Bankruptcy Court for the: _____ District of ___Delaware___
(State)

Case number (*If known*): _____

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

■ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ Other document that requires a declaration_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___06/03/2019___          ✘ /s/ Scott D. Levin
MM / DD / YYYY                          Signature of individual signing on behalf of debtor

                                        Scott D. Levin
                                        Printed name

                                        President and CEO
                                        Position or relationship to debtor

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| FTD Companies, Inc.,[1] | : | Case No. 19-_____ (____) |
| a Delaware corporation, | : |  |
|  | : | (Joint Administration Requested) |
| Debtor. | : |  |
|  | : |  |

**STATEMENT OF CORPORATE OWNERSHIP**

Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(1) and 7007.1,

FTD Companies, Inc. ("FTD Companies") on behalf of itself and its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represents as follows:

1.    FTD Companies is the corporate parent of each of the other Debtors in these chapter 11 cases and directly or indirectly owns 100% interest in all of the Debtors.[2]

2.    FTD Companies' equity securities are publicly held.  Nantahala Capital Management, LLC owns 14.0%.  Travertine Creek, Inc. owns 12.0%. Diamond Investment Group, LLC owns 12.0%.  FTD 50 LLC owns 12.0%.  No other entity directly or indirectly owns 10% or more of the issued and outstanding common stock of FTD Companies.

---

[1]    The last four digits of the Debtor's taxpayer identification number are 5852.  The Debtor's noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

[2]    A corporate organization chart depicting the ownership structure of the Debtors is attached as Exhibit A to the Declaration of Scott D. Levin in Support of First Day Pleadings, which was filed contemporaneously herewith.

**Fill in this information to identify the case and this filing:**

Debtor Name ___FTD Companies, Inc._____

United States Bankruptcy Court for the: _____ District of ___Delaware___
                                                                          (State)

Case number (*If known*): _____

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors                          12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☑ Other document that requires a declaration ___Statement of Corporate Ownership and List of Equity Holders___

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___06/03/2019___          ✘ /s/ Scott D. Levin _____
                    MM / DD / YYYY               Signature of individual signing on behalf of debtor

                                               ___Scott D. Levin_____
                                               Printed name

                                               ___President and CEO_____
                                               Position or relationship to debtor