**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTD Companies, Inc., <u>et al.</u>,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 19-11240 (LSS)<br><br>(Jointly Administered)<br>**Re: D.I. 82** |

**DECLARATION OF STEVE BLOOM**
**IN SUPPORT OF THE BIDDING PROCEDURES MOTION**

I, Steve Bloom, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am an Executive Director at Moelis & Company LLC ("<u>Moelis</u>"), an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022. I am authorized to make this declaration (this "<u>Declaration</u>") on behalf of Moelis.

2. Moelis is the proposed investment banker and financial advisor for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>" and, together with their non-debtor affiliates, the "<u>Company</u>") with respect to the

---

[1] The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): FTD Companies, Inc. (5852); Bloom That, Inc. (9936); Florists' Transworld Delivery, Inc. (6960); FlowerFarm, Inc. (2852); FSC Denver LLC (7104); FSC Phoenix LLC (7970); FTD, Inc. (1271); FTD.CA, Inc. (7556); FTD.COM Inc. (4509); FTD Group, Inc. (9190); FTD Mobile, Inc. (7423); Giftco, LLC (5832); Provide Cards, Inc. (3462); Provide Commerce LLC (0019); and Provide Creations, Inc. (8964). The Debtors' noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

Debtors' FTD Sale Process (as defined below), and as set forth more fully in the Moelis Retention Application.[2]

3.  I submit this Declaration in support of the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice thereof and (F) Granting Related Relief; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 82] (the "Bidding Procedures Motion").[3] In particular, I submit this Declaration in support of my opinions that (a) the Debtors' proposed FTD Sale Process is appropriate under the circumstances and has enabled the Debtors to identify the most likely bidders for the FTD Assets and (b) the Bidding Procedures are appropriate under the circumstances.

4.  Except as otherwise indicated, all statements set forth in this Declaration are based on (a) my direct personal knowledge of the Debtors, (b) information learned from my review of relevant documents, (c) information provided to me by Moelis employees working with

---

[2] On June 6, 2019, the Debtors filed the *Debtors' Application for Entry of an Order (I) Authorizing the Employment and Retention of Moelis & Company LLC as Financial Advisor and Investment Banker to the Debtors Effective Nunc Pro Tunc to the Petition Date, (II) Waiving Certain Information Requirements Imposed by Local Rule 2016-2 and (III) Granting Related Relief* [Docket No. 80] (the "Moelis Retention Application"). The Moelis Retention Application is scheduled to be considered at a hearing before the Court on July 2, 2019.

[3] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms later in this Declaration or in the Bidding Procedures Motion, as applicable.

me on the transaction, (d) information provided to me by, or discussions with, the Debtors' management team or the Debtors' other advisors or (e) my opinion based upon my experience. If called to testify, I could and would competently testify to the facts and the opinions set forth herein.

## Qualifications

5. Moelis is an international investment banking and financial advisory firm, a registered broker-dealer with the United States Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority. Moelis has approximately 840 employees based in 15 offices located in North America, South America, Europe, the Middle East and Asia. Moelis provides a broad range of investment banking and financial advisory services to clients, including with respect to general corporate finance; mergers, acquisitions and divestitures; corporate restructurings; special committee assignments and capital raising.

6. Moelis and its professionals have extensive experience with advising distressed companies in connection with their in- and out-of-court reorganization efforts, including in connection with large, complex chapter 11 proceedings. Moelis has served as financial advisor and/or investment banker to debtors and other key constituents in numerous recent chapter 11 cases. See, e.g., In re Hexion Holdings LLC, Case No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); In re Aegean Marine Petroleum Network Inc., Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); In re Parker Drilling Company, Inc., Case No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); In re ATD Corporation, Case No. 18-12221 (KJC) (Bankr. D. Del. Nov. 5, 2018); In re Aralez Pharmaceuticals US Inc., No. 18-12425 (MG) (Bankr. S.D.N.Y. Nov. 1, 2018); In re iHeartMedia, Inc., No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); In re Global A&T Electronics Ltd., Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); In re Toys 'R Us, Inc., Case No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); In re TK Holdings, Inc.,

