**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FTD Companies, Inc., <u>et al</u>.,[1] | : | Case No. 19-11240 (LSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | Proposed Hr'g Date:  July 2, 2019 at 2:00 p.m. (ET) |
| | : | Proposed Obj. Deadline:  June 28, 2019 at 12:00 p.m. (ET) |
| | : | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE DEBTORS TO PROVIDE BIDDING PROTECTIONS
IN ACCORDANCE WITH THE BIDDING PROCEDURES AND THE GATEWAY
STALKING HORSE AGREEMENT AND (II) GRANTING RELATED RELIEF**

FTD Companies, Inc. and its direct and indirect domestic subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), respectfully represent as follows:

**<u>Background</u>**

1. On June 3, 2019 (the "<u>Petition Date</u>"), each of the Debtors commenced a case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors' chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") are consolidated for procedural purposes only and administered jointly.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1]  The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  FTD Companies, Inc. (5852); Bloom That, Inc. (9936); Florists' Transworld Delivery, Inc. (6960); FlowerFarm, Inc. (2852); FSC Denver LLC (7104); FSC Phoenix LLC (7970); FTD, Inc. (1271); FTD.CA, Inc. (7556); FTD.COM Inc. (4509); FTD Group, Inc. (9190); FTD Mobile, Inc. (7423); Giftco, LLC (5832); Provide Cards, Inc. (3462); Provide Commerce, Inc. (0019); and Provide Creations, Inc. (8964).  The Debtors' noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

2. A comprehensive description of the Debtors' businesses and operations, capital structure and the events leading to the commencement of these Chapter 11 Cases can be found in the *Declaration of Scott D. Levin in Support of First-Day Pleadings* (the "First Day Declaration") [Docket No. 3], which was filed on the Petition Date and is incorporated herein by reference.

3. On June 6, 2019, the Debtors filed the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 82] (the "Bidding Procedures Motion"),[2] which is scheduled to be heard at a hearing before the Court on June 25, 2019. The facts and legal arguments set forth in the Bidding Procedures Motion are incorporated herein by reference.

**Jurisdiction and Venue**

4. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding

---

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Motion.

RLF1 21458513v.1

pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

5. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors hereby seek entry of an order (the "Stalking Horse Order"), substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors[3] to provide certain standard bidding protections (the "Bidding Protections") to Gateway Mercury Holdings, LLC ("Gateway") pursuant to the Bidding Procedures and the terms of that certain *Amended and Restated Asset Purchase Agreement*, dated as of June 19, 2019, by and among Gateway, as purchaser, and FTD, Inc., Florists Transworld Delivery, Inc., FTD.COM Inc., FTD.CA, Inc., Provide Commerce, LLC, FlowerFarm, Inc. and Bloom That, Inc., as sellers (as may be hereafter amended, supplemented or otherwise modified, the "Gateway Stalking Horse Agreement" and the sale transactions contemplated thereby, the "Gateway Sale"),[4] substantially in the form attached hereto as Exhibit B, which shall be subject to higher or better offers for the

---

[3] For ease, the Debtor sellers under the Gateway Stalking Horse Agreement (as hereinafter defined) generally are referred to herein as the "Debtors."

[4] As originally executed on June 2, 2019, the Gateway Stalking Horse Agreement contained certain items that were subject to post-signing finalization.  These items related primarily to the completion of the schedules to the Gateway Stalking Horse Agreement and Gateway's procurement of acquisition financing.  As set forth in the Gateway Stalking Horse Agreement (as amended on June 19, 2019), the schedules thereto have been completed, and the financing contingencies no longer exist.

Purchased Assets (as defined in the Gateway talking Horse Agreement) submitted in accordance with the Bidding Procedures; and (b) granting related relief.[5]

6. In support of this Motion, the Debtors submit (a) the *Declaration of Steve Bloom in Support of the Gateway Stalking Horse Motion* and (b) the *Declaration of Alan D. Holtz in Support of the (I) Gateway Stalking Horse Motion, (II) Farids Stalking Horse Motion and (III) PlanetArt Stalking Horse Motion*, each filed contemporaneously herewith.

