**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FTD Companies, Inc., et al.,[1] | : | Case No. 19-11240 (LSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

**DECLARATION OF JEAN HOSTY IN SUPPORT OF THE FARIDS
STALKING HORSE MOTION AND PLANETART STALKING HORSE MOTION**

I, Jean Hosty, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am a Director at Piper Jaffray & Co. ("Piper Jaffray"), an investment banking firm that has its principal office at 800 Nicollet Mall, Suite 1800, Minneapolis, Minnesota 55402. I am authorized to make this declaration (this "Declaration") on behalf of Piper Jaffray.

2. Piper Jaffray is the proposed investment banker for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and, together with their non-debtor affiliates, the "Company") with respect to the Debtors Provide Sale Process (as defined below), and as set forth more fully in the Piper Jaffray Retention Application.[2]

---

[1] The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): FTD Companies, Inc. (5852); Bloom That, Inc. (9936); Florists' Transworld Delivery, Inc. (6960); FlowerFarm, Inc. (2852); FSC Denver LLC (7104); FSC Phoenix LLC (7970); FTD, Inc. (1271); FTD.CA, Inc. (7556); FTD.COM Inc. (4509); FTD Group, Inc. (9190); FTD Mobile, Inc. (7423); Giftco, LLC (5832); Provide Cards, Inc. (3462); Provide Commerce LLC (0019); and Provide Creations, Inc. (8964). The Debtors' noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

[2] On June 6, 2019, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing Them to (I) Employ and Retain Piper Jaffray & Co. as Investment Banker to the Debtors Effective* Nunc Pro Tunc *to the Petition Date, (II) Approving the Terms of the Engagement Letter, (III) Waiving Certain Time-Keeping Requirements and (IV) Granting Related Relief* [Docket No. 79] (the "Piper Jaffray Retention Application"). The Piper Jaffray Retention Application is scheduled to be considered at a hearing before the Court on July 2, 2019.

3.    I submit this Declaration in support of the (a) *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Provide Bidding Protections in Accordance with the Bidding Procedures and the Farids Stalking Horse Agreement and (II) Granting Related Relief* filed contemporaneously herewith (the "Farids Stalking Horse Motion") and (b) *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Provide Bidding Protections in Accordance with the Bidding Procedures and the PlanetArt Stalking Horse Agreement and (II) Granting Related Relief* filed contemporaneously herewith (the "PlanetArt Stalking Horse Motion" and, together with the Farids Stalking Horse Motion, the "Provide Stalking Horse Motions").[3]  In particular, I submit this Declaration in support of my opinions that: (x) the extensive Sale Process that the Debtors are undertaking is appropriate and has enabled the Debtors to identify the most likely bidders for the Purchased Assets (as defined in the Provide Stalking Horse Motions) and (y) the Bidding Protections are reasonable and appropriate.

4.    Except as otherwise indicated, all statements set forth in this Declaration are based on (a) my personal knowledge, (b) my review of relevant documents, (c) information provided to me by Piper Jaffray employees working under my supervision, (d) information provided to me by, or discussions with, the management team of the Debtors or their other advisors, or (e) my opinion based upon my experience.  If called to testify, I could and would testify to the facts and the opinions set forth herein.

---

[3]  Capitalized terms used but not otherwise defined herein have the meanings set forth in the Provide Stalking Horse Motions, the Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice thereof and (F) Granting Related Relief; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief [Docket No. 82], or the Piper Jaffray Retention Application, as applicable.

**Qualifications**

5.     Piper Jaffray is an international investment banking and financial advisory firm, with 54 offices worldwide and more than 1,000 employees.  Piper Jaffray provides corporate finance and investment banking services, as well as execution capabilities, in a variety of areas, including financial restructuring.  Piper Jaffray is one of the leading advisors and investment bankers to troubled companies, both inside and outside of bankruptcy, as well as to bondholders, banks, other secured and unsecured creditors, official creditor committees, acquirers, equity sponsors, and other parties in interest involved with financially challenged companies.  Piper Jaffray's Restructuring and Special Situations Group has professionals dedicated to providing restructuring and other financial advisory services.  The professionals of Piper Jaffray's Restructuring and Special Situations Group has advised on over 100 transactions, valued in excess of $200 billion.

