**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTD Companies, Inc., <u>et al.</u>,[1]<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 19-11240 (LSS)<br><br>(Jointly Administered) |

**DECLARATION OF STEVE BLOOM IN SUPPORT OF
<u>THE GATEWAY STALKING HORSE MOTION</u>**

　　　　　I, Steve Bloom, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

　　　　　1.　　I am an Executive Director at Moelis & Company LLC ("<u>Moelis</u>"), an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022. I am authorized to make this declaration (this "<u>Declaration</u>") on behalf of Moelis.

　　　　　2.　　Moelis is the proposed investment banker and financial advisor for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>" and, together with their non-debtor affiliates, the "<u>Company</u>") with respect to the

---

[1]　　The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): FTD Companies, Inc. (5852); Bloom That, Inc. (9936); Florists' Transworld Delivery, Inc. (6960); FlowerFarm, Inc. (2852); FSC Denver LLC (7104); FSC Phoenix LLC (7970); FTD, Inc. (1271); FTD.CA, Inc. (7556); FTD.COM Inc. (4509); FTD Group, Inc. (9190); FTD Mobile, Inc. (7423); Giftco, LLC (5832); Provide Cards, Inc. (3462); Provide Commerce LLC (0019); and Provide Creations, Inc. (8964). The Debtors' noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

**DError! Bookmark not defined.**

Debtors' FTD Sale Process (as defined below), and as set forth more fully in the Moelis Retention Application.[2]

3.   I submit this Declaration in support of the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Provide Bidding Protections in Accordance with the Bidding Procedures and the Gateway Stalking Horse Agreement and (II) Granting Related Relief* [Docket No. 185] (the "Gateway Stalking Horse Motion")[3] filed contemporaneously herewith.  In particular, I submit this Declaration in support of (a) the Debtors' decision to enter into that certain *Amended and Restated Asset Purchase Agreement*, dated as of June 19, 2019, by and among Gateway Mercury Holdings, LLC ("Gateway"), as purchaser, and FTD, Inc., Florists Transworld Delivery, Inc., FTD.COM Inc., FTD.CA, Inc., Provide Commerce, LLC, FlowerFarm, Inc. and Bloom That, Inc., as sellers (as may be hereafter amended, supplemented or otherwise modified, the "Gateway Stalking Horse Agreement" and, the sale transactions contemplated thereby, the "Gateway Sale"), substantially in the form attached to the Gateway Stalking Horse Motion as Exhibit B, and to provide Gateway with certain Bidding Protections in accordance with the terms of the Gateway Stalking Horse Agreement and the Bidding Procedures; and (b) my opinions that (i) the Bidding Protections are appropriate and (ii) the Sale Process that the Debtors are undertaking is appropriate under the circumstances and has enabled the Debtors to identify the

---

[2]   On June 6, 2019, the Debtors filed the *Debtors' Application for Entry of an Order (I) Authorizing the Employment and Retention of Moelis & Company LLC as Financial Advisor and Investment Banker to the Debtors Effective Nunc Pro Tunc to the Petition Date, (II) Waiving Certain Information Requirements Imposed by Local Rule 2016-2 and (III) Granting Related Relief* [Docket No. 80] (the "Moelis Retention Application").  The Moelis Retention Application is scheduled to be considered at a hearing before the Court on July 2, 2019.

[3]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Gateway Stalking Horse Motion or the Bidding Procedures Motion [Docket No. 82], as applicable.

most likely bidders for the Purchased Assets (as defined in the Gateway Stalking Horse Agreement).

4.  Except as otherwise indicated, all statements set forth in this Declaration are based on (a) my direct personal knowledge of the Debtors, (b) information learned from my review of relevant documents, (c) information provided to me by Moelis employees working with me in connection with the Debtors' Sale Process, (d) information provided to me by, or discussions with, the Debtors' management team or the Debtors' other advisors or (e) my opinion based upon my experience. If called to testify, I could and would competently testify to the facts and the opinions set forth herein.

