# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> FTD Companies, Inc., et al.,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 19-11240 (LSS) <br><br> (Jointly Administered) |

## DECLARATION OF STEVE BLOOM IN SUPPORT OF THE SALE OF THE FTD ASSETS AND RESTRUCTURED PROFLOWERS BUSINESS TO GATEWAY MERCURY HOLDINGS, LLC

I, Steve Bloom, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1.  I am an Executive Director at Moelis & Company LLC ("Moelis"), an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022. I am authorized to make this declaration (this "Declaration") on behalf of Moelis.

2.  Moelis is the investment banker and financial advisor for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") with respect to the Debtors' FTD Sale Process (as defined in the Motion (as defined below)), and as set forth more fully in the Moelis Retention Application.[2]

---

[1] The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): FTD Companies, Inc. (5852); Bloom That, Inc. (9936); Florists' Transworld Delivery, Inc. (6960); FlowerFarm, Inc. (2852); FSC Denver LLC (7104); FSC Phoenix LLC (7970); FTD, Inc. (1271); FTD.CA, Inc. (7556); FTD.COM Inc. (4509); FTD Group, Inc. (9190); FTD Mobile, Inc. (7423); Giftco, LLC (5832); Provide Cards, Inc. (3462); Provide Commerce LLC (0019); and Provide Creations, Inc. (8964). The Debtors' noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

[2] On July 2, 2019, the Court entered an order [Docket No. 292] granting the *Debtors' Application for Entry of*

RLF1 21830890v.1

3. I submit this Declaration in support of the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice thereof and (F) Granting Related Relief; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 82] (the "Motion").³

4. In particular, I submit this Declaration in support of (a) the Debtors' decision to transfer the FTD Assets and the Restructured ProFlowers Business (collectively, the "Purchased Assets") pursuant to that certain *Second Amended and Restated Asset Purchase Agreement*, dated as of July 31, 2019, by and among Gateway Mercury Holdings, LLC ("Gateway"), as purchaser, and FTD, Inc., Florists' Transworld Delivery, Inc., FTD.COM Inc., FTD.CA, Inc., Provide Commerce, LLC, FlowerFarm, Inc. and Bloom That, Inc., as sellers (the "Gateway Purchase Agreement" and, the sale transactions contemplated thereby, the "Gateway Sale"), substantially in the form attached as Exhibit A to the *Notice of Auction Results in Connection with the Sale of the FTD Assets and the Restructured ProFlowers Business* [Docket No. 499]; and (b) my opinions that (i) the Purchased Assets have been thoroughly marketed and (ii) the Gateway Successful Bid

---

an Order (I) Authorizing the Employment and Retention of Moelis & Company LLC as Financial Advisor and Investment Banker to the Debtors Effective Nunc Pro Tunc to the Petition Date, (II) Waiving Certain Information Requirements Imposed by Local Rule 2016-2 and (III) Granting Related Relief [Docket No. 80] (the "Moelis Retention Application").

³ Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the Bloom Declarations (as defined below), as applicable.

(as defined below) is the highest or otherwise best bid submitted at the Auction for the Purchased Assets.

5.      Except as otherwise indicated, all statements set forth in this Declaration are based on (a) my direct personal knowledge of the Debtors, (b) information learned from my review of relevant documents, (c) information provided to me by Moelis employees working with me in connection with the Debtors' Sale Process, (d) information provided to me by, or discussions with, the Debtors' management team or the Debtors' other advisors or (e) my opinion based upon my experience.  If called to testify, I could and would competently testify to the facts and the opinions set forth herein.

### Qualifications

6.      Moelis is an international investment banking and financial advisory firm, a registered broker-dealer with the United States Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority.  Moelis has approximately 840 employees based in 15 offices located in North America, South America, Europe, the Middle East and Asia.  Moelis provides a broad range of investment banking and financial advisory services to clients, including with respect to general corporate finance; mergers, acquisitions and divestitures; corporate restructurings; special committee assignments and capital raising.

7.      Moelis and its professionals have extensive experience with advising distressed companies in connection with their in- and out-of-court reorganization efforts, including in connection with large, complex chapter 11 proceedings.  Moelis has served as financial advisor and/or investment banker to debtors and other key constituents in numerous recent chapter 11 cases.  See, e.g., In re Hexion Holdings LLC, Case No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); In re Aegean Marine Petroleum Network Inc., Case No. 18-13374 (MEW) (Bankr.