Case No. 17-11375 (Bankr. D. Del. Aug. 30, 2017); In re Basic Energy Services, Inc., Case No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); In re Allied Nevada Gold Corp., No. 15-10503 (MFW) (Bankr. D. Del. April 15, 2015); In re ITR Concession Co. LLC, No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); In re GSE Envt'l, Inc., No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); In re MACH Gen, LLC, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); In re Sorenson Commc'ns, Inc., Case No. 14-10454 (BLS) (Bankr. D. Del. Mar. 25, 2014); In re MPM Silicones, LLC, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014); In re Cengage Learning, Inc., Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. Sept. 13, 2013); In re OSH 1 Liquidating Corp. f/k/a Orchard Supply Hardware Stores Corp., Case No. 13-11565 (CSS) (Bankr. D. Del. July 15, 2013); In re Revel AC, Inc., Case No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 17, 2013); In re AMF Bowling Worldwide, Inc., Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 20, 2012); In re Residential Capital, LLC, No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 30, 2012); and In re AMR Corp., No. 11-15463 (SHL) (Bankr. S.D.N.Y. Mar. 7, 2012).

**The Debtors' Prepetition Marketing and Sale Process**

7.    In July 2018, the Debtors commenced an assessment of strategic alternatives in pursuit of a global resolution of the Company's challenges. These alternatives included, among others, a sale or merger of the entire Company, the sale or other disposition of certain business segments or assets, a corporate restructuring, refinancing debt and the pursuit of certain other initiatives. The Debtors engaged Moelis to serve as their investment banker in connection with their review of strategic alternatives, including to design and execute a marketing and sale process (the "FTD Sale Process") for, among other things, (a) a sale of the entire Company or, in the alternative, (b) one or more transactions involving the following Assets or businesses: (i) FTD.com, the business unit held by Debtor FTD.COM Inc.; (ii) the florist business segment

(together with FTD.com, the "FTD Assets") held by Debtor Florists' Transworld Delivery, Inc.; and (iii) the Company's Interflora business unit in the United Kingdom (the "Interflora Business").

8. Moelis worked closely with the Debtors' management team to develop a strategic marketing process for the FTD Sale Process. The initial marketing phase of the FTD Sale Process began with Moelis soliciting interest from 123 parties, including 29 potential strategic parties and 94 potential financial sponsors, in consummating a sale or merger involving the entire Company. These parties included seven potential international strategic parties and six potential international financial sponsors to determine their interest in an acquisition of the entire Company or, in the alternative, an acquisition of the Interflora Business.

9. Following this initial outreach, the Debtors executed confidentiality agreements with, and provided a confidential information presentation to, 54 parties that expressed interest in conducting due diligence on the Company's businesses. Moelis and the Debtors' management team also conducted a series of calls with potential bidders during which the management team discussed the Company's businesses, financial profile and strategic plan.

10. In November 2018, the Debtors received six non-binding indications of interest from parties interested in acquiring the entire Company. The Debtors then granted these parties access to additional diligence materials, including management presentations and access to a virtual data room containing confidential information about the Company. In late 2018, the Debtors also received two indications of interest from parties interested in acquiring the Interflora Business.

11. The momentum of the prepetition FTD Sale Process slowed significantly following the release of the Company's 2019 Valentine's Day results. For a second year in a row, the Company underperformed during the peak Valentine's Day season. After Valentine's Day

2019, the Debtors recalibrated the FTD Sale Process to focus more on marketing and consummating strategic sales of individual businesses while remaining willing to entertain offers for the entire Company.

12.    During the second phase of the prepetition FTD Sale Process, Moelis solicited interest from a targeted group of 37 potential buyers focused on the FTD Assets.[4] Moelis contacted parties that had communicated interest in consummating a transaction with the Company during the first phase of the FTD Sale Process, that had subsequently expressed interest in considering transactions involving the FTD Assets or that had expertise in executing complex "carve-out" or similar transactions.  Moelis also continued advancing discussions with parties interested in acquiring the Interflora Business.