**The Gateway Stalking Horse Agreement**

7. As set forth in the Bidding Procedures Motion, the consummation of Sale Transactions that will maximize the value of the Debtors' estates and creditor recoveries is the cornerstone of the Debtors' chapter 11 strategy. The Debtors are seeking to sell substantially all of their assets, which include, among other businesses and assets, (a) FTD.com, the business unit held by Debtor FTD.COM Inc.; (b) the florist business segment (the "Florist Segment") held by Debtor Florists' Transworld Delivery, Inc.; (c) the Restructured ProFlowers Business;[6] (d) the Overhead and Shared Services (as defined in the Gateway Stalking Horse Agreement), subject to the terms of the Gateway Stalking Horse Agreement and the transition services agreement described in section 8.10 thereof; and (e) all other assets to be acquired by Gateway under the terms of the Gateway Stalking Horse Agreement) (collectively, the assets in clauses (a) through (e), the "Purchased Assets").

---

[5] To the extent of any inconsistency between the terms of the Gateway Stalking Horse Agreement and the description of such contained in this Motion, the terms of the Gateway Stalking Horse Agreement shall control.

[6] As set forth in the First Day Declaration and the Bidding Procedures Motion, on May 30, 2019, the Debtors initiated a restructuring of their ProFlowers business to reduce costs, drive value for the ProFlowers® brand and to better support the Florist Segment operations. As part of this restructuring, (a) the ProFlowers floral order fulfillment and distribution segments were transitioned to the Florist Segment and certain third-party fulfillment partners and (b) the ProFlowers website was maintained to continue to receive, process and fulfill online orders (the as-restructured ProFlowers collectively is referred to as the "Restructured ProFlowers Business"). See First Day Decl. ¶¶ 58-60; Bidding Procedures Motion ¶ 12, n. 4.

8.      To that end, the Debtors have secured a "stalking horse bid" (the "Gateway Stalking Horse Bid") for the Purchased Assets, for an aggregate purchase price of approximately $95 million.  From an economic perspective (and taking into account the working capital adjustment contained in the Gateway Stalking Horse Agreement), the Debtors currently expect to realize approximately $86 million in gross proceeds upon the closing of the Gateway Sale (based on the Debtors' management team's forecast of working capital at closing).  The Gateway Stalking Horse Agreement is the product of the Debtors' and their advisors' extensive marketing efforts, which began well prior to the Petition Date and have been ongoing during the course of these Chapter 11 Cases.  By this Motion, the Debtors seek authority to provide Gateway with standard Bidding Protections in accordance with the terms of the Gateway Stalking Horse Agreement and the Bidding Procedures.  Specifically, the Gateway Stalking Horse Agreement provides for the payment of (a) an expense reimbursement, in an amount not to exceed $1.5 million, equal to the reasonable and documented costs and expenses incurred by Gateway in connection with the Gateway Stalking Horse Agreement and any proposed Gateway Sale (the "Expense Reimbursement Amount"), and (b) a "break-up" fee in an amount equal to $2.14 million (the "Break-Up Fee" and, together with the Expense Reimbursement Amount, the "Termination Payment"), in the event the Debtors consummate an Alternative Transaction (as defined in the Gateway Stalking Horse Agreement).  Together, the maximum Expense Reimbursement Amount and the Break-Up Fee would equate to roughly 4.23% of the estimated cash proceeds of the Gateway Sale.