6.     Piper Jaffray is recognized for its expertise in providing investment banking and financial advisory services in financially distressed situations and has served a number of reorganization, workout and bankruptcy clients in several industries across the United States. Piper Jaffray has extensive experience in structuring transactions and conducting merger-and-acquisition processes in distressed environments. Some in- and out-of-court transactions completed by Piper Jaffray or its current restructuring personnel over the past 15 years include Synergy Pharmaceuticals, Fairway Energy, Willowood USA, Egalet Corporation, RM OpCo (RealMex), rue21, Capital Brands Holdings, Aerogroup International, Portrait Innovations, Flanders Electric Motor Service, Bravo Brio Restaurant Group, Quintana Energy Services, Ignite Restaurant Group, Central Grocers, Pyote Water Systems, Sotera Wireless, Garden Fresh Restaurant Corporation, Rotary Drilling Tools, Malibu Lighting Corporation, Golden County

Foods, Mi Pueblo San Jose, C&K Markets, Solavei, Eurofresh, Neogenix Oncology, Barneys New York, Chef Solutions, Brooks Food Group, Loehmann's Inc., Accuride Corp., Claim Jumper, Sun World International, Custom Food Holdings, Hoop Retail, J.T. Packard, Brown & Cole Stores, Larry's Markets, Select Snacks, Chi-Chi's, Mercury Plastics, Enron Corp., W.R. Grace & Co., Levitz Furniture, Safety-Kleen, and Edwards Theatres, as well as several private transactions.

**The Debtors' Prepetition Marketing and Sale Process**

7.     As set forth in greater detail in the *Declaration of Steve Bloom in Support of the Bidding Procedures Motion* [Docket No. 180], it is my understanding that in July 2018, the Debtors commenced a comprehensive assessment of strategic alternatives in pursuit of a global resolution of the Company's challenges.  These alternatives included, among others, a sale or merger of the entire Company, the sale or other disposition of certain business segments or assets, a corporate restructuring, refinancing debt and the pursuit of certain other value-enhancing initiatives.  The Debtors engaged Moelis to serve as their investment banker in connection with their review of strategic alternatives, including to conduct an expansive two-part prepetition FTD Sale Process.  When the momentum of the prepetition FTD Sale Process stalled following the release of the Company's 2019 Valentine's Day results, the Debtors recalibrated the Sale Process to focus more on marketing and consummating strategic sales of individual businesses while remaining willing to entertain offers for the entire Company.  In furtherance of the Debtors' focus on consummating sales of individual businesses, the Debtors engaged Piper Jaffray in April 2019 to serve as their investment banker in connection with their review of strategic alternatives for the Non-Core Assets.

8.     In particular, Piper Jaffray has been engaged to design and execute a marketing and sale process (the "Provide Sale Process") for certain of the Company's non-core business units

4

(collectively, the "Provide Businesses"), including (a) the ProFlowers business (including ProPlants), which is operated by Provide Commerce; (b) the Gourmet Foods business (including Shari's Berries) ("Gourmet Foods"), which also is operated by Provide Commerce; and (c) Personal Creations (including Gifts.com) ("Personal Creations"), which is operated by Debtor Provide Creations, Inc.

9. Piper Jaffray worked closely with the Debtors' management team to develop a strategic marketing protocol for the Provide Sale Process. The initial marketing phase of the Provide Sale Process began with Piper Jaffray soliciting interest from 113 parties, including 11 potential strategic buyers and 102 potential financial buyers, in acquiring one or more of the Provide Businesses. Following this initial outreach, the Debtors executed confidentiality agreements with, and granted access to confidential Company information to, 31 parties that expressed interest in conducting due diligence on the Provide Businesses. Piper Jaffray and the Debtors' management team also conducted a series of calls with potential bidders during which the management team discussed the Company's businesses, financial profile and strategic plan. By early May 2019, the Debtors had received five indications of interest from parties interested in acquiring some or all of the Provide Businesses.