**Qualifications**

5.  Moelis is an international investment banking and financial advisory firm, a registered broker-dealer with the United States Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority. Moelis has approximately 840 employees based in 15 offices located in North America, South America, Europe, the Middle East and Asia. Moelis provides a broad range of investment banking and financial advisory services to clients, including with respect to general corporate finance; mergers, acquisitions and divestitures; corporate restructurings; special committee assignments and capital raising.

6.  Moelis and its professionals have extensive experience with advising distressed companies in connection with their in- and out-of-court reorganization efforts, including in connection with large, complex chapter 11 proceedings. Moelis has served as financial advisor and/or investment banker to debtors and other key constituents in numerous recent chapter 11 cases. See, e.g., In re Hexion Holdings LLC, Case No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); In re Aegean Marine Petroleum Network Inc., Case No. 18-13374 (MEW) (Bankr.

S.D.N.Y. Feb. 20, 2019); In re Parker Drilling Company, Inc., Case No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); In re ATD Corporation, Case No. 18-12221 (KJC) (Bankr. D. Del. Nov. 5, 2018); In re Aralez Pharmaceuticals US Inc., No. 18-12425 (MG) (Bankr. S.D.N.Y. Nov. 1, 2018); In re iHeartMedia, Inc., No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); In re Global A&T Electronics Ltd., Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); In re Toys 'R Us, Inc., Case No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); In re TK Holdings, Inc., Case No. 17-11375 (Bankr. D. Del. Aug. 30, 2017); In re Basic Energy Services, Inc., Case No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); In re Allied Nevada Gold Corp., No. 15-10503 (MFW) (Bankr. D. Del. April 15, 2015); In re ITR Concession Co. LLC, No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); In re GSE Envt'l, Inc., No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); In re MACH Gen, LLC, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); In re Sorenson Commc'ns, Inc., Case No. 14-10454 (BLS) (Bankr. D. Del. Mar. 25, 2014); In re MPM Silicones, LLC, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014); In re Cengage Learning, Inc., Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. Sept. 13, 2013); In re OSH 1 Liquidating Corp. f/k/a Orchard Supply Hardware Stores Corp., Case No. 13-11565 (CSS) (Bankr. D. Del. July 15, 2013); In re Revel AC, Inc., Case No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 17, 2013); In re AMF Bowling Worldwide, Inc., Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 20, 2012); In re Residential Capital, LLC, No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 30, 2012); and In re AMR Corp., No. 11-15463 (SHL) (Bankr. S.D.N.Y. Mar. 7, 2012).

**The Debtors' Prepetition Marketing and Sale Process**

7. In July 2018, the Debtors commenced an assessment of strategic alternatives in pursuit of a global resolution of the Company's challenges. These alternatives included, among others, a sale or merger of the entire Company, the sale or other disposition of

certain business segments or Assets, a corporate restructuring, refinancing debt and the pursuit of certain other initiatives. The Debtors engaged Moelis to serve as their investment banker in connection with their review of strategic alternatives, including to design and execute a marketing and sale process (the "FTD Sale Process") for, among other things, (a) a sale of the entire Company or, in the alternative, (b) one or more transactions involving the following Assets or businesses: (i) FTD.com, the business unit held by Debtor FTD.COM Inc.; (ii) the florist business segment (together with FTD.com, the "FTD Assets") held by Debtor Florists' Transworld Delivery, Inc.; and (iii) the Company's Interflora business unit in the United Kingdom (the "Interflora Business").

8.  Moelis worked closely with the Debtors' management team to develop a strategic marketing process for the FTD Sale Process. The initial marketing phase of the FTD Sale Process began with Moelis soliciting interest from 123 parties, including 29 potential strategic parties and 94 potential financial sponsors, in consummating a sale or merger involving the entire Company. These parties included seven potential international strategic parties and six potential international financial sponsors to determine their interest in an acquisition of the entire Company or, in the alternative, an acquisition of the Interflora Business.