S.D.N.Y. Feb. 20, 2019); In re Parker Drilling Company, Inc., Case No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); In re ATD Corporation, Case No. 18-12221 (KJC) (Bankr. D. Del. Nov. 5, 2018); In re Aralez Pharmaceuticals US Inc., No. 18-12425 (MG) (Bankr. S.D.N.Y. Nov. 1, 2018); In re iHeartMedia, Inc., No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); In re Global A&T Electronics Ltd., Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); In re Toys 'R Us, Inc., Case No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); In re TK Holdings, Inc., Case No. 17-11375 (Bankr. D. Del. Aug. 30, 2017); In re Basic Energy Services, Inc., Case No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); In re Allied Nevada Gold Corp., No. 15-10503 (MFW) (Bankr. D. Del. April 15, 2015); In re ITR Concession Co. LLC, No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); In re GSE Envt'l, Inc., No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); In re MACH Gen, LLC, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); In re Sorenson Commc'ns, Inc., Case No. 14-10454 (BLS) (Bankr. D. Del. Mar. 25, 2014); In re MPM Silicones, LLC, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014); In re Cengage Learning, Inc., Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. Sept. 13, 2013); In re OSH 1 Liquidating Corp. f/k/a Orchard Supply Hardware Stores Corp., Case No. 13-11565 (CSS) (Bankr. D. Del. July 15, 2013); In re Revel AC, Inc., Case No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 17, 2013); In re AMF Bowling Worldwide, Inc., Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 20, 2012); In re Residential Capital, LLC, No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 30, 2012); and In re AMR Corp., No. 11-15463 (SHL) (Bankr. S.D.N.Y. Mar. 7, 2012).

**The Debtors' Continued Marketing Efforts**

8.  As set forth in greater detail in the (a) *Declaration of Steve Bloom in Support of the Bidding Procedures Motion* [Docket No. 180] and (b) *Declaration of Steve Bloom in Support of the Gateway Stalking Horse Motion* [Docket No. 197] (together, the "Bloom

Declarations"), the Debtors engaged Moelis in July 2018 to serve as their investment banker in connection with their review of strategic alternatives, including to design and execute the FTD Sale Process.

9. The Debtors, with the assistance of Moelis, also conducted a robust postpetition marketing process for the Purchased Assets. Following the entry of the Bidding Procedures Order[4], the Debtors filed and served the *Notice of Sale, Bidding Procedures, Auction, Sale Hearing and other Deadlines Related Thereto* [Docket No. 215] on, among others, all parties known to the Debtors as having expressed an interest in a transaction involving the Purchased Assets in the preceding 12 months, and published the same in *USA Today* and the *Chicago Tribune* (*see* Docket No. 287). Further, in addition to conducting an extensive prepetition outreach process, promptly following the commencement of these chapter 11 cases, Moelis contacted 32 parties on behalf of the Debtors, including 9 potential strategic buyers and 23 potential financial sponsors, to solicit interest in a sale transaction involving the Purchased Assets.[5] As a result of these efforts, the Debtors ultimately received three Qualified Bids for the Purchased Assets. Among these Qualified Bids was the Gateway Stalking Horse Bid (as defined below).

10. The Debtors determined it was in the best interests of their businesses, restructuring efforts and stakeholders to pursue a stalking horse transaction with Gateway for the sale of the Purchased Assets for a purchase price of approximately $95 million, as reflected in that

---

[4] On June 25, 2019, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (VI) Granting Related Relief* [Docket No. 201] (the "Bidding Procedures Order").

[5] Of those 32 parties, 25 executed a non-disclosure agreement with the Debtors, but ultimately declined to pursue a transaction, and four parties declined to execute a non-disclosure agreement with the Debtors.

certain *Amended and Restated Asset Purchase Agreement*, dated as of June 19, 2019 (the "Gateway Stalking Horse Agreement" and the terms thereof, the "Gateway Stalking Horse Bid"), substantially in the form attached as Exhibit B to the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Provide Bidding Protections in Accordance with the Bidding Procedures and the Gateway Stalking Horse Agreement and (II) Granting Related Relief* [Docket No. 185]. After taking account of certain estimated working capital adjustments contained in the Gateway Stalking Horse Agreement, the Debtors expected to realize approximately $86 million in gross proceeds upon a closing of the sale contemplated by the Gateway Stalking Horse Bid (based on the Debtors' management team's forecast of working capital at closing).

11. I believe that executing the Gateway Stalking Horse Agreement was a critical step in support of the Debtors' ability to conduct a competitive Auction and to obtain the highest or otherwise best bid for the Purchased Assets under the circumstances of these chapter 11 cases.

12. Following entry into the Gateway Stalking Horse Agreement, the Debtors, with the assistance of Moelis, continued working with parties that had expressed interest in a potential transaction involving the Purchased Assets, to enable such parties to be in a position to submit Qualified Bids by the Bid Deadline and participate in the Auction.

13. Given the marketing process for the Purchased Assets, the number of parties contacted in connection therewith and the extensive diligence conducted by potential purchasers, I believe that the Purchased Assets have been thoroughly marketed.