13.    By the end of May 2019, the Debtors had received eight non-binding indications of interest from parties interested in acquiring the FTD Assets and, in addition, in some cases, non-FTD Assets.  On May 31, 2019, the Company closed a sale of the Interflora Business to a subsidiary of The Wonderful Company through the sale of the equity interests of the Debtors' non-debtor affiliate, FTD UK Holdings Limited, for a cash purchase price of approximately $60 million.

14.    Gateway Mercury Holdings, LLC ("Gateway") submitted a bid for the FTD Assets and the Restructured ProFlowers Business (as defined in the Bidding Procedures Motion), for a purchase price of approximately $95 million (subject to a working capital adjustment), as reflected in that certain *Amended and Restated Asset Purchase Agreement*, dated as of June 19, 2019, by and among Gateway, as purchaser, and FTD, Inc., Florists Transworld Delivery, Inc.,

---

[4]    In furtherance of the Debtors' focus on consummating sales of individual businesses, the Debtors engaged Piper Jaffray & Co. in April 2019 to direct a parallel sale process for certain of the Company's non-FTD Assets.

FTD.COM Inc., FTD.CA, Inc., Provide Commerce, LLC, FlowerFarm, Inc. and Bloom That, Inc., as sellers (as may be hereafter amended, supplemented or otherwise modified, the "Gateway Stalking Horse Agreement").[5] Executing the Gateway Stalking Horse Agreement was a critical step in support of the Debtors' ability to conduct a competitive postpetition FTD Sale Process that will allow the Debtors to maximize value for their estates and creditor recoveries.

### The Bidding Procedures

15. I believe the Bidding Procedures will provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers to purchase the Debtors' Assets in accordance with the timeline for these chapter 11 cases established by the Debtors' postpetition financing facility (the "DIP Facility"). In light of the time constraints imposed by the Milestones under the Debtors' DIP Facility and the substantial costs of administering the Debtors' chapter 11 cases, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to attract competitive and active bidding from parties that the Debtors have determined possess the financial capability to close on a Sale Transaction quickly and efficiently. I believe that the Bidding Procedures balance the need to provide adequate notice to parties in interest, including to sufficiently market the Debtors' Assets in the context of a postpetition FTD Sale Process, with the need to consummate one or more Sale Transactions to preserve any value of the Assets.

16. As described above, Moelis has marketed the Company's businesses to a range of potential strategic and financial buyers. These efforts began prior to the commencement of these

---

[5] The asset purchase agreement originally executed by the Debtors and Gateway on June 2, 2019 contained certain items that were subject to post-signing finalization. These items related primarily to the completion of the schedules to the agreement and Gateway's procurement of acquisition financing. As set forth in the Gateway Stalking Horse Agreement, the schedules have been completed and the financing contingencies no longer exist.

chapter 11 cases and have continued thereafter. In accordance with the Bidding Procedures, bidders will be provided with access to information about the Debtors' Assets that will aid parties in developing thoughtful and competitive bids. Given the extent of the prepetition marketing process, the ongoing work of interested parties and the availability of information, and based on my experience, I believe the Bidding Procedures provide sufficient time for prospective bidders to evaluate and submit competing bids and are consistent with market practice.

17. The Debtors' proposed auction process is another important feature of the Bidding Procedures. The flexibility to enter into one or more Stalking Horse Agreements with designated Stalking Horse Bidders, coupled with a structured process through which the Debtors may solicit, analyze and negotiate competitive offers, increases the likelihood that the Debtors will generate the best reasonably available value for their Assets.

18. The Debtors and their advisors constructed the Bidding Procedures to promote transparency and good faith throughout the FTD Sale Process.

19. In summary, I believe the Bidding Procedures are designed to promote a competitive and expedient FTD Sale Process, which is critical to preserving the going-concern value of the Debtors' Assets and maximizing recoveries for the Debtors' economic stakeholders.

Dated: June 24, 2019

                                                                        */s/ Steve Bloom*
                                                                       Steve Bloom
                                                                       Executive Director, Moelis & Company LLC