9.      The Bidding Procedures also provide for certain other Bidding Protections for Gateway, in its capacity as a Stalking Horse Bidder.  For example, if the Gateway Stalking Horse Bid is selected as the Baseline Bid (or a Leading Bid) for the Purchased Assets at the

RLF1 21458513v.1

Auction, a topping bid must include a minimum purchase price in an amount equal to the sum of (a) the purchase price in the Gateway Stalking Horse Bid (taking into account any working capital adjustment under the Gateway Stalking Horse Agreement), (b) the Termination Payment and (c) the applicable Minimum Overbid amount, as determined by the Debtors in consultation with the Consultation Parties (such topping bid, a "Stalking Horse Overbid"). See Bidding Procedures, Section VII.B.3. Additionally, the Debtors only will consider a Partial Bid for a portion of the Purchased Assets if (x) the Debtors receive another Partial Bid for the remaining Purchased Assets that, when taken together, the Partial Bids constitute a higher or better bid than the Gateway Stalking Horse Bid, plus the Termination Payment; or (y) the Partial Bid proposes a purchase price for a portion of the Purchased Assets that, (i) when taken together with the liquidation value of the remaining Purchased Assets, exceeds the purchase price in the Gateway Stalking Horse Bid (taking into account any working capital adjustment under the Gateway Stalking Horse Agreement) plus the Termination Payment; and (ii) includes a cash component in an amount sufficient to pay the Termination Payment. See Bidding Procedures, Section VI.A.4.

10.  In accordance with Local Rule 6004-1(b)(iv), the below chart summarizes certain significant terms of the Gateway Stalking Horse Agreement:[7]

| MATERIAL TERMS OF THE GATEWAY STALKING HORSE AGREEMENT | |
|---|---|
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | If the Gateway Stalking Horse Agreement is terminated as provided therein, each Party will be relieved of its duties and obligations arising thereunder after the date of such termination and there will be no Liability |

---

[7] This summary is qualified in its entirety by the provisions of the Gateway Stalking Horse Agreement. To the extent that there is any inconsistency between the terms of the Gateway Stalking Horse Agreement and this summary, the terms of the Gateway Stalking Horse Agreement shall control. To the extent a particular type of provision identified in Local Rule 6004-1(b)(iv) is not herein summarized, the Gateway Stalking Horse Agreement does not contain a provision of such type or such provision is otherwise inapplicable to the relief requested herein. Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the Gateway Stalking Horse Agreement, as applicable.

RLF1 21458513v.1

| | |
|---|---|
| | or obligation of the Purchaser, any Seller or any of their respective Representatives; provided, that, (i) the foregoing is subject to any obligations of the Sellers to pay the Purchaser a Termination Payment in accordance with the terms of the Gateway Stalking Horse Agreement and (ii) nothing in the Gateway Stalking Horse Agreement shall be deemed to release any Party from Liability for any breach of the Gateway Stalking Horse Agreement prior to termination. See Gateway Stalking Horse Agreement, § 4.6(a).<br><br>Any claim or cause of action based upon, arising out of, or related to the Gateway Stalking Horse Agreement or any agreement, document, or instrument contemplated thereby may only be brought against Persons that are expressly named as Parties thereto, and only with respect to the specific obligations set forth therein.  Other than Parties, no other party will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under the Gateway Stalking Horse Agreement or the agreements, documents, or instruments contemplated thereby or for any Legal Proceedings based on, in respect of, or by reason of, the Transactions (including the breach, termination or failure to consummate such transactions).  No Person will be liable to any other Person for any remote, speculative, or punitive damages with respect to the Transactions. See id. at § 11.11. |
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | The Gateway Stalking Horse Agreement may be terminated by either Purchaser or the Company, if the Closing has not occurred by 5:00 p.m. (Central time) on August 26, 2019 (the "Termination Date"), which date may be extended in accordance with the terms of the Gateway Stalking Horse Agreement.  See Gateway Stalking Horse Agreement, § 4.4(a)(i).<br><br>The Gateway Stalking Horse Agreement may be terminated by Purchaser if (i) the Stalking Horse Order and the Bidding Procedures Order are not entered on or before July 8, 2019 or (ii) if the Approval Order is not entered on or before August 12, 2019. See id. at § 4.4(c)(ii). |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | Purchaser deposited $9,500,000 (the "Deposit Amount") into an escrow account, which will be held in the escrow account and will be either delivered to Purchaser or paid to the Company as follows: (i) if the Closing occurs, the Deposit Amount, less the Adjustment Escrow Amount, will be applied toward the Cash Amount payable by Purchaser; (ii) if the Gateway Stalking Horse Agreement is terminated by the Company pursuant to Section 4.4(d) thereof, then the Deposit Amount will promptly be released to the Company; or (iii) if the Gateway Stalking Horse Agreement is terminated for any reason other than by Sellers pursuant to Section 4.4(d), then the Deposit Amount will promptly be released to Purchaser.  See Gateway Stalking Horse Agreement, § 3.2. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | For a period of three years following the Closing Date, Purchaser will permit the Sellers reasonable access to Purchaser's and the Acquired Business' books and records to enable the Debtors to administer their Chapter 11 Cases.  See Gateway Stalking Horse Agreement, § 8.8(a). |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | The Debtors seek to sell their rights to all avoidance claims or causes of action against counterparties to Purchased Contracts arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state law (collectively, the "Avoidance Actions"), and all other claims or causes of action against Counterparties to Purchased Contracts under any other provision of the Bankruptcy Code or applicable Laws, including all actions relating to vendors and service providers used in the Acquired Business, except for claims related to Excluded Liabilities; provided, that, the Purchaser will not pursue, assert, sell, convey, assign or file any claim that |