10. Beginning in mid-May 2019, Piper Jaffray focused its outreach and marketing efforts on potential buyers that would be willing and able to serve as a stalking horse bidder for an expeditious sale of all, or a subset of, the Provide Businesses. In late May 2019, the Debtors entered into non-binding letters of intent for the acquisition of (a) Personal Creations by PlanetArt LLC and (b) Gourmet Foods by Farids & Co. LLC ("Farids"), which is owned by the founder of Edible Arrangements, LLC (together, in clauses (a) and (b), the "Potential Provide Stalking Horse Bidders"). Following the Petition Date, Piper Jaffray and the Debtors continued to work to

5

advance negotiations with the Potential Provide Stalking Horse Bidders, with the goal of executing Stalking Horse Agreements for the sale of Gourmet Foods and Personal Creations.

11. These efforts were ultimately successful with respect to the sale of Gourmet Foods and Personal Creations and the Debtors entered into:

(a) that certain *Asset Purchase Agreement*, dated as of June 23, 2019, by and among Farids, as purchaser, and Provide Commerce LLC, as seller (the "Farids Stalking Horse Agreement" and the sale transactions contemplated thereby, the "Farids Sale"), substantially in the form attached to the Farids Stalking Horse Motion as Exhibit B, pursuant to which Farids seeks to purchase substantially all of the assets related to Gourmet Foods (as set forth in section 2.1 of the Farids Stalking Horse Agreement) for an aggregate purchase price of approximately $5 million (the "Farids Purchase Price");[4] and

(b) that certain *Asset Purchase Agreement*, dated as of June 23, 2019, by and among PlanetArt LLC, as purchaser ("PlanetArt"), and Provide Creations, Inc., Provide Commerce LLC, FTD, Inc., and Giftco, LLC., as sellers (the "PlanetArt Stalking Horse Agreement" and the sale transactions contemplated thereby, the "PlanetArt Sale"), substantially in the form attached to the PlanetArt Stalking Horse Motion as Exhibit B, pursuant to which PlanetArt seeks to purchase substantially all of the assets related to Personal Creations (as set forth in section 2.1 of the PlanetArt Stalking Horse Agreement) for an aggregate purchase price of approximately $18.1 million, as adjusted pursuant to section 3.4 of the PlanetArt Stalking Horse Agreement (the "PlanetArt Purchase Price").

As set forth in further detail below, executing the Farids Stalking Horse Agreement and the PlanetArt Stalking Horse Agreement was a critical step in support of the Debtors' ability to conduct a competitive postpetition Sale Process that will allow the Debtors to maximize value for their estates and creditor recoveries.

---

[4] In addition to the Purchase Price of $5 million, Farids has agreed to pay up to $1 million in adjusted EBITDA losses incurred in operating Gourmet Foods during the period between the Petition Date and the Closing Date (as defined in the Farids Stalking Horse Agreement) (the "EBITDA Loss Adjustment").

**The Bidding Protections**

12. The Provide Stalking Horse Agreements and the Bidding Procedures provide for certain standard bidding protections (the "Bidding Protections") that have become customary to offer "stalking horse" bidders in connection with the sale of significant assets in chapter 11. Specifically:

> (c) the Farids Stalking Horse Agreement provides for the payment of (i) an expense reimbursement, in an amount not to exceed $125,000, equal to Farid's reasonable and documented costs and expenses (including fees and expenses of counsel) incurred by Farids in connection with the Farids Stalking Horse Agreement and any proposed Farids Sale (the "Farids Expense Reimbursement") and (ii) a "break-up" fee in an amount equal to $137,500 (the "Farids Break-Up Fee" and, together with the Farids Expense Reimbursement, the "Farids Termination Payment"), in the event the Debtors consummate an Alternative Transaction (as defined in the Farids Stalking Horse Agreement); and
>
> (d) the PlanetArt Stalking Horse Agreements provides for (i) an expense reimbursement, in an amount not to exceed $181,000, equal to the reasonable and documented costs and expenses incurred by PlanetArt in connection with the PlanetArt Stalking Horse Agreement and any proposed PlanetArt Sale (the "Planet Art Expense Reimbursement") and (ii) a "break-up" fee in an amount equal to $543,000 (the "PlanetArt Break-Up Fee" and, together with the PlanetArt Expense Reimbursement, the "PlanetArt Termination Payment"), in the event the Debtors consummate an Alternative Transaction (as defined in the PlanetArt Stalking Horse Agreement).