9.  Following this initial outreach, the Debtors executed confidentiality agreements with, and provided a confidential information presentation to, 54 parties that expressed interest in conducting due diligence on the Company's businesses. Moelis and the Debtors' management team also conducted a series of calls with potential bidders during which the management team discussed the Company's businesses, financial profile and strategic plan.

10. In November 2018, the Debtors received six non-binding indications of interest from parties interested in acquiring the entire Company. The Debtors then granted these parties access to additional diligence materials, including management presentations and access to

a virtual data room containing confidential information about the Company.  In late 2018, the Debtors also received two indications of interest from parties interested in acquiring the Interflora Business.

11. The momentum of the prepetition FTD Sale Process slowed significantly following the release of the Company's 2019 Valentine's Day results.  For a second year in a row, the Company underperformed during the peak Valentine's Day season.  After Valentine's Day 2019, the Debtors recalibrated the FTD Sale Process to focus more on marketing and consummating strategic sales of individual businesses while remaining willing to entertain offers for the entire Company.

12. During the second phase of the prepetition FTD Sale Process, Moelis solicited interest from a targeted group of 37 potential buyers focused on the FTD Assets.[4]  Moelis contacted parties that had communicated interest in consummating a transaction with the Company during the first phase of the FTD Sale Process, that had subsequently expressed interest in considering transactions involving the FTD Assets or that had expertise in executing complex "carve-out" or similar transactions.  Moelis also continued advancing discussions with parties interested in acquiring the Interflora Business.

13. By the end of May 2019, the Debtors had received eight non-binding indications of interest from parties interested in acquiring the FTD Assets and, in some cases, certain non-FTD Assets.  On May 31, 2019, the Company closed a sale of the Interflora Business to a subsidiary of The Wonderful Company through the sale of the equity interests of the Debtors'

---

[4] In furtherance of the Debtors' focus on consummating sales of individual businesses, the Debtors engaged Piper Jaffray & Co. in April 2019 to direct a parallel sale process for certain of the Company's non-FTD Assets.

non-debtor affiliate, FTD UK Holdings Limited, for a cash purchase price of approximately $60 million.

14. Gateway has submitted a bid for the FTD Assets and the Restructured ProFlowers Business (as defined in the Bidding Procedures Motion) (the "<u>Gateway Stalking Horse Bid</u>"), for a purchase price of approximately $95 million, as reflected in the Gateway Stalking Horse Agreement.[5] From an economic perspective (and taking into account the working capital adjustment contained in the Gateway Stalking Horse Agreement), the Debtors currently expect to realize approximately $86 million in gross proceeds upon the closing of the Gateway Sale (based on the Debtors' management team's forecast of working capital at closing).

15. The asset purchase agreement originally executed by the Debtors and Gateway on June 2, 2019, contained certain items that were subject to post-signing finalization. These items related primarily to the completion of the schedules to the agreement and Gateway's procurement of acquisition financing. As set forth in the Gateway Stalking Horse Agreement, the schedules have been completed and the financing contingencies no longer exist. With the schedules having been completed, the net working capital adjustment having been defined, and the financing contingencies having been eliminated, the Debtors now seek Court authority to provide Gateway with Bidding Protections in accordance with the terms of the Gateway Stalking Horse Agreement and the Bidding Procedures.

16. As set forth in further detail below, executing the Gateway Stalking Horse Agreement was a critical step in support of the Debtors' ability to conduct a competitive postpetition Sale Process designed to obtain the best available value for their Assets.

---

[5] For ease, the Debtor sellers under the Gateway Stalking Horse Agreement generally are referred to herein as the "Debtors."

**The Bidding Protections**

17.     The Gateway Stalking Horse Agreement and the Bidding Procedures provide for certain standard bidding protections (the "Bidding Protections") that have become customary to offer "stalking horse" bidders in connection with the sale of significant assets in chapter 11.