**The Debtors' Auction Process**

14. To allow themselves to evaluate bids and work with bidders to improve their bids, the Debtors, in consultation with the Consultation Parties, rescheduled the Auction from July

22, 2019 to July 31, 2019. In accordance with the Bidding Procedures Order, the Debtors filed and served on the Sale Notice Parties, including all parties that had expressed an interest in a transaction involving the Purchased Assets, a *Notice of Adjournment of Auction and Sale Hearing for (A) the FTD Assets and Provide Commerce and (B) Gourmet Foods and (II) Extension of Certain Deadlines Set Forth in the Bidding Procedures* [Docket No. 420] (*see* Docket No. 439).

15. As set forth above, in addition to the Gateway Stalking Horse Bid, the Debtors received two additional Qualified Bids for the Purchased Assets.

16. After a thorough analysis of the three Qualified Bids, the Debtors, with the advice of Moelis and their other advisors and in consultation with the Consultation Parties, determined that the Qualified Bid submitted by Vine Holding Corporation ("Vine") was a higher bid than the Gateway Stalking Horse Bid and would serve as the Baseline Bid at the Auction for the Purchased Assets (the "Vine Baseline Bid").[6] The Vine Baseline Bid included a purchase price of approximately $102.5 million. After taking account of certain estimated working capital adjustments and the Termination Payment the Debtors would be obligated to pay Gateway upon the closing of an Alternative Transaction, the Debtors expected to realize approximately $90.1 million in gross proceeds upon the closing of a sale on the terms set forth in the Vine Baseline Bid (based on the Debtors' management team's forecast of working capital at closing).

17. After deliberating with their advisors and consulting with the Consultation Parties, the Debtors determined that, after the initial overbid for the Purchased Assets, Qualified Bidders would be required to submit successive bids in increments of no less than $1 million (the "Minimum Overbid Amount") to proceed to the next round of bidding.

---

[6] The Vine Baseline Bid was not deemed a Qualified Bid until July 30, 2019.

18. Prior to the commencement of the Auction, the Debtors notified each of the parties that had submitted Qualified Bids of their status as Qualified Bidders eligible to participate in the Auction, the selection and material terms of the Vine Baseline Bid and the Minimum Overbid Amount.

19. In accordance with the Bidding Procedures Order and the Bidding Procedures, on July 31, 2019, the Debtors held an Auction. Ultimately, Gateway and Vine were the only Qualified Bidders that elected to participate in the Auction for the Purchased Assets.

20. The Auction concluded after several rounds of robust and competitive bidding. After careful deliberation with their advisors and consulting with the Consultation Parties, the Debtors selected the final bid submitted by Gateway as the highest or otherwise best bid for the Purchased Assets (the "Gateway Successful Bid"). The Gateway Successful Bid includes cash consideration of approximately $110.86 million, allows the Debtors to avoid the payment of the Termination Payment in the approximate amount of $3.64 million, includes a "ticking" fee of $200,000 per day for each day the Gateway Sale fails to close after August 15, 2019, through August 20, 2019, and includes the assumption of employee paid time off obligations in the estimated amount of approximately $2.4 million. After taking account of certain estimated working capital adjustments in the Gateway Purchase Agreement, the Debtors expect to realize approximately $103.1 million in gross proceeds upon the closing of the Gateway Sale (based on the Debtors' management team's forecast of working capital at closing). Accordingly, the Debtors expect to realize increased proceeds of (a) approximately $16.9 million more than what the Debtors expected to realize from a closing of the sale contemplated by the Gateway Stalking Horse Bid and (b) approximately $13.0 million more than what the Debtors expected to realize from a closing of the sale contemplated by the Vine Baseline Bid.

21. In accordance with the Bidding Procedures Order and the Bidding Procedures, the Debtors selected the final bid submitted by Vine to serve as the Backup Bid for the Purchased Assets (the "Vine Backup Bid"). The Vine Backup Bid includes a purchase price of approximately $113.5 million and a "ticking" fee of $200,000 per day for each day the transaction fails to close after August 15, 2019, through August 20, 2019. After taking account of certain estimated working capital adjustments and the Termination Payment the Debtors would be obligated to pay Gateway upon the consummation of an Alternative Transaction, the Debtors determined that they would realize approximately $102.1 million in gross proceeds upon a closing of the sale contemplated by the Vine Backup Bid (based on the Debtors' management team's forecast of working capital at closing).

22. Based on my experience marketing the Purchased Assets and my analysis of the Qualified Bids received in respect thereof, I believe the Gateway Successful Bid reflects the highest price and the best terms of all of the bids received for the Purchased Assets and provides a greater recovery for the Debtors' estates and stakeholders than would be provided by any other available alternative, including the Vine Backup Bid.

Dated: August 7, 2019

                                                /s/ *Steve Bloom*
                                                Steve Bloom
                                                Executive Director, Moelis & Company LLC