| | |
|---|---|
| | relates to the Avoidance Actions. See Gateway Stalking Horse Agreement, § 2.1(b)(xx). |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | None of Purchaser, any Affiliates of Purchaser, or any assignee of Purchaser will assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for Liabilities of any Seller or any of their respective Affiliates, whether or not related to the Acquired Business or Purchased Assets and whether existing on the Closing Date or arising thereafter, including on the basis of any Law imposing successor or transferee liability or otherwise by operation of Law or by Contract, other than the Assumed Liabilities and the obligations of Purchaser under the Gateway Stalking Horse Agreement. See Gateway Stalking Horse Agreement, § 2.4. |
| **Sale Free and Clear**<br>Local Rule 6004-1(b)(iv)(M) | The Debtors seek to sell to Gateway the Purchased Assets free and clear of all Liens (other than Transferred Exceptions) and Excluded Liabilities, to the fullest extent permissible under law, including section 363(f) of the Bankruptcy Code. See Gateway Stalking Horse Agreement, §§ 2.1, 5.5. |
| **Relief from Bankruptcy Rule 6004(h) Stay**<br>Local Rule 6004-1(b)(iv)(O) | The obligations of Purchaser to consummate the Gateway Sale is subject to, on or prior to the Closing Date (as provided in the Gateway Stalking Horse Agreement), the fulfillment of, among other conditions, the following: entry of (i) the Stalking Horse Order, (ii) the Bidding Procedures Order and (iii) the Approval Order, and none of such orders shall be subject to a stay or have been vacated or revoked. See Gateway Stalking Horse Agreement, § 9.1(e).<br><br>The obligations of Seller to consummate the Gateway Sale is subject to, on or prior to the Closing Date (as provided in the Gateway Stalking Horse Agreement), the entry of the Approval Order, which shall not be subject to a stay or have been vacated or revoked. See id. at § 9.3(c). |

11. A proposed form of Sale Order was filed with and attached to the Bidding Procedures Motion as Exhibit B. Gateway and other bidders for the Debtors' assets will be required to submit to the Debtors a modified proposed Sale Order, revised to reflect the terms of their respective bids. In accordance with Local Rule 6004-1(b)(iv), the Bidding Procedures Motion summarizes the significant terms of the proposed Sale Order, which summary is incorporated herein by reference.