The maximum Farids Termination Payment would equate to roughly 4.38% of the Farids Purchase Price (when taking into account the maximum EBITDA Loss Adjustment), and the maximum PlanetArt Termination Payment would equate to 4.00% of the PlanetArt Purchase Price.

13. The Bidding Procedures also provide for certain Bidding Protections for Stalking Horse Bidders. For example, if either the Farids Stalking Horse Bid or the PlanetArt Stalking Horse Bid is selected as the Baseline Bid (or a Leading Bid) for the Purchased Assets at the Auction, a topping bid must include a minimum purchase price in an amount equal to the sum of (a) the applicable Purchase Price, (b) the applicable Termination Payment and (c) the applicable

Minimum Overbid amount, as determined by the Debtors in consultation with the Consultation Parties.  Additionally, the Bidding Procedures provide that the Debtors only will consider a Partial Bid for a portion of the Purchased Assets if (x) the Debtors receive another Partial Bid for the remaining Purchased Assets that, when taken together, the Partial Bids constitute a higher or better bid than the applicable Stalking Horse Bid, plus the applicable Termination Payment; or (y) the Partial Bid proposes a purchase price for a portion of the Purchased Assets that, (i) when taken together with the liquidation value of the remaining Purchased Assets, exceeds the Purchase Price in the Farids Stalking Horse Bid or the PlanetArt Stalking Horse Bid, as applicable, plus the applicable Termination Payment; and (ii) includes a cash component in an amount sufficient to pay the applicable Termination Payment.

14.     Based on my conversations with Farids, PlanetArt and their respective advisors, I do not believe that Farids or PlanetArt would have agreed to serve as a Stalking Horse Bidder for the Purchased Assets without the Bidding Protections, including assurance that the applicable Termination Payment would be paid under the conditions set forth in their respective Stalking Horse Agreements.  The Debtors, with the assistance of Piper Jaffray and their other advisors, negotiated the terms of the Termination Payments to promote more competitive bidding for the Purchased Assets.  I believe the Termination Payments serve this important objective because they induce Farids and/or PlanetArt to hold open their respective offers for the Purchased Assets as a minimum bid on which other bidders and the Debtors may rely.  Commencing any auction with the Farids Stalking Horse Bid and/or the PlanetArt Stalking Horse Bid in hand better positions the Debtors to solicit competing bids of materially higher or of otherwise better value and, ultimately, to maximize value for the Debtors' estates and stakeholders.  Further, I believe the

Farids Stalking Horse Bid and the PlanetArt Stalking Horse Bid will provide assurance that the price at which the applicable Purchased Assets are sold will reflect their fair market value.

15. I understand that the Debtors do not intend to terminate the Farids Stalking Horse Agreement or the PlanetArt Stalking Horse Agreement unless they receive a Qualified Bid at the Auction for an Alternative Transaction that generates higher or better value for the applicable Purchased Assets and that also includes sufficient consideration to cover the cost of the applicable Termination Payment. As such, I believe that the Bidding Protections will enhance—not diminish—the value of the Debtors' estates.

16. Based on my experience marketing the Purchased Assets, assisting the Debtors with negotiating the terms of the Farids Stalking Horse Agreement and the PlanetArt Stalking Horse Agreement and advising parties in connection with comparable chapter 11 sale processes, I believe that the Debtors' decision to provide Farids and PlanetArt with Bidding Protections, including the respective Termination Payments, in accordance with the terms of the Bidding Procedures and the relevant Stalking Horse Agreement is (a) commensurate with the real and substantial benefits conferred upon the Debtors' estates by the Farids Stalking Horse Bid and the PlanetArt Stalking Horse Bid, as applicable; and (b) fair, reasonable and appropriate in light of the size and nature of the proposed Farids Sale and the PlanetArt Sale, as applicable, and the efforts that have been and likely will be expended by Farids and PlanetArt, respectively, in connection with the Debtors' Sale Process.

17. Finally, I believe that the Debtors, Farids, PlanetArt and each of their respective advisors (as applicable) negotiated the terms of the Farids Stalking Horse Agreement and the PlanetArt Stalking Horse Agreement, respectively and the Bidding Protections without collusion, in good faith and from arms'-length bargaining positions at all times.

Dated: June 25, 2019

      /s/  Jean Hosty
Jean Hosty
Piper Jaffray & Co.