18.     Specifically, the Gateway Stalking Horse Agreement provides for the payment of (a) an expense reimbursement, in an amount not to exceed $1.5 million, equal to the reasonable and documented costs and expenses incurred by Gateway in connection with the Gateway Stalking Horse Agreement and any proposed Gateway Sale (the "Expense Reimbursement"), and (b) a "break-up" fee in an amount equal to $2.14 million (the "Break-Up Fee" and, together with the Expense Reimbursement, the "Termination Payment"), in the event the Debtors consummate an Alternative Transaction (as defined in the Gateway Stalking Horse Agreement).  Together, the maximum Expense Reimbursement and the Break-Up Fee would equate to roughly 4.2% of the estimated gross proceeds of the Gateway Sale.

19.     The Bidding Procedures also provide for certain Bidding Protections for Stalking Horse Bidders.  For example, if the Gateway Stalking Horse Bid is selected as the Baseline Bid (or a Leading Bid) for the Purchased Assets at the Auction, a topping bid must include a minimum purchase price in an amount equal to the sum of (a) the purchase price (taking into account any working capital adjustment under the Gateway Stalking Horse Agreement), (b) the Termination Payment and (c) the applicable Minimum Overbid amount, as determined by the Debtors in consultation with the Consultation Parties.  Additionally, the Bidding Procedures provide that the Debtors only will consider a Partial Bid for a portion of the Purchased Assets if (x) the Debtors receive another Partial Bid for the remaining Purchased Assets that, when taken

together, the Partial Bids constitute a higher or better bid than the Gateway Stalking Horse Bid (taking into account any working capital adjustment under the Gateway Stalking Horse Agreement), plus the Termination Payment; or (y) the Partial Bid proposes a purchase price for a portion of the Purchased Assets that, (i) when taken together with the liquidation value of the remaining Purchased Assets, exceeds the purchase price in the Gateway Stalking Horse Bid (taking into account any working capital adjustment under the Gateway Stalking Horse Agreement) plus the Termination Payment; and (ii) includes a cash component in an amount sufficient to pay the Termination Payment.

20. Based on my conversations with Gateway and its advisors, I do not believe that Gateway would have agreed to serve as a Stalking Horse Bidder for the Purchased Assets without the Bidding Protections, including assurance that the Termination Payment would be paid under the conditions set forth in the Gateway Stalking Horse Agreement. The Debtors, with the assistance of their advisors, negotiated the terms of the Termination Payment to promote more competitive bidding for the Purchased Assets. I believe the Termination Payment serves this important objective because it induces Gateway to hold open its offer for the Purchased Assets as a minimum bid on which other bidders and the Debtors may rely. Commencing any auction with the Gateway Stalking Horse Bid in hand better positions the Debtors to solicit competing bids of materially higher or of otherwise better value.

21. I understand that the Debtors do not intend to terminate the Gateway Stalking Horse Agreement unless they receive a Qualified Bid at the Auction for an Alternative Transaction that generates higher or better value for the Purchased Assets that also includes sufficient consideration to cover the cost of the Termination Payment.

RLF1 21461267v.1

22. Based on my experience marketing the Purchased Assets and assisting the Debtors with negotiating the financial terms of the Gateway Stalking Horse Agreement, I believe that the Debtors' decision to provide Gateway with Bidding Protections, including the Termination Payment, in accordance with the terms of the Bidding Procedures and the Gateway Stalking Horse Agreement is fair, reasonable and appropriate in light of the size and nature of the proposed Gateway Sale and the efforts that have been and likely will be expended by Gateway in connection with the Debtors' Sale Process.

23. Finally, I believe that the Debtors, Gateway and each of their respective advisors (as applicable) negotiated the terms of the Gateway Stalking Horse Agreement and the Bidding Protections without collusion, in good faith and from arms'-length bargaining positions.

Dated: June 25, 2019

                                                                /s/  Steve Bloom
                                                                 Steve Bloom
                                                                 Executive Director, Moelis & Company LLC