## Argument[8]

### A. The Proposed Bidding Protections Are Necessary, Reasonable and Appropriate

12.  Providing a stalking horse bidder with certain bidding protections in connection with a sale of significant assets under section 363 of the Bankruptcy Code has become standard practice in chapter 11 cases. In the Third Circuit, "break-up" fees and expense reimbursements are considered administrative expenses and must be necessary to preserve the value of a debtor's estate. See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999). In O'Brien, the Third Circuit provided two examples of a potential benefit accruing from the payment of a break-up fee. See id. at 537. First, a benefit to the estate may arise if, "assurance of a breakup fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. Second, bidding protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id. Termination and similar fees are effective mechanisms for protecting bidders in connection with an asset sale and can be "important tools to encourage bidding and to maximize the value of the debtor's assets." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Put differently, these bidding protections enable a debtor to assure a sale to a contractually-committed bidder at a price the debtor

---

[8] The legal arguments set forth in the Bidding Procedures Motion in paragraphs 36 through 43 (with respect to (i) the Debtors' sound business justification for the sale of their Assets, (ii) the sufficiency of the Sale Noticing and Objection Procedures and (iii) reasonableness and fairness of the price the Debtors will yield for their Assets) and in paragraphs 48 through 57 (with respect to the Debtors' justifications for (i) a sale of their Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code; and (ii) the assumption and assignment of Contracts in connection therewith) are incorporated herein by reference. See Bidding Procedures Motion ¶¶ 36-43, 48-57.

believes is fair and reasonable, while providing the debtor with the opportunity to generate even greater value through an auction process. See In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted) (internal quotation marks omitted).

13. The Termination Payment was a material inducement for Gateway to enter into the Gateway Stalking Horse Agreement. The Termination Payment promotes more competitive bidding for the Purchased Assets because it ensures that Gateway will hold open its offer as a minimum bid on which other bidders and the Debtors may rely. Executing the Gateway Stalking Horse Agreement has put the Debtors in a more advantageous position to solicit additional competitive bids for the Purchased Assets that may be materially higher or of otherwise better value to the Debtors' estates. The Gateway Stalking Horse Bid also increases the likelihood that the price at which the Purchased Assets are sold will reflect their true worth. In short, the Gateway Stalking Horse Bid will serve as a catalyst for other Qualified Bids.

14. Finally, the Debtors carefully negotiated the terms of Termination Payment to ensure that it would be commensurate with the value conferred on the Debtors' estates by the Gateway Stalking Horse Bid. The Debtors have determined, in their reasonable business judgment, and upon the advice and counsel of their advisors, that the Termination Payment would appropriately compensate Gateway for the risk is has assumed and the substantial value it has conferred on the Debtors' estates in the event the Debtors elect to pursue an Alternative Transaction (as defined in the Gateway Stalking Horse Agreement). Accordingly, the Termination Payment satisfies the standard articulated by the Third Circuit in O'Brien.

15. As noted above, the Bidding Procedures provide for additional Bidding Protections for Stalking Horse Bidders, including by establishing Stalking Horse Overbid requirements and certain Qualified Bid requirements specifically for Stalking Horse Assets. Bidding incentives such as these have become commonplace in connection with sales of significant assets under section 363 of the Bankruptcy Code. Courts regularly approve these types of incentives under the "business judgment standard," pursuant to which courts grant deference to the actions of a debtor's board of directors when such actions were taken in good faith and in the exercise of reasonable judgment. See Integrated Res., Inc., 147 B.R. at 656 (citing Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

16. The Debtors' decision to offer Gateway Bidding Protections is an exercise of the Debtors' sound business judgment. The Bidding Protections, both individually and collectively, were material inducements for Gateway's entry into the Gateway Stalking Horse Agreement. As such, the Bidding Protections are necessary for the Debtors to ensure a sale of the Purchased Assets to a contractually-committed buyer at a price the Debtors believe is fair, and to maintain the ability to pursue enhanced value for the Purchased Assets through the Debtors' Auction process.

**B. The Gateway Sale Would Be Consummated in Good Faith**

17. Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser. Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) embodies the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.), No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting Cumberland Farms Dairy, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbots Dairies of Penn., Inc.), 788 F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) … provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

18. While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Abbotts Dairies, 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F,2d 1195, 1198 (7th Cir. 1978)) (other citations omitted); see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997).

19. The Debtors and Gateway have entered into the Gateway Stalking Horse Agreement without collusion, in good faith and through extensive arms'-length negotiations. To that end, the Debtors and Gateway have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Gateway Stalking Horse Agreement and in the Debtors' Sale Process generally. To the best of the Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Gateway Stalking Horse Agreement to be set aside under section 363(n) or any other applicable provision of the Bankruptcy Code. As such, in the event Gateway is named the Successful Bidder for the Purchased

Assets, the Debtors request a finding that Gateway is a good-faith purchaser and is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code.

**Requests for Immediate Relief & Waiver of Stay**

20. Pursuant to Bankruptcy Rule 6004(h), the Debtors seek a waiver of any stay of the effectiveness of the Stalking Horse Order. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

21. As set forth above and in the Bidding Procedures Motion, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' assets for the benefit of the Debtors' economic stakeholders. Given the Debtors' precarious financial condition, their obligation to comply with the Milestones under the DIP Facility and the time-intensive nature of conducting a postpetition Sale Process from beginning to end, the relief requested herein should be granted and effective as soon as practicable. Any delay in the obtaining the relief requested herein could inhibit the Debtors' ability to maximize the value of the Purchased Assets and, ultimately, jeopardize the Debtors' chapter 11 strategy. Accordingly, the Debtors submit that ample cause exists to justify waiving the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that such stay applies to the relief requested herein.

**Consent to Jurisdiction**

22. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

**Notice**

23. Notice of this Motion shall be provided to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the official committee of unsecured creditors appointed in these Chapter 11 Cases; (c) counsel for Bank of America, N.A., in its capacity as administrative agent under the Credit Facility and the DIP Facility; (d) the Internal Revenue Service; (e) all persons and entities known by the Debtors to have expressed interest to the Debtors in a Sale Transaction involving any of the Debtors' assets during the past 12 months, including any party that has submitted bid for any of the Debtors' assets; (f) all persons and entities known by the Debtors to have asserted any lien on or encumbrance with respect to the Debtors' assets (for whom identifying information and addresses are available to the Debtors); (g) the United States Securities and Exchange Commission; (h) the United States Attorney's Office for the District of Delaware; and (i) any other party entitled to notice pursuant to Bankruptcy Rule 2002 or order of the Court. The Debtors respectfully submit that no further notice of this Motion need be provided.

**No Prior Request**

24. No prior request for the relief sought herein has been made to this Court or any other court in connection with these Chapter 11 Cases.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Stalking Horse Order, substantially in the form attached hereto as <u>Exhibit A</u>; and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

RLF1 21458513v.1

| | |
|---|---|
| Dated: June 24, 2019<br><br>Wilmington, Delaware | Respectfully submitted,<br><br>*/s/ Brett M. Haywood*<br>Daniel J. DeFranceschi (No. 2732)<br>Paul N. Heath (No. 3704)<br>Brett M. Haywood (No. 6166)<br>Megan E. Kenney (No. 6426)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square, 920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Email: defranceschi@rlf.com<br>    heath@rlf.com<br>    haywood@rlf.com<br>    kenney@rlf.com<br><br>-and-<br><br>Heather Lennox (*pro hac vice*)<br>Thomas A. Wilson (*pro hac vice*)<br>JONES DAY<br>901 Lakeside Avenue<br>Cleveland, Ohio 44114<br>Telephone: (216) 586-3939<br>Email: hlennox@jonesday.com<br>    tawilson@jonesday.com<br><br>Timothy W. Hoffmann (*pro hac vice*)<br>JONES DAY<br>77 West Wacker<br>Chicago, Illinois 60601<br>Telephone: (312) 782-3939<br>Email: thoffmann@jonesday.com<br><br>Danielle D. Donovan (*pro hac vice*)<br>JONES DAY<br>1420 Peachtree Street, N.E., Suite 800<br>Atlanta, Georgia 30309<br>Telephone: (404) 521-3939<br>Email: ddonovan@jonesday.com<br><br>PROPOSED ATTORNEYS FOR DEBTORS<br>AND DEBTORS IN POSSESSION |