**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| GUE Liquidation Companies, Inc., et al.,[1] | : | Case No. 19-11240 (LSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**DISCLOSURE STATEMENT FOR**
**JOINT PLAN OF LIQUIDATION FOR THE DEBTORS**

The Debtors are the following 15 entities:

1. GUE Liquidation Companies, Inc. (*f/ka* FTD Companies, Inc.)
2. Bloom That, Inc.
3. GUE Liquidation Delivery, Inc. (*f/k/a* Florists' Transworld Delivery, Inc.)
4. FlowerFarm, Inc.
5. FSC Denver LLC
6. FSC Phoenix LLC
7. GUE Liquidation, Inc. (*f/k/a* FTD, Inc.)
8. GUE Liquidation.CA, Inc. (*f/k/a* FTD.CA, Inc.)
9. GUE Liquidation.COM Inc. (*f/k/a* FTD.COM Inc.)
10. GUE Liquidation Group, Inc. (*f/k/a* FTD Group, Inc.)
11. GUE Liquidation Mobile, Inc. (*f/k/a* FTD Mobile, Inc.)
12. GUE Liquidation Giftco, LLC (*f/k/a* Giftco, LLC)
13. Provide Cards, Inc.
14. GUE Liquidation Commerce LLC (*f/k/a* Provide Commerce LLC)
15. GUE Liquidation Creations, Inc. (*f/k/a* Provide Creations, Inc.)

---

[1]     The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  GUE Liquidation Companies, Inc. (5852); Bloom That, Inc. (9936); GUE Liquidation Delivery, Inc. (6960); FlowerFarm, Inc. (2852); FSC Denver LLC (7104); FSC Phoenix LLC (7970); GUE Liquidation, Inc. (1271); GUE Liquidation.CA, Inc. (7556); GUE Liquidation.COM Inc. (4509); GUE Liquidation Group, Inc. (9190); GUE Liquidation Mobile, Inc. (7423); GUE Liquidation Giftco, LLC (5832); Provide Cards, Inc. (3462); GUE Liquidation Commerce LLC (0019); and GUE Liquidation Creations, Inc. (8964).  The Debtors' noticing address in these chapter 11 cases is 3113 Woodcreek Drive, Downers Grove, IL 60515.

*Counsel to the Debtors*

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Brett M. Haywood (No. 6166)
Megan E. Kenney (No. 6426)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email:  defranceschi@rlf.com
        heath@rlf.com
        haywood@rlf.com
        kenney@rlf.com

        -and-

Heather Lennox (*pro hac vice*)
Thomas A. Wilson (*pro hac vice*)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email:  hlennox@jonesday.com
        tawilson@jonesday.com

Brad B. Erens (*pro hac vice*)
Caitlin K. Cahow (*pro hac vice*)
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
Email:  bberens@jonesday.com
        ccahow@jonesday.com

| **IMPORTANT INFORMATION FOR YOU TO READ** |
|---|

**THE DEADLINE TO VOTE ON THE PLAN IS NOVEMBER 26, 2019 AT 5:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE VII OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS.  YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE IT MAY AFFECT YOUR RIGHTS.**

_____

The above-captioned debtors and debtors in possession (the "Debtors") are providing the information in this Disclosure Statement (this "Disclosure Statement") to Holders of Claims and Interests for purposes of soliciting votes to accept or reject the _Joint Plan of Liquidation for the Debtors_ (the "Plan").[2]  The Debtors are providing you with the information in this Disclosure Statement because you may be a creditor entitled to vote on the Plan.

_____

The Debtors urge each holder of a claim or an equity interest to consult with its own advisors with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and all of the actions necessary to effectuate the Plan.

_____

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in these Chapter 11 Cases and certain documents related to the Plan that may be attached hereto and are incorporated by reference herein.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  The information contained herein or attached hereto is made only as of the date of this Disclosure Statement, and there can be no assurances that the statements contained herein will be correct at any time after this date.

_____

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other nonbankruptcy laws.  This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

_____

This Disclosure Statement contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended.  Statements containing words such as "may," "believe," "anticipate," "expect," "intend," "plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitation, information

_____

[2]  Unless otherwise specified herein, capitalized terms not otherwise defined herein have the meanings given to them in the Plan, dated September 18, 2019, and attached hereto as Exhibit A.

regarding the Debtors' expectations with respect to future events. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those risks described under the caption "Plan-Related Risk Factors" in Section VII of this Disclosure Statement. Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is, therefore, speculative.

_____

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions regarding the Debtors' business. Although the Debtors believe that such financial information fairly reflects the financial conditions of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business and their future results and operations. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

_____

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. The Liquidation Trusts may object to claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such objections to Claims.

_____

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion or amendment. The Debtors reserve the right to file an amended plan and related amended disclosure statement from time to time, subject to the terms of the Plan.

_____

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described in Article VII of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived. You are encouraged to read this Disclosure Statement in its entirety, including, but not limited to, the Plan and Section VII of this Disclosure Statement entitled "Plan-Related Risk Factors," before submitting your ballot to vote to accept or reject the Plan.

_____

The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

_____

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated thereby.

_____

The Debtors support confirmation of the Plan and recommend all Holders of Claims entitled to vote on the Plan vote to accept the Plan.

| QUESTIONS AND ADDITIONAL INFORMATION |
| --- |

**If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Omni Management Group, the Claims and Noticing Agent, by either (a) visiting the Document Website at www.omnimgt.com/ftd or (b) calling (866) 205-3144.**

RLF1 22059067v.1

## TABLE OF CONTENTS

I.    INTRODUCTION ..........................................................................................................1
    A.    The Plan ...........................................................................................................1
    B.    Consolidation of the Debtors for Plan Purposes .............................................1
    C.    The Adequacy of This Disclosure Statement ...................................................2
    D.    Summary of Classes and Treatment of Claims and Interests Under the Plan ..................................2
    E.    Voting on and Confirmation of the Plan ..........................................................3
    F.    Class Entitled to Vote on the Plan ...................................................................3
    G.    Votes Required for Acceptance by a Class .......................................................3
    H.    Certain Factors to be Considered Prior to Voting ...........................................3
    I.    Classes Not Entitled to Vote on the Plan .........................................................4
    J.    Solicitation Package .........................................................................................4
    K.    Voting Procedures ............................................................................................5
    L.    Plan Objection Deadline ..................................................................................5
    M.    Confirmation Hearing ......................................................................................5

II.    THE DEBTORS' ORGANIZATIONAL STRUCTURE  AND BUSINESS AS OF THE
    PETITION DATE .......................................................................................................6
    A.    The Debtors' Business and Corporate Structure ..............................................6
    B.    Significant Obligations of the Debtors as of the Petition Date ........................6
        1.    Prepetition Funded Indebtedness .........................................................6
        2.    Unsecured Trade Debt ..........................................................................7

III.    EVENTS LEADING TO THE CHAPTER 11 CASES ...............................................7
    A.    The Proposed Benefits of the Provide Acquisition Failed to Materialize. .......7
    B.    The Shifting Consumer Landscape and Competitive Market Dynamics Increased Pressure
        on the Debtors. ..................................................................................................7
    C.    Continued Underperformance Led to Tightened and Insufficient Liquidity ....8

IV.    EVENTS DURING THE CHAPTER 11 CASES ........................................................8
    A.    First Day Relief ................................................................................................8
    B.    Retention of Professionals ...............................................................................9
    C.    Appointment of the Creditors' Committee ......................................................9
    D.    The Final Postpetition Financing Order ..........................................................9
    E.    Key Employee Incentive Program and Key Employee Retention Program .....9
    F.    Schedules and Statements ..............................................................................10
    G.    The Bar Date Order ........................................................................................10
    H.    The Debtors' Sale Process .............................................................................10
        1.    Prepetition Marketing Efforts and Sale Process ................................10
        2.    Postpetition Sale Process ...................................................................12
    I.    Committee Settlement ....................................................................................13
    J.    Exclusivity .....................................................................................................13

V.    SUMMARY OF THE PLAN ....................................................................................13
    A.    Classification and Treatment of Claims and Interests ...................................13
        1.    Unclassified Claims ...........................................................................14
        2.    Classification of Claims and Interests ...............................................16
        3.    Treatment of Claims and Interests .....................................................16
        4.    Reservation of Rights Regarding Claims ...........................................18
        5.    Postpetition Interest on Claims .........................................................18
        6.    Insurance ............................................................................................18
        7.    Class Without Voting Claim Holders .................................................18

B.    Means for Implementation of the Plan ........................................................................18
    1.    Corporate Existence ...........................................................................18
    2.    Debtor Liquidation Trust ...................................................................19
    3.    Committee Liquidation Trust .............................................................24
    4.    Corporate Actions ..............................................................................28
    5.    No Revesting of Assets ......................................................................29
    6.    Creation and Maintenance of Trust Accounts ....................................29
    7.    Preservation of Causes of Action .......................................................29
    8.    Cancellation and Surrender of Instruments, Securities and Other Documentation ...........30
    9.    Release of Liens .................................................................................30
    10.    Effectuating Documents; Further Transactions ..................................30
    11.    Substitution in Pending Legal Actions ...............................................30
C.    Treatment of Executory Contracts and Unexpired Leases .........................................30
    1.    Assumption and Rejection of Executory Contracts and Unexpired Leases ....................30
    2.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed by the
        Debtor Liquidation Trust ...................................................................31
    3.    Claims Based on Rejection of Executory Contracts and Unexpired Leases ...................31
    4.    Contracts and Leases Entered Into After the Petition Date ................32
    5.    Insurance Policies ..............................................................................32
    6.    Reservation of Rights ........................................................................32
D.    Provisions Regarding Distributions ...........................................................................33
    1.    Distributions for Claims Allowed as of the Effective Date ...............33
    2.    Method of Distributions to Holders of Claims ..................................33
    3.    Disbursing Agent ...............................................................................33
    4.    Disputed Claims Reserves .................................................................33
    5.    Investment of Trust Accounts ............................................................34
    6.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ....................34
    7.    Distribution Record Date ...................................................................35
    8.    De Minimis Distributions ..................................................................35
    9.    Compliance with Tax Requirements ..................................................35
    10.    Manner of Payment Under the Plan ...................................................36
    11.    Time Bar to Cash Payments ..............................................................36
    12.    Setoffs ................................................................................................36
    13.    Allocation Between Principal and Accrued Interest ..........................36
    14.    Distributions to Holders of Disputed Claims ....................................36
    15.    Claims Paid or Payable by Third Parties ...........................................37
E.    Disputed, Contingent and Unliquidated Claims ........................................................37
    1.    Allowance of Claims .........................................................................37
    2.    Prosecution of Objections to Claims .................................................37
    3.    Estimation of Claims .........................................................................38
    4.    Claims Subject to Pending Actions ...................................................38
    5.    Offer of Judgment .............................................................................38
F.    Confirmation of the Plan ...........................................................................................39
    1.    Conditions Precedent to Confirmation ..............................................39
    2.    Conditions Precedent to the Effective Date .......................................39
    3.    Waiver of Conditions to Confirmation or the Effective Date ............40
    4.    Effect of Nonoccurrence of Conditions to the Effective Date ...........40
    5.    Nonconsensual Confirmation ............................................................40
    6.    Effect of Confirmation ......................................................................40
    7.    Votes Solicited in Good Faith ...........................................................42
G.    Miscellaneous Provisions ..........................................................................................43
    1.    Modification of the Plan ....................................................................43
    2.    Revocation of the Plan or Non-Occurrence of Confirmation Date or Effective
        Date.....................................................................................................43
    3.    Conversion or Dismissal of Certain of the Chapter 11 Cases ...........43
    4.    Inconsistency .....................................................................................43

| | 5. | Exhibits and Schedules | 43 |
| | 6. | Exemption from Transfer Taxes | 43 |
| | 7. | Severability | 44 |
| | 8. | Successors and Assigns | 44 |
| VI. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 44 |
| | A. | Confirmation Hearing | 44 |
| | | 1. The Debtors | 45 |
| | | 2. The Secured Parties | 45 |
| | | 3. The Creditors' Committee | 45 |
| | B. | Requirements for Confirmation of the Plan | 46 |
| | | 1. Feasibility | 46 |
| | | 2. Best Interests of Creditors – Liquidation Analysis | 46 |
| | C. | Alternative Plans | 47 |
| | D. | Acceptance by Impaired Classes | 47 |
| | E. | Requirements of Section 1129(b) of the Bankruptcy Code | 48 |
| | | 1. Fair and Equitable Test | 48 |
| | | 2. Unfair Discrimination | 49 |
| VII. | | PLAN-RELATED RISK FACTORS | 49 |
| | A. | Risk Factors Related to Certain Bankruptcy Considerations | 49 |
| | | 1. The Debtors May Not Be Able to Secure Confirmation of the Plan | 49 |
| | | 2. Sufficient Votes to Confirm the Plan May Not be Received | 50 |
| | | 3. Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests | 50 |
| | | 4. The Effective Date May Not Occur | 50 |
| | | 5. The Debtors May Modify the Plan to Remove Consolidation of Estates | 50 |
| | B. | Risk Factors That May Affect Recoveries Available to Holders of Allowed Claims Under the Plan | 51 |
| | | 1. The Amount of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims | 51 |
| | | 2. Any Valuation of Any Assets to be Distributed Under the Plan is Speculative | 51 |
| | | 3. The Debtors Cannot Guarantee the Timing of Such Recoveries | 51 |
| | | 4. Certain Tax Implications of the Debtors' Bankruptcies | 51 |
| | C. | Risks Relating to Securities Laws | 51 |
| | | 1. Non-Transferability | 51 |
| | | 2. Uncertainty of Value | 51 |
| | D. | Disclosure Statement Disclaimer | 52 |
| | | 1. The Financial Information Contained in This Disclosure Statement Has Not Been Audited | 52 |
| | | 2. Information Contained in This Disclosure Statement Is For Soliciting Votes | 52 |
| | | 3. This Disclosure Statement Was Not Reviewed or Approved by the SEC | 52 |
| | | 4. This Disclosure Statement May Contain Forward Looking Statements | 52 |
| | | 5. No Legal or Tax Advice Is Provided to You by This Disclosure Statement | 52 |
| | | 6. No Admissions Made | 52 |
| | | 7. Failure to Identify Potential Objections | 53 |
| | | 8. No Waiver of Right to Object or Right to Recover Transfers and Assets | 53 |
| | | 9. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors | 53 |
| | | 10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update | 53 |
| | | 11. No Representations Outside This Disclosure Statement are Authorized | 53 |
| | E. | Liquidation Under Chapter 7 | 53 |
| VIII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN | 54 |
| | A. | U.S. Federal Income Tax Consequences to Holders of Allowed Claims | 55 |

     1.  U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Secured
        Lender  Claims and U.S. Holders of Allowed General Unsecured Claims......................55
     2.  Accrued Interest......................................................................................................56
     3.  Post-Effective Date Cash Distributions ....................................................................57
     4.  Market Discount ......................................................................................................57
     5.  Bad Debt or Worthless Securities Deduction ..................................................................57
     6.  Medicare Surtax........................................................................................................57
  B.  Backup Withholding and Information Reporting...........................................................57
  C.  Importance of Obtaining Professional Tax Assistance ...................................................58

IX.  RECOMMENDATION AND CONCLUSION .........................................................................58

RLF1 22059067v.1

**TABLE OF EXHIBITS**

Exhibit A        Joint Plan of Liquidation for the Debtors

Exhibit B        Tabulation Rules

RLF1 22059067v.1

## I.    INTRODUCTION

This Disclosure Statement provides information regarding the Plan (which may be further amended, supplemented or otherwise modified from time to time in accordance with the terms thereof), which the Debtors are seeking to have confirmed by the Bankruptcy Court.[3]  A copy of the Plan is attached hereto as Exhibit A.  The rules of construction set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors believe that the Plan is in the best interests of their Estates.  The Debtors recommend that all Holders of Claims entitled to vote accept the Plan by returning their Ballots so as to be actually received by the Claims and Noticing Agent no later than November 26, 2019 at 5:00 p.m. (prevailing Eastern Time).  Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing on December 18, 2019 at 10:00 a.m. (prevailing Eastern Time).

### A.    The Plan

The Debtors filed for chapter 11 bankruptcy protection on June 3, 2019.  A chapter 11 bankruptcy case permits a debtor to resolve its affairs and distribute the proceeds of its estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement.  The Plan contemplates a liquidation of the Debtors and their Estates and is therefore referred to as a "plan of liquidation."  The primary objective of the Plan is to maximize the value of recoveries to Holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan.  The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (1) Impaired or Unimpaired by the Plan, (2) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or (3) deemed to accept or reject the Plan.  Claims against the Debtors and Interests in the Debtors are classified in five separate Classes, as described herein.

### B.    Consolidation of the Debtors for Plan Purposes

As part of Confirmation, the Debtors are proposing that, on the Effective Date, their Estates be deemed consolidated for administrative purposes related to the Plan, including for purposes of (1) implementing the Plan, (2) voting, (3) assessing whether the Confirmation standards have been met, (4) calculating and making distributions under the Plan and (5) filing post-Confirmation reports and paying quarterly fees to the U.S. Trustee.

In addition, if the Bankruptcy Court grants the Debtors' request for consolidation, pursuant to the Confirmation Order, as of the Effective Date:  (1) all assets and liabilities of the Debtors shall be deemed merged; (2) all guarantees or responsibility of one Debtor of the obligations of any other Debtor shall be deemed eliminated, and all guarantees or responsibility executed by multiple Debtors of the obligations of any other Entity shall be deemed consolidated into a single obligation, so that any Claim against any Debtor and any guarantee or responsibility thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Debtors; (3) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor shall be deemed filed against, and shall be deemed a single obligation of, the Debtors; (4) Intercompany Claims between Debtors shall be deemed eliminated and extinguished; and (5) Interests of one Debtor in another Debtor shall be deemed cancelled.  Such consolidation will not affect (1) the vesting of the Debtors' assets in the Debtor Liquidation Trust or Committee Liquidation Trust, as applicable; (2) the right to distributions from any insurance policies or proceeds of such policies; (3) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (4) the rights of the Debtors or the Liquidation Trustees to contest setoff or

---

[3]    Unless otherwise specified herein, capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

recoupment efforts alleged by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

C.     **The Adequacy of This Disclosure Statement**

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Debtors submit this Disclosure Statement in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder (Section I hereof);

- the Debtors' organizational structure, business operations and financial obligations (Section II hereof);

- the events leading to the filing of the Debtors' Chapter 11 Cases (Section III hereof);

- the major events during these Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Section IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Holders of Claims entitled to vote on the Plan (Section V.A hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan (Section V.B hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Section V.F.6 hereof);

- the statutory requirements for confirming the Plan (Section VI hereof);

- certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan (Section VII hereof); and

- certain United States federal income tax consequences of the Plan (Section VIII hereof).

D.     **Summary of Classes and Treatment of Claims and Interests Under the Plan**

The table below summarizes the classification and treatment of all classified Claims and Interests under the Plan.  The classification, treatment and projected recoveries of classified Claims are described in summary form below for illustrative purposes only.  **Recoveries available to Holders of Claims are estimates and actual recoveries may differ materially based on, among other things, the amount of Claims actually Allowed.**

-2-

| CLASS | DESIGNATION | IMPAIRMENT | VOTING STATUS | ESTIMATED AGGREGATE ALLOWED AMOUNT | PROJECTED RECOVERY |
|-------|-------------|------------|---------------|-----------------------------------|--------------------|
| 1 | Priority Claims | Unimpaired | Deemed to Accept / Not Entitled to Vote | [$0 - $0.5M] | 100% |
| 2 | Secured Lender Claims | Impaired | Entitled to Vote | $107M | TBD |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept / Not Entitled to Vote | [$0 - $0.5M] | 100% |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | [$75M - $85M] | TBD |
| 5 | Interests | Impaired | Deemed to Reject / Not Entitled to Vote | N/A | 0% |

### E.    Voting on and Confirmation of the Plan

By order of the Bankruptcy Court, the Disclosure Statement Order, among other things, (1) approved this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (2) established Plan voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes (the "Tabulation Rules").  A copy of the Tabulation Rules approved by the Bankruptcy Court is attached hereto as Exhibit B.

### F.    Class Entitled to Vote on the Plan

Classes 2 and 4 (Secured Lender Claims and General Unsecured Claims, respectively) are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes").  If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote, and you will not receive a Solicitation Package (as defined below) or a Ballot.  If your Claim or Interest is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Claims and Noticing Agent on behalf of the Debtors, otherwise provide to you.

### G.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan by a class of claims or interests is determined by calculating the amount and the number of claims or interests voting to accept, as a percentage of the allowed claims or interests, as applicable, in the class.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (1) the Holders of at least two-thirds in dollar amount of the Claims validly voting in each Class vote to accept the Plan; and (2) the Holders of more than one-half in number of the Claims validly voting in each Class vote to accept the Plan.

### H.    Certain Factors to be Considered Prior to Voting

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

-3-

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or consummation could result in, among other things, increased Administrative Expense Claims or Professional Fee Claims.

**I.      Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote (1) if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or (2) if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan.

| CLASS | DESIGNATION | IMPAIRMENT | VOTING STATUS |
|-------|-------------|------------|---------------|
| 1 | Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | Interests | Impaired | Deemed to Reject |

**J.      Solicitation Package**

The package of materials (the "Solicitation Package") to be sent to Holders of Claims entitled to vote on the Plan will contain:

- a cover letter describing (1) the contents of the Solicitation Package; (2) information about how to obtain access, free of charge, to the Plan, the Disclosure Statement and the Disclosure Statement Order, together with the exhibits thereto, on the case administration website; and (3) information about how to obtain, free of charge, paper copies of any of the documents included in the Solicitation Package;

- a notice of the Confirmation Hearing;

- copies of the Plan and Disclosure Statement (in electronic format);

- the Disclosure Statement Order (excluding the exhibits thereto);

- for Holders of Claims in the Voting Classes (i.e., Holders of Claims in Classes 2 and 4), an appropriate form of Ballot, instructions on how to complete the Ballot and a pre-paid, preaddressed Ballot return envelope and such other materials as the Bankruptcy Court may direct; and

- any supplemental documents filed with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be included in the Solicitation Package, including any other letters in support of the Plan.

The Debtors will cause the Claims and Noticing Agent to complete the distribution of the Solicitation Packages to Holders of Claims in the Voting Classes by four business days after entry of the Disclosure Statement Order.

-4-

The Solicitation Package (except for the Ballots) may also be obtained free of charge from the Claims and Noticing Agent by: (1) visiting www.omnimgt.com/ftd; (2) writing to Omni Management Group, Re: FTD Companies, Inc., 5955 De Sota Ave., Suite 100, Woodland Hills, CA 91367; (3) emailing the Claims and Noticing Agent at ftd@omnimgt.com; or (4) calling (866) 205-3144.

The Debtors will file the Plan Supplement no later than November 12, 2019, except as otherwise provided under the Plan.

### K.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, one or more Ballots have been enclosed in your Solicitation Package for the purpose of voting on the Plan. To be counted, all Ballots must be <u>actually received</u> by the Claims and Noticing Agent by the Voting Deadline, which is November 26, 2019, at 5:00 p.m., prevailing Eastern Time, as follows:

- If by first class mail, hand delivery or overnight mail, Ballots must be sent to:

      FTD Companies, Inc., et al. Ballot Processing
      c/o Omni Management Group
      5955 De Soto Ave., Suite 100
      Woodland Hills, CA 91367

- In addition to accepting Ballots via first class mail, hand delivery and overnight mail, the Voting Agent will accept Ballots via electronic, online transmissions, solely through a customized online balloting portal at **https://omnimgt.com/FTD**. Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the online balloting portal. Instructions for electronic, online transmission of Ballots are set forth on the forms of the Ballots. The encrypted Ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this matter, and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

Ballots should not be sent directly to the Debtors.

### L.    Plan Objection Deadline

The deadline to file objections to Confirmation of the Plan is November 26, 2019, at 4:00 p.m. (prevailing Eastern Time) (the "Plan Objection Deadline"). All objections to Confirmation of the Plan (the "Confirmation Objections") must be in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objection must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are actually received on or before the Plan Objection Deadline. Parties wishing to reply to any Confirmation Objection shall have until December 13, 2019 at 4:00 p.m.(prevailing Eastern Time) to file a reply.

### M.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. The Bankruptcy Court entered the Disclosure Statement Order which, among other things, scheduled a Confirmation Hearing.

The Confirmation Hearing will commence on December 18, 2019, at 10:00 a.m. (prevailing Eastern Time), before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N Market St, Sixth Floor, Courtroom **[2]**, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment

announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, before, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

## II.    THE DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESS AS OF THE PETITION DATE

### A.    The Debtors' Business and Corporate Structure

As of the Petition Date, the Debtors consisted of FTD Companies, Inc. and certain of its direct and indirect domestic subsidiaries.  Tracing their origins back over 100 years, the Debtors were a premier floral and gifting company with an international presence that historically provided floral, specialty foods, gift and related products and services to consumers, retail florists and other retail locations and companies in need of floral and gifting solutions.  Prior to the Petition Date, the Debtors operated primarily in the United States and Canada; they also had a worldwide presence as their iconic Mercury Man® logo was displayed in over 30,000 floral shops in more than 125 countries. The Debtors' diversified portfolio of brands also included ProFlowers®, Shari's Berries®, Personal Creations®, Gifts.com™ and ProPlants®.  In addition to floral arrangements and plants, which were the Debtors' primary offerings, the Debtors also marketed and sold gift items, including gourmet dipped berries and other specialty foods, personalized gifts, gift baskets and other gifting products.

### B.    Significant Obligations of the Debtors as of the Petition Date

#### 1.    Prepetition Funded Indebtedness

Certain of the Debtors were party to a credit agreement, dated as of July 17, 2013 (as amended, supplemented or otherwise modified, the "Amended and Restated Credit Agreement") among FTD Companies, Inc. and its foreign subsidiary Interflora British Unit; certain wholly-owned domestic subsidiaries of FTD Companies, Inc. as guarantors (the "Guarantors");[4] the financial institutions from time to time party thereto as lenders; and Bank of America, N.A., as administrative agent for the lenders.   Obligations under the Amended and Restated Credit Agreement were secured by a lien on substantially all of the assets of the Guarantors and FTD Companies, Inc., including a pledge of 100% of the issued and outstanding capital stock of certain subsidiaries of FTD Companies, Inc. that are directly owned by the Guarantors.

The Amended and Restated Credit Agreement initially provided for three facilities (collectively, the "Credit Facility"): (a) a $200 million term loan (the "Term Loan Facility"); (b) a revolving credit facility with initial availability of $250 million[5] (the "Revolving A Facility"); and (c) a revolving credit facility with initial availability of $100 million[6] (the "Revolving B Facility" and, together with the Revolving A Facility, the "Revolving Credit Facility").  All obligations under the Credit Facility were to be due at maturity on September 19, 2019.  As of the Petition Date, the Debtors had approximately $149.4 million in secured indebtedness outstanding under the Credit Facility, consisting of $57.4 million under the Term Loan Facility and $92 million under the Revolving Credit Facility.

---

[4]    As of the Petition Date, the Debtor entities that were Guarantors were:  Florists' Transworld Delivery, Inc.; FTD Group, Inc.; FTD, Inc.; FTD.CA, Inc.; FTD.COM Inc.; Provide Commerce LLC; Provide Cards, Inc.; Provide Creations, Inc.; Giftco, LLC; and FTD Mobile, Inc.

[5]    Amendments to the Amended and Restated Credit Agreement have reduced the lenders' commitments sunder the Revolving A Facility to $150 million.

[6]    Amendments to the Amended and Restated Credit Agreement have reduced the lenders' commitments sunder the Revolving B Facility to $25 million.

2.      **Unsecured Trade Debt**

In the ordinary course of their businesses, the Debtors historically purchased goods and services from numerous vendors.  These vendors included, among others, suppliers of (a) perishable and non-perishable inventory, (b) commercial common carrier services, (c) various marketing and technology services and (d) third-party drop-ship services for the Debtors' enterprise. The Debtors relied on an extensive network of domestic and international suppliers for their inventory needs, which included both perishable inventory (e.g., flowers and berries) and non-perishable inventory (e.g., branded and non-branded containers and customized packaging).  The Debtors' ProFlowers, Gourmet Foods and Personal Creations business units relied heavily on shipping services to fulfill consumer orders and, generally, the Debtors depended upon substantial marketing, technology and other services to operate their businesses, promote their brands, drive sales and meet the needs of their customers.  As of the Petition Date, the Debtors estimated that they owed approximately $72.4 million for unsecured obligations for goods and services.

## III.   EVENTS LEADING TO THE CHAPTER 11 CASES

A.      **The Proposed Benefits of the Provide Acquisition Failed to Materialize.**

At the end of 2014, FTD Companies, Inc. and its affiliates borrowed $120 million under the Amended and Restated Credit Agreement and, with other consideration, acquired Debtor Provide Commerce LLC (the "Provide Acquisition").  Through that acquisition, FTD Companies, Inc. and its affiliates acquired the ProFlowers, Gourmet Foods and Personal Creations business units (collectively, the "Provide Business Units").

The Provide Acquisition was designed to complement and enhance FTD's existing businesses, with the ultimate goal of driving greater profitability.  Unlike the Debtors' "asset-light" B2B business model, ProFlowers took ownership of the floral inventory and fulfilled orders directly through a company-operated supply chain.  As a result, coupled with a direct-marketing strategy, ProFlowers appealed to a broad market of consumers who wanted an efficient order process coupled with lower cost purchases.  Shari's Berries operated off of a similar model, leveraging direct marketing techniques to drive significant order volumes for dipped strawberries and other gourmet foods during the two primary peak periods (i.e., Valentine's Day and Mother's Day).

Though the Debtors did realize certain synergies following the Provide Acquisition, such as certain reduced marketing costs, the integration of the Provide Business Units into the legacy businesses never materialized, resulting in the Debtors running essentially independent, rather than integrated, businesses.  In particular, a number of key post-acquisition targets, such as (i) floral brand alignment, (ii) necessary technological investments in the combined business (e.g., the consolidation of technology/ecommerce platforms) and (iii) the integration of marketing and business teams lagged.  As a result, both the Provide Commerce and the Debtors' legacy brands suffered from internal friction and suboptimal structures within the Debtors' enterprise.  ProFlowers was further hampered by a loss of critical institutional knowledge and key analytic capabilities due to post-acquisition employee attrition.

B.      **The Shifting Consumer Landscape and Competitive Market Dynamics Increased Pressure on the Debtors.**

While the Debtors struggled to unify their businesses and implement the Provide Acquisition, the floral industry – and consumer expectations – continued to evolve.  Following the example set by ProFlowers, other companies began to deliver farm-sourced fresh bouquets directly to customers, increasing competition in the B2C space.  In addition, the expanding influence of e-commerce platforms like Amazon transformed customer expectations, particularly with respect to the fast, free delivery of goods.  Given the perishable and delicate nature of the product, delivery and service fees were standard in the floral industry. As e-commerce companies trained consumers to expect free or nominal cost delivery, floral service fees became anathema to many customers.

A number of other market factors put additional pressure on the Debtors, including, among other things, increased shipping and online marketing costs, low barriers to entry for other direct-to-consumer businesses and the

growing presence of grocers and mass merchants providing low-cost floral products and chocolate-dipped strawberries during peak holidays. Collectively, market pressures contributed to declining sales and decreased order volumes, impairing the B2C businesses' ability to leverage and capitalize on scale.

### C.    Continued Underperformance Led to Tightened and Insufficient Liquidity.

Facing pressure from the struggles described above, the Debtors implemented a turnaround strategy in 2017. The turnaround strategy called for significant investment in capabilities, technology and capital expenditures over a three-year period (e.g., capital expenditures on a consolidated basis more than doubled from approximately $15.1 million in 2017 to approximately $33.8 million in 2018). Nonetheless, despite the Debtors' best efforts, this turnaround strategy and the $120 million borrowing for the Provide Acquisition placed too much financial stress on the Debtors' enterprise. Deteriorating operational performance severely impaired the company's profitability and, in April 2018, FTD Companies, Inc. filed its 2017 10-K including a going concern qualification (a default under the Amended and Restated Credit Agreement).

Despite further efforts, the Debtors' continued to materially underperform projections and compromised market confidence. Key vendors began to raise concerns regarding the Debtors' liquidity, particularly after FTD Companies, Inc. released its 2018 Form 10-K, which included another going concern qualification and other disclosures regarding the companies' uncertain financial position. Accommodations made to such vendors further depleted the Debtors' already limited liquidity. Subsequently, the Provide Business Units significantly missed their 2019 Mother's Day forecast, leading to a substantial liquidity shortfall that the Debtors could not bridge and forcing the Debtors to turn their focus towards a chapter 11 filing.

## IV.    EVENTS DURING THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, or shortly thereafter, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of motions and applications (collectively, the "First Day Motions") with the Bankruptcy Court. On June 4 and 5, 2019 (interim relief) and July 1 and 2, 2019 (final relief), the Bankruptcy Court entered orders granting relief to, among other things: (1) prevent interruptions to the Debtors' businesses; (2) ease the strain on the Debtors' relationships with certain essential constituents; (3) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases; and (4) permit the Debtors access to postpetition funding and cash collateral.

The orders entered pursuant to the First Day Motions authorized the Debtors to, among other things:

- continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms and continue to perform intercompany transactions;

- pay certain prepetition taxes and fees;

- fulfill and honor all customer obligations (including those owed to the Debtors' florist network members) the Debtors deemed appropriate in the ordinary course of business and continue, renew, replace, implement new and/or terminate any customer practices and incur customer obligations as the Debtors deem appropriate;

- pay their obligations under insurance policies entered into prepetition and renew, supplement, modify and purchase insurance coverage in the ordinary course of business;

- pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs;

-8-

- make payments on account of prepetition Claims of certain lien claimants, essential suppliers and suppliers who otherwise may have a claim under the Perishable Agriculture Commodities Act; and

- provide certain assurance of future payment to utilities and establish procedures for utilities to request additional or different assurance of future payment, pursuant to which the utilities would be prohibited from discontinuing service except in certain circumstances.

### B.        Retention of Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in these Chapter 11 Cases, the Debtors filed the following applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ certain advisors:  (1) Jones Day as the Debtors' counsel; (2) Richards, Layton & Finger, P.A. as the Debtors' co-counsel; (3) Omni Management Group, Inc. as the Debtors' Claims and Noticing Agent and administrative advisor; (4) AP Services, LLC to provide interim management services, including the services of Alan D. Holtz as Chief Restructuring Officer and Scott M. Tandberg as Associate Restructuring Officer; (5) Moelis & Company LLC ("Moelis") as the Debtors' financial adviser and investment banker; (6) Piper Jaffray & Co. ("Piper Jaffray") as the Debtors' investment banker; and (7) Deloitte & Touche LLP as independent auditor and accounting service provider.  Further, the Debtors filed a motion seeking approval of procedures for the interim compensation and reimbursement of expenses of retained professionals in the Chapter 11 Cases (the "Interim Compensation Procedures").  The Bankruptcy Court has entered orders approving all of the aforementioned retention applications and the Interim Compensation Procedures.

### C.        Appointment of the Creditors' Committee

On June 12, 2019, the U.S. Trustee filed the Notice of Appointment of Committee of Unsecured Creditors (Docket No. 118), notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Creditors' Committee") in these Chapter 11 Cases.  The Creditors' Committee is currently composed of the following members:  (1) United Parcel Services, Inc.; (2) Atlas Flowers, Inc. d/b/a Golden Flowers; (3) Farm Direct Corp.; (4) Veritiv Corporation; (5) Ad Results, Media, LLC; (6) Legacy Staffing Solutions LLC; and (7) Packaging Corp. of America.  On July 2, 2019, the Creditors' Committee filed applications to retain Kelley Drye & Warren LLP ("Kelley Drye") and Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch") as legal co-counsel and Province, Inc. ("Province") as its financial advisor.  On July 19, 2019, the Bankruptcy Court entered orders approving the retention applications of Kelley Drye, Benesch and Province.

### D.        The Final Postpetition Financing Order

On the Petition Date, the Debtors filed a motion (Docket No. 19) (the "Postpetition Financing Motion"), seeking the entry of interim and final orders authorizing the Debtors to enter into an agreement to obtain postpetition financing and utilize the cash collateral of the Secured Parties on a consensual basis during the Debtors' Chapter 11 Cases (the "Postpetition Financing Agreement").  On June 5, 2019 the Bankruptcy Court entered an interim order (Docket No. 60); and on July 2, 2019, the Bankruptcy Court entered a final order (Docket No. 311) (the "Final Postpetition Financing Order"), granting the relief sought in the Postpetition Financing Motion.  The Bankruptcy Court's entry of the Final Postpetition Financing Order enabled the Debtors to fund their business in the ordinary course, which ensured continued, uninterrupted operations, preserving the value the Debtors' Estates for the benefit of all stakeholders.  Additionally, the Final Postpetition Financing Order permitted the Debtors to establish a reserve of $15.5 million from the Secured Parties' collateral to pay the expenses of winding down the Debtors' estates and pay unpaid Allowed administrative expensive claims in the Chapter 11 Cases.

### E.        Key Employee Incentive Program and Key Employee Retention Program

On June 7, 2019, the Debtors filed a motion (Docket No. 93) seeking approval of a key employee incentive program (the "KEIP") and a key employee retention program (the "KERP") to, respectively, (i) incentivize key executive-level employees with bonuses tied to certain sale milestones and (ii) mitigate attrition risk with respect to certain non-insider employees whose expertise the Debtors deemed necessary to avoid disruption to the Debtors'

business and restructuring efforts. The Bankruptcy Court entered an order approving the KEIP and the KERP on June 28, 2019 (Docket No. 249).

### F.    Schedules and Statements

On July 15, 2019, the Debtors filed their Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("SOFAs"). Interested parties may review the Schedules and SOFAs and any amendments thereto by visiting the Debtors' Case Information Website (located at www.omnimgt.com/ftd).

### G.    The Bar Date Order

On July 26, 2019, the Bankruptcy Court entered the Bar Date Order, which established procedures and set deadlines for filing proofs of claim and requests for payment of administrative expenses against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). The Bar Date Notice was filed on August 23, 2019 (Docket No. 607) and published in the USA Today (on August 27, 2019), the Chicago Tribune (on August 28, 2019) and the San Diego Union-Tribune (on August 28, 2019). Copies of the Bar Date Notice were served on all Holders of Claims appearing in the Debtors' Schedules. Pursuant to the Bar Date Order and the Bar Date Notice, the following deadlines were established:

- *General Bar Date*. Except as otherwise set forth in the Bar Date Order and Bar Date Notice, the last date for all entities holding claims against the Debtors that arose prior to the Petition Date (whether secured, unsecured priority – including section 503(b)(9) claims or unsecured nonpriority) to file proofs of claim is October 7, 2019 at 5:00 p.m., prevailing Eastern Time.

- *Government Bar Date*. Except as otherwise set forth in the Bar Date Order and Bar Date Notice, the last date for all governmental units holding claims against the Debtors that arose prior to the Petition Date (whether secured, unsecured priority or unsecured nonpriority) to file proofs of claim is December 2, 2019 at 5:00 p.m., prevailing Eastern Time.

- *Administrative Expense Bar Date*. Except as otherwise set forth in the Bar Date Order and Bar Date Notice and section 503(b)(1)(D) of the Bankruptcy Code, the last date for (i) all entities holding claims of any kind that arose during the period beginning on or after the Petition Date and ending August 23, 2019, including claims under sections 503(b)(1) through (8) of the Bankruptcy Code (excluding claims under section 503(b)(9)) and (ii) governmental units holding claims against the Debtors that are deemed entitled to administrative priority despite some portion of such claim being attributable to prepetition periods to file such claims is October 7, 2019 at 5:00 p.m., prevailing Eastern Time. Additional information regarding bar dates for Administrative Expense Claims is set forth in the Plan and the summary of Plan terms below.

### H.    The Debtors' Sale Process

#### 1.    Prepetition Marketing Efforts and Sale Process

The Debtors filed their Chapter 11 Cases with the goal of selling substantially all of their assets in order to maximize creditor recoveries. Prior to the Petition Date, the Debtors and their advisors began exploring and analyzing various strategies and protocols to ensure such a sale process would result in the best return to creditors. Pursuant to this process, the Debtors and their non-Debtor affiliates (collectively, the "Company") engaged:

> (a) Moelis to serve as their investment banker in connection with a marketing and sale process (the "FTD Sale Process") for, among other things, (i) a sale of the entire Company or, in the alternative, (ii) one or more transactions involving: (A) FTD.com, the business unit held by Debtor FTD.COM Inc.; (B) the florist business segment, (together with FTD.com, the "FTD Assets") held by Debtor Florists' Transworld Delivery, Inc.; and (C) the Debtors' Interflora business unit in the United Kingdom; and

(b) Piper to serve as their investment banker in connection with a marketing and sale process (the "Provide Sale Process") for various business units, including the Provide Business Units (i.e., ProFlowers, Gourmet Foods and Personal Creations).

### a.    FTD Prepetition Sale Process

Beginning in July 2018, Moelis spearheaded an expansive two-part prepetition FTD Sale Process, which began with Moelis soliciting interest from 123 parties regarding consummating a strategic transaction focused on the entire Company.  Specifically, Moelis contacted 29 potential strategic parties and 94 potential financial sponsors to market a sale or merger of the entire Company.  In response to this initial outreach, certain parties expressed interest in acquiring specific assets, including the Interflora business unit.  Moelis also contacted seven potential international strategic parties and six potential international financial sponsors to determine their interest in a potential acquisition of the entire Company or, in the alternative, in a potential transaction for the sale of the Interflora business unit.  This initial outreach was fruitful.  In November 2018, the Debtors received six non-binding indications of interest from parties interested in acquiring the entire Company.  In late 2018, the Debtors also received two indications of interest from parties interested in acquiring the Interflora business unit.

The momentum of the prepetition FTD Sale Process stalled following the release of the Company's 2019 Valentine's Day results.  For a second year in a row, the Company materially underperformed during the peak Valentine's Day season, a critical period for floral and gifting retailers.  After Valentine's Day, the Debtors strategically narrowed the focus of the FTD Sale Process with an increased emphasis on sales of individual businesses.  During this second phase of the prepetition FTD Sale Process, Moelis solicited interest from a targeted group of 37 potential buyers focused on the FTD Assets.  Moelis also continued assisting the Debtors in advancing discussions with the parties interested in acquiring the Interflora business unit and expanded outreach to other potential buyers.

These adjustments were effective.  By the end of May 2019, the Debtors had received eight non-binding indications of interest from parties interested in acquiring the FTD Assets.  On May 31, 2019, the Company closed the sale of the Interflora business unit to a subsidiary of The Wonderful Company through the sale of the equity interests of the Debtors' non-debtor affiliate, FTD UK Holdings Limited, for a cash purchase price of approximately $59.5 million.  Additionally, on June 2, 2019, the Debtors entered into an asset purchase agreement, subject to certain conditions, with Gateway Mercury Holdings, LLC ("Gateway", an affiliate of Nexus Capital Management LP) for the sale of the FTD Assets and the Restructured ProFlowers Business[7] for an aggregate purchase price of $95 million (the "Gateway Agreement").

### b.    Provide Prepetition Sale Process

In furtherance of the Debtors' focus on consummating sales of individual businesses, the Debtors engaged Piper Jaffray in April 2019 to direct their prepetition Provide Sale Process, which ran parallel to the FTD Sale Process.  In so doing, Piper Jaffray solicited interest from 113 parties, including 11 potential strategic buyers and 102 potential financial buyers, in acquiring one or more of the Provide Businesses.  The Debtors executed confidentiality agreements with, and granted access to confidential Company information to, 31 parties that responded to this initial outreach with interest in conducting due diligence on the Provide Businesses.  By early May 2019, the Debtors had received five indications of interest from parties interested in acquiring some or all of the Provide Businesses.

Beginning in mid-May 2019, Piper Jaffray focused its outreach and marketing efforts on potential buyers that would be willing and able to serve as a stalking horse bidder for an expeditious sale of all, or a subset of, the Provide Businesses.  Again, this strategy proved effective.  In late May, the Debtors entered into non-binding letters

---

[7]    On May 30, 2019, the Debtors initiated a restructuring of their ProFlowers business to reduce costs, drive value for the ProFlowers® brand, and better support the Florist Segment operations.  As part of this restructuring, (a) the ProFlowers floral order fulfillment and distribution segments were transitioned to the Debtors' florist business segment and certain third-party fulfillment partners and (b) the ProFlowers website was maintained to continue to receive, process and fulfill online orders (the as-restructured ProFlowers collectively is referred to as the "Restructured ProFlowers Business").

of intent for the acquisition of (a) Personal Creations by PlanetArt LLC ("PlanetArt") and (b) Gourmet Foods by Farids & Co., LLC ("Farids").

## 2.      Postpetition Sale Process

On June 6, 2019, the Debtors filed a motion (the "Sale Motion", Docket No. 82) seeking approval of (a) the Debtors' sale of substantially all of their assets, including the FTD Assets, Gourmet Foods and Personal Creations and (b) bidding procedures related thereto.  Thereafter, the Debtors entered into:  (a) an amended and restated Gateway Agreement (the "Amended and Restated Gateway Agreement") with Gateway; (b) an asset purchase agreement with Farids for the sale of the Gourmet Foods business (including Shari's Berries) for an aggregate purchase price of $5 million (the "Farids Agreement"); and (c) an asset purchase agreement with PlanetArt for the sale of the Personal Creations business (including Gifts.com) for an aggregate purchase price of $18.1 million (the "PlanetArt Agreement").

On June 24, 2019, the Debtors filed three motions (the "Stalking Horse Motions," Docket Nos. 185, 186 and 187, respectively) designating the Amended and Restated Gateway Agreement, Farids Agreement and PlanetArt Agreement as the stalking horse agreements for the FTD Sale, the sale of Gourmet Foods and the sale of Personal Creations, respectively (the "Gateway Stalking Horse Agreement," the "Farids Stalking Horse Agreement and the "PlanetArt Stalking Horse Agreement," respectively).  On June 25, 2019, the Bankruptcy Court approved the Debtors' bidding procedures as proposed in the Sale Motion (Docket No. 201) (the "Bidding Procedures Order").  On July 2, 2019, the Bankruptcy Court approved each of the Stalking Horse Motions (Docket Nos. 306, 307 and 308, respectively)

Pursuant to the Bidding Procedures Order, the Debtors continued to solicit bids for the sale of Personal Creations, the FTD Assets and Gourmet Foods and scheduled an auction for each (to the extent necessary) to be held on July 22, 2019 at 10:00 a.m. if one or more Qualified Bids (as defined in the Bidding Procedures Order) were received on or before July 15, 2019 (the "Bid Deadline").

### a.      Personal Creations Sale

Except for the stalking horse bid from PlanetArt, the Debtors did not receive any other Qualified Bids for Personal Creations before the Bid Deadline.  Accordingly, the Debtors canceled the July 22, 2019 auction with respect to Personal Creations pursuant to the Bidding Procedures Order and designated the PlanetArt Stalking Horse Agreement as the Successful Bid (as defined in the Bidding Procedures Order) for Personal Creations. On August 1, 2019, after a hearing on July 31, 2019, the Bankruptcy Court entered an order approving the sale of Personal Creations to PlanetArt (Docket No. 490).  The Personal Creations sale closed effective August 1, 2019.

### b.      Gourmet Foods Sale

In addition to the stalking horse bid from Farids, the Debtors received a Qualified Bid from SBGF Acquisition, LLC ("SBGF"), an affiliate of 1-800-Flowers.com, Inc. for the purchase of Gourmet Foods. On July 19, 2019 (Docket No. 420), the Debtors adjourned the auction with respect to Gourmet Foods to July 31, 2019.  On July 31, 2019, the Debtors held an auction for their Gourmet Foods business; SBGF and Farids attended the auction.  After multiple rounds of bidding, SBGF submitted the highest and best bid for Gourmet Foods, with a purchase price of $20.5 million (see Docket No. 500 – *Notice of Auction Results in Connection with the Sale of Gourmet Foods*).  On August 9, 2019, the Bankruptcy Court held a hearing and entered an order approving the sale of Gourmet Foods to SBGF (the "Gourmet Foods Sale Order", Docket No. 553).  The Gourmet Foods sale closed on August 14, 2019.

### c.      FTD Sale

In addition to the stalking horse bid from Gateway, the Debtors received Qualified Bids from (i) Vine Holding Corporation ("Platinum"), an affiliate of Platinum Equity Small Cap Fund, L.P. and (ii) Teleflora LLC ("Teleflora"), a wholly owned subsidiary of The Wonderful Company LLC.  On July 19, 2019 (Docket No. 420), the Debtors adjourned the auction with respect to the FTD Assets to July 31, 2019.  On July 31, 2019, the Debtors held

-12-

an auction for their FTD Assets; Gateway, Platinum and Telefora attended the auction.  After multiple rounds of bidding, Gateway submitted the highest and best bid for the FTD Assets, with a purchase price of $110,860,000 in cash plus the assumption of certain liabilities (see Docket No. 499 – *Notice of Auction Results in Connection with the Sale of the FTD Assets and the Restructured ProFlowers Business*).  On August 9, 2019, the Bankruptcy Court held a hearing and entered an order approving the sale of the FTD Assets to Gateway (Docket No. 552).  The FTD sale closed on August 23, 2019.

### d.    Sale Proceeds and Escrows

As authorized by the Final Postpetition Financing Order, the Debtors used the net proceeds from the Personal Creations Sale, the Gourmet Foods Sale and the FTD Sale to pay down, in full, the Postpetition Financing Agreement, as well make additional payments on account of obligations owing under the Amended and Restated Credit Agreement.  In connection with the sales agreements, certain escrows or other rights to payment, including the FTD/ProFlowers Escrow, the Gourmet Foods Reserve, the Personal Creations Escrow, were created or existed, which may provide additional proceeds to the Debtors' estates available to pay Allowed Class 2 Secured Lender Claims and, in the case of the Gourmet Foods Reserve was to be used to pay certain obligations of the Debtors' estates as described more fully in the Gourmet Foods Sale Order.  At the time of the sales, the Debtors, with the consent of the Secured Parties, also created certain additional funds and reserves, including the Employee Termination Fund, the Tax Fund, the Tax Refunds, the Texas Ad Valorem Settlement Reserve and the TSA Funds (each as defined in the Plan) in order to provide for payment of certain employee and tax obligations of the Debtors' estates, as well as the obligations of the Debtors under the Gateway TSA and the PlanetArt TSA.

### I.    Committee Settlement

**[TBD]**

### J.    Exclusivity

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan.  If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan.  Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods "for cause."  On [_____], 2019, the Debtors filed a motion seeking extension of their exclusive periods to File and solicit acceptance of a chapter 11 plan.

## V.    SUMMARY OF THE PLAN

**The following summary highlights certain substantive provisions of the Plan, and is not, nor is it intended to be, a complete description or a substitute for a full and complete review of the Plan.  The Debtors urge all Holders of Claims and Interests to read and study carefully the Plan, a copy of which is attached hereto as <u>Exhibit A</u>.**

The Plan controls the actual treatment of Claims against and Interests in the Debtors under the Plan, and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and the Debtors' Estates, all parties receiving property under the Plan and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

### A.    Classification and Treatment of Claims and Interests

All Claims and Interests, except for those Claims set forth in Section V.A.1 below, are classified for voting and Distribution pursuant to the Plan as set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified herein.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class

and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes.  A Holder of a Claim that may be asserted against more than one of the Debtors shall be entitled to a single Distribution as if such Holder had a single Claim against the Debtors.

1.    **Unclassified Claims**

a.    **Payment of Administrative Expense Claims**

i.    **Administrative Expense Claims in General**

Except as specified in Section II.C.1 of the Plan, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Expense Claim and the applicable Debtor or the Debtor Liquidation Trustee, as applicable, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Expense Claim will receive, in full satisfaction of its Administrative Expense Claim, Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made at the Debtor Liquidation Trustee's option, (A) in the ordinary course of business or (B) on the latest to occur of (1) the Effective Date (or as soon as reasonably practicable thereafter), (2) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter) and (3) such other date as may be agreed upon by the Debtor Liquidation Trustee and the Holder of such Claim.

ii.    **Statutory Fees**

On or before the Effective Date, Administrative Expense Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors or the Debtor Liquidation Trustee in Cash equal to the amount of such Administrative Expense Claims.  Fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Debtor Liquidation Trustee until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

iii.    **Professional Compensation**

A.    **Final Fee Applications and Payment of Professional Fee Claims**

To the extent required by a Final Order of the Court approving a Professional's retention, all final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 30 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  Professional Fee Claims not subject to approval by separate Court order will be paid from the Professional Fee Escrow Account in accordance with any Final Order approving the retention of such Professional.

To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section II.C.1.a of the Plan.

B.    **Professional Fee Escrow Account**

As soon as practicable after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Professional Fee Claims owing to the Professionals shall

-14-

be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as set forth in Sections II.C.1.c and II.C.1.d of the Plan.

### C.    Allocation and Estimation of Professional Fees and Expenses

Professionals providing services to the Debtors shall reasonably estimate their unpaid Professional Fee Claims against the Debtors relating to the period prior to and through the Effective Date and shall deliver such estimate to the Debtors by two Business Days prior to the Confirmation Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

### iv.    Post-Confirmation Date Professional Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date through the Effective Date, the Debtors or the Debtor Liquidation Trust, as applicable, will, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash from the Professional Fee Escrow Account the reasonable and documented legal, professional or other fees and expenses related to implementation and consummation of the Plan incurred by the Debtors (including the reasonable and documented fees and expenses of the Creditors' Committee Professionals).  Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

When all Professional Fee Claims have been paid in full as set forth in Sections II.C.1.c and I.D.1.d of the Plan, any remaining amount in the Professional Fee Escrow Account shall be distributed to Holders of Allowed Class 2 Claims in accordance with the terms of the Plan.

### v.    Bar Date for Administrative Expense Claims

Except with respect to Professional Fee Claims or otherwise as set forth in the Plan, requests for payment of Administrative Expense Claims that arose during the period after the Closing Date and ending on the Effective Date must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date.  Objections to such requests for payment of Administrative Expense Claims and all requests for payment of Administrative Expense Claims made pursuant to the Bar Date Order must be Filed and served on the Notice Parties and the requesting party by (A) 90 days after the Effective Date or (B) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Expense Claims.

Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the applicable Bar Date or as otherwise set forth in the Plan, will be forever barred from asserting such Administrative Expense Claims against the Debtors, the Liquidation Trusts or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date.

### b.    Payment of Priority Tax Claims

### i.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtors or the Debtor Liquidation Trustee, as applicable, each Holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Debtor Liquidation Trustee, as applicable, in full

-15-

satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, satisfaction and release of such Claim, (A) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (B) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

**ii.**        **Other Provisions Concerning Treatment of Priority Tax Claims**

Notwithstanding anything to the contrary in Article II of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors, the Liquidation Trusts or their respective property.

**2.**        **Classification of Claims and Interests**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for voting and Distribution pursuant to the Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Except as otherwise specifically provided for herein, the Confirmation Order or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

**3.**        **Treatment of Claims and Interests**

**a.**        **Priority Claims (Class 1)**

  **i.**        *Classification.*  Class 1 consists of all Priority Claims.

  **ii.**        *Treatment.*  On the Effective Date, each Holder of an Allowed Priority Claim will receive on account of and in full and complete settlement and release of such Claim, Cash in the amount of such Allowed Priority Claim.

  **iii.**        *Voting.*  Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Claim in Class 1 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

**b.**        **Secured Lender Claims (Class 2)**

  **i.**        *Classification.*  Class 2 consists of all Secured Lender Claims.

  **ii.**        *Treatment.*  Unless otherwise agreed by any Holder of an Allowed Secured Lender Claim and the Debtors or the Debtor Liquidation Trustee (as applicable), each Holder of an Allowed Secured Lender Claim will receive its Pro Rata share of the Debtor Liquidation Trust Assets in excess of any amounts reserved to fund the Debtor Liquidation Trustee Functions (other than payment of Allowed Secured Lender Claims) or to pay claims (other than Allowed Secured Lender Claims) from such Debtor Liquidation Trust Assets.  For the avoidance of doubt, Allowed Secured Lender Claims shall only be entitled to payment of any remaining interest in the (A) the Wind Down Reserve Amount, (B) the Gourmet Foods Reserve Amount, (C) the Employee

-16-

Termination Fund Amount, (D) the Tax Fund Amount, (E) the TSA Funds, (F) the Tax Refunds, (G) the Texas Ad Valorem Settlement Reserve Amount and (H) the Professional Fee Escrow Amount to the extent that such amounts or assets are not used by the Debtors or the Debtor Liquidation Trust for the purposes for which such funds, reserves or escrows were created or for payment of Allowed Administrative Expense Claims, Priority Claims, Priority Tax Claims or Other Secured Claims under the Plan, except that the Debtors and Debtor Liquidation Trust shall only be entitled to the Gourmet Foods Reserve Amount for such purposes or payments to the extent provided in the Gourmet Foods Reserve Amount Protocol.  Further, (A) any rights to the Personal Creations Escrow Amount, (B) any rights to the Interflora Escrow Amount, (C) any rights to the FTD/ProFlowers Escrow Amount and (D) any rights to the Payment Processor Escrow Amount shall be fully available for payment of Allowed Secured Lender Claims except to the extent that the Committee Settlement Order provides that any such assets shall be used to fund the Committee Settlement Amount.

iii.    ***Voting.***  Claims in Class 2 are Impaired.  Each Holder of an Allowed Claim in Class 2 is, therefore, entitled to vote on the Plan.

c.    **Other Secured Claims (Class 3)**

i.    ***Classification.***  Class 3 consists of all Other Secured Claims.

ii.    ***Treatment.***  Unless otherwise agreed by any Holder of an Allowed Other Secured Claim and the Debtors or the Debtor Liquidation Trustee (as applicable), on the later of (A) the Effective Date or as soon as reasonably practicable thereafter and (B) the date on which such Other Secured Claim becomes an Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Debtor Liquidation Trustee:  (1) payment in full in Cash; (2) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest thereon required to be paid under section 506(b) of the Bankruptcy Code; or (3) such other recovery as is necessary to render such Claim Unimpaired.

iii.    ***Voting.***  Claims in Class 3 are Unimpaired.  Each holder of an Allowed Claim in Class 3 is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote on the Plan.

d.    **General Unsecured Claims (Class 4)**

i.    ***Classification.***  Class 4 consists of all General Unsecured Claims.

ii.    ***Treatment.***  Unless otherwise agreed by any Holder of an Allowed General Unsecured Claim and the Debtors or the Committee Liquidation Trustee (as applicable), each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Committee Liquidation Trust Assets in excess of any amounts necessary to pay Committee Liquidation Trust Expenses; provided, however, that the Committee Settlement Amount shall only be available for payment of Allowed Class 4 Claims to the extent that the Debtor Liquidation Trustee has paid in full pursuant to the terms of the Plan, or, in its sole discretion, fully reserved for, all: (A) Allowed Administrative Expense

-17-

Claims, (B) Allowed Priority Tax Claims, (C) Allowed Priority Claims and (D) Allowed Other Secured Claims.

           **iii.**      *Voting*.  Claims in Class 4 are Impaired.  Each Holder of an Allowed Claim in Class 4 is, therefore, entitled to vote on the Plan.

    **e.**      **Interests (Class 5)**

           **i.**      *Classification*.  Class 5 consists of all Interests in GUE.

           **ii.**      *Treatment*.  On the Effective Date, the Interests will be canceled, and Holders of Class 5 Interests will not receive any Distribution pursuant to the Plan.

           **iii.**      *Voting*.  Each Holder of a Class 5 Interest will be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan.

    **4.**      **Reservation of Rights Regarding Claims**

Except as otherwise provided in the Plan or in other Final Orders of the Bankruptcy Court, nothing shall affect the Debtors', the Debtor Liquidation Trustee's or the Committee Liquidation Trustee's rights and defenses, whether legal or equitable, with respect to any Claim, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

    **5.**      **Postpetition Interest on Claims**

Except as required by applicable bankruptcy law, postpetition interest shall not accrue or be payable on account of any Claim.

    **6.**      **Insurance**

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an Insurance Policy, such Claim shall first be paid by proceeds of such Insurance Policy, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

    **7.**      **Class Without Voting Claim Holders**

If Holders of Claims in a particular Impaired Class of Claims are entitled to vote to accept or reject the Plan, but no Holders of Claims in such Impaired Class of Claims vote to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

**B.**      **Means for Implementation of the Plan**

    **1.**      **Corporate Existence**

    **a.**      **Dissolution of the Debtors**

On the Effective Date, the Debtors' members, directors, managers and officers and any remaining employees shall be deemed to have resigned and the Debtors dissolved for all purposes and of no further legal existence under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice or application with the Secretary of State of the State of Delaware or any other state or government authority, and without the need to pay any franchise or similar taxes in order to effectuate such dissolution.

b. **Sole Recourse**

All Claims against the Debtors are deemed satisfied, waived and released as to the Debtors in exchange for the treatment of such Claims under the Plan on the Effective Date, and, except as otherwise set forth in the Plan or other Final Orders of the Bankruptcy Court, Holders of Allowed Claims against any Debtor will have recourse solely to the assets of the applicable Liquidation Trust for the payment of their Allowed Claims in accordance with the terms of the Plan and the Debtor Liquidation Trust Agreement or Committee Liquidation Trust Agreement, as applicable.

2. **Debtor Liquidation Trust**

a. **Debtor Liquidation Trust Generally**

On or prior to the Effective Date, the Debtor Liquidation Trust shall be established in accordance with the Debtor Liquidation Trust Agreement for the purpose of liquidating the Debtor Liquidation Trust Assets, reconciling Claims (other than General Unsecured Claims) and making all Distributions to Holders of Allowed Claims (other than General Unsecured Claims) in accordance with the terms of the Plan and the Debtor Liquidation Trust Agreement.

Subject to and to the extent set forth in the Plan, the Confirmation Order, the Debtor Liquidation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Debtor Liquidation Trust shall be empowered to:  (i) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Debtor Liquidation Trust; (ii) establish, maintain and administer Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan; (iii) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle and protect, as applicable, the Debtor Liquidation Trust Assets (directly or through its professionals or a Third Party Disbursing Agent), in accordance with the Plan; (iv) review, reconcile, settle or object to Claims (other than General Unsecured Claims) that are Disputed Claims pursuant to the procedures for allowing Claims prescribed in the Plan; (v) pursue Causes of Action that are Debtor Liquidation Trust Assets as set forth in Section III.G of the Plan; (vi) calculate and make Distributions of the proceeds of the Debtor Liquidation Trust Assets to Holders of Allowed Claims (other than General Unsecured Claims); (vii) retain, compensate and employ professionals to represent the Debtor Liquidation Trust; (viii) prepare and file appropriate Tax returns and other reports on behalf of the Debtor Liquidation Trust and pay Taxes or other obligations owed by the Debtor Liquidation Trust; (ix) exercise such other powers as may be vested in the Debtor Liquidation Trust under the Debtor Liquidation Trust Agreement and the Plan, or as are deemed by the Debtor Liquidation Trustee to be necessary and proper to implement the provisions of the Debtor Liquidation Trust Agreement and effectuate the purpose of the Debtor Liquidation Trust; and (x) dissolve the Debtor Liquidation Trust in accordance with the terms of the Debtor Liquidation Trust Agreement.

Notwithstanding anything to the contrary in Section III.B of the Plan, the Debtor Liquidation Trust's primary purpose is liquidating the Debtor Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Debtor Liquidation Trust's liquidating purpose and reasonably necessary to conserve and protect the Debtor Liquidation Trust Assets and provide for the orderly liquidation thereof.

b. **Funding of and Transfer of Assets Into the Debtor Liquidation Trust**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors shall transfer the Debtor Liquidation Trust Assets to the Debtor Liquidation Trust, and all such assets shall vest in the Debtor Liquidation Trust on such date, to be administered by the Debtor Liquidation Trustee in accordance with the Plan and the Debtor Liquidation Trust Agreement.  Except as set forth in Section III.I of the Plan, the Debtor

Liquidation Trust Assets shall be transferred to the Debtor Liquidation Trust free and clear of all Liens, Claims, encumbrances or interests.

The Debtor Liquidation Trustee shall have the authority to create additional sub-accounts in Trust Accounts and sub-trusts within the Debtor Liquidation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Debtor Liquidation Trust.

The act of transferring the Debtor Liquidation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Debtor Liquidation Trust as if the asset or right was still held by the applicable Debtor.

### c.      Debtor Liquidation Trustee

The initial Debtor Liquidation Trustee shall be such individual or entity as may be selected by the Debtors with the consent of the Prepetition Agent and as shall be disclosed in the Plan Supplement.  Except as otherwise provided in the Plan, the Debtor Liquidation Trustee (i) shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code and (ii) shall be the sole representative of, and shall act for, the Debtors, and shall assume any such outstanding responsibility of the Debtors under the Plan.  The powers, rights and responsibilities of the Debtor Liquidation Trustee shall be specified in the Debtor Liquidation Trust Agreement and shall include the authority and responsibility to fulfill (i) the items identified in Section III.B.1 of the Plan and (ii) the Debtor Liquidation Trustee Functions set forth in Section III.B.4 of the Plan.  Other rights and duties of the Debtor Liquidation Trustee and the Debtor Liquidation Trust Beneficiaries shall be as set forth in the Debtor Liquidation Trust Agreement.

### d.      Debtor Liquidation Trustee Functions

On and after the Effective Date, the Debtor Liquidation Trustee and/or the Debtor Liquidation Trust, as applicable, shall carry out the Debtor Liquidation Trustee Functions and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the Debtor Liquidation Trust Agreement.

The Debtor Liquidation Trustee Functions shall include any and all powers and authority to: (i) effectuate the Plan, including the prosecution and any other disposition of all litigation related to any appeals in respect to the approval and/or implementation of the Plan; (ii) wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to terminate the corporate or organizational existence of the Debtors; (iii) take any actions necessary to (A) resolve all matters related to the Debtor Liquidation Trust Assets and (B) vest such assets in the Debtor Liquidation Trust; (iv) execute the Debtors' remaining obligations under the Gateway TSA and PlanetArt TSA, if any; (v) pay all (A) Allowed Administrative Expense Claims (including payment of Professional Fee Claims as set forth in Section II.C.1 of the Plan), (B) Allowed Priority Tax Claims, (C) Allowed Priority Claims, (D) Allowed Secured Lender Claims and (E) Allowed Other Secured Claims pursuant to the Plan; (vi) pay out of the Tax Fund, on account of any claim, including, without limitation, any General Unsecured Claim, any amounts (including any related attorneys' fees) the Debtor Liquidation Trustee considers necessary or appropriate to allow any officer or director of any of the Debtors serving on or after the Petition Date to avoid personal liability on account of such claim or the costs and expenses of defending an action for personal liability on account of such claim; (vii) pay the Debtor Liquidation Trust Expenses; (viii) prepare and file appropriate Tax returns and other reports on behalf of the Debtors and pay Taxes or other obligations owed by the Debtors (including, without limitation, any Allowed Administrative Expense Claims and Allowed Priority Tax Claims asserted by taxing authorities), and, in the Debtor Liquidation Trustee's discretion, request an expedited determination of any unpaid tax liability of a Debtor pursuant to section 505(b) of the Bankruptcy Code; (ix) file, prosecute, settle and/or dispose of any and all objections to asserted (A) Administrative Expense Claims, (B) Priority Tax Claims, (C) Priority Claims, (D) Secured Lender Claims and (E) Other Secured Claims; (x) enter into and consummate Dissolution Transactions; (xi) take such actions as are necessary or appropriate to close any of the Debtors' Chapter 11 Cases; (xii) retain, compensate and employ professionals to represent the Debtor Liquidation Trust or the Debtor Liquidation Trustee, as applicable; and (xiii) take any other actions not inconsistent with the Plan provisions that the Debtor Liquidation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

-20-

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Debtor Liquidation Trustee.

### e.        Debtor Liquidation Trust Agreement

Prior to the Effective Date, the Debtors and the Debtor Liquidation Trustee shall execute and deliver the Debtor Liquidation Trust Agreement.

The Debtor Liquidation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Debtor Liquidation Trustee and/or other parties.  Any such indemnification shall be the sole responsibility of the Debtor Liquidation Trust and payable solely from the Debtor Liquidation Trust Assets.

### f.        Fees and Expenses of the Debtor Liquidation Trust

From and after the Effective Date, Debtor Liquidation Trust Expenses shall be paid from the Debtor Liquidation Trust Assets in the ordinary course of business, in accordance with the Plan and the Debtor Liquidation Trust Agreement.  Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Debtor Liquidation Trustee, on behalf of the Debtor Liquidation Trust, may employ and pay in the ordinary course of business, any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Debtor Liquidation Trustee, are necessary to assist the Debtor Liquidation Trustee in the performance of the Debtor Liquidation Trustee's duties under the Plan and the Debtor Liquidation Trust Agreement, subject to any limitations and procedures established by the Debtor Liquidation Trust Agreement.

### g.        Limitation of Liability

Neither the Debtor Liquidation Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or Debtor Liquidation Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Debtor Liquidation Trust.  The Debtor Liquidation Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee.  The Debtor Liquidation Trustee may, in connection with the performance of his, her or its functions, in the Debtor Liquidation Trustee's sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing.  Notwithstanding such authority, the Debtor Liquidation Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Debtor Liquidation Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud.  Persons dealing with the Debtor Liquidation Trustee shall look only to the Debtor Liquidation Trust Assets to satisfy any liability incurred by the Debtor Liquidation Trustee to such person in carrying out the terms of the Plan or the Debtor Liquidation Trust Agreement, and the Debtor Liquidation Trustee shall have no personal obligation to satisfy such liability.

### h.        Indemnification

The Debtor Liquidation Trust shall indemnify the Debtor Liquidation Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Debtor Liquidation Trust Indemnified Parties (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Debtor Liquidation Trust Indemnified Parties in connection with the acceptance, administration, exercise and performance of their duties under the Plan or

the Debtor Liquidation Trust Agreement, as applicable.  An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct.  In addition, the Debtor Liquidation Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Debtor Liquidation Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Debtor Liquidation Trust or the implementation or administration of the Plan if the Debtor Liquidation Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Debtor Liquidation Trust.  To the extent the Debtor Liquidation Trust indemnifies and holds harmless any Debtor Liquidation Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Debtor Liquidation Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Debtor Liquidation Trust Expenses.  The costs and expenses incurred in enforcing the right of indemnification in this Section shall be paid by the Debtor Liquidation Trust.  This provision shall survive the termination of the Debtor Liquidation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Debtor Liquidation Trustee.

### i.    Insurance

The Debtor Liquidation Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Debtor Liquidation Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Debtor Liquidation Trustee, which insurance coverage may, at the sole option of the Debtor Liquidation Trustee, be extended for a reasonable period after the termination of the Debtor Liquidation Trust Agreement.

### j.    Dissolution of the Debtor Liquidation Trust

In no event shall the Debtor Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion made within the six month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension is necessary to facilitate or complete the recovery on, and liquidation of, the Debtor Liquidation Trust Assets.

### k.    Records

The Debtor Liquidation Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Debtor Liquidation Trust Assets and objections to Disputed Claims (other than General Unsecured Claims).

### l.    Tax Treatment; No Successor in Interest

The Debtor Liquidation Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and, to the extent applicable, as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section l.468B-9.  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Debtor Liquidation Trust will be treated (i) as the transfer of assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Debtor Liquidation Trust Assets, subject to any liabilities of the Debtors or the Debtor Liquidation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Debtor Liquidation Trust in exchange for the beneficial interests in the Debtor Liquidation Trust, and (ii) to the extent applicable,  as the transfer of assets by the Debtors to one more Disputed Claims Reserves.

### i.    Liquidation Purpose of the Debtor Liquidation Trust

The Debtor Liquidation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent

with, the liquidating purpose of the Debtor Liquidation Trust. Accordingly, the Debtor Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Debtor Liquidation Trust Assets, make timely distributions to the Debtor Liquidation Trust Beneficiaries and not unduly prolong its duration. The Debtor Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Debtor Liquidation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Debtor Liquidation Trustee expressly for such purpose.

The Debtor Liquidation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Debtor Liquidation Trust Beneficiaries treated as grantors and owners of the Debtor Liquidation Trust. For all U.S. federal income tax purposes, all parties (including the Debtors, the Debtor Liquidation Trustee and the Debtor Liquidation Trust Beneficiaries) shall treat the transfer of the Debtor Liquidation Trust Assets by the Debtors to the Debtor Liquidation Trust, as set forth in the Debtor Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Debtor Liquidation Trust Assets, followed by a transfer by such Holders to the Debtor Liquidation Trust. Thus, the Debtor Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Debtor Liquidation Trustee shall make a good faith determination of the fair market value of the Debtor Liquidation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the Debtors, the Debtor Liquidation Trustee and the Debtor Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Debtor Liquidation Trust Assets.

The right and power of the Debtor Liquidation Trustee to invest the Debtor Liquidation Trust Assets, the proceeds thereof or any income earned by the Debtor Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Debtor Liquidation Trustee may expend the Cash of the Debtor Liquidation Trust (A) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Debtor Liquidation Trust during liquidation, (B) to pay the respective reasonable administrative expenses (including, but not limited to, any Taxes imposed on the Debtor Liquidation Trust) and (C) to satisfy other respective liabilities incurred by the Debtor Liquidation Trust in accordance with the Plan and the Debtor Liquidation Trust Agreement (including, without limitation, the payment of any Taxes).

### ii. Disputed Claims Reserves

To the extent applicable, Debtor Liquidation Trust Assets reserved for Holders of Disputed Claims (excluding Disputed Claims concerning General Unsecured Claims), shall be treated as one or more Disputed Claims Reserves. The Debtor Liquidation Trustee shall treat any such Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Debtor Liquidation Trustee shall be the administrator of any such Disputed Claims Reserve within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all Tax reporting and withholding required by any such Disputed Claims Reserve.

### m. Settlement of Claims Other Than General Unsecured Claims

Except as otherwise provided in the Plan or the Debtor Liquidation Trust Agreement, on and after the Effective Date, the Debtor Liquidation Trustee may compromise or settle any Claims (other than General Unsecured Claims) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy

Code or Bankruptcy Rules, and may pay the charges that it incurs on or after the Effective Date for Debtor Liquidation Trust Expenses without application to the Bankruptcy Court.

### n.    Sales of Assets by Debtor Liquidation Trust

The Debtor Liquidation Trustee may conduct any sales or liquidations of non-Cash Debtor Liquidation Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court.  Upon the sale, liquidation, transfer or other disposition of the Debtor Liquidation Trust Assets by the Debtor Liquidation Trustee, the Debtor Liquidation Trustee shall deposit the proceeds of all such sales, liquidations, transfers or dispositions into one or more Trust Accounts.

### 3.    Committee Liquidation Trust

### a.    Committee Liquidation Trust Generally

On or prior to the Effective Date, the Committee Liquidation Trust shall be established in accordance with the Committee Liquidation Trust Agreement for the purpose of liquidating the Committee Liquidation Trust Assets, resolving Disputed Claims to the extent such Disputed Claims concern General Unsecured Claims and making all Distributions to Holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and the Committee Liquidation Trust Agreement.  Subject to and to the extent set forth in the Plan, the Confirmation Order, the Committee Liquidation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Committee Liquidation Trust shall be empowered to:  (i) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Committee Liquidation Trust; (ii) establish, maintain and administer Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan; (iii) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle and protect, as applicable, the Committee Liquidation Trust Assets (directly or through its professionals or a Third Party Disbursing Agent), in accordance with the Plan; (iv) review, reconcile, settle or object to all General Unsecured Claims that are Disputed Claims pursuant to the procedures for allowing Claims prescribed in the Plan; (v) pursue Avoidance Actions as set forth in Section III.G of the Plan; (vi) calculate and make Distributions of the proceeds of the Committee Liquidation Trust Assets to the holders of Allowed General Unsecured Claims; (vii) retain, compensate and employ professionals to represent the Committee Liquidation Trust; (viii) prepare and file appropriate Tax returns and other reports on behalf of the Committee Liquidation Trust and pay Taxes or other obligations owed by the Committee Liquidation Trust; (ix) exercise such other powers as may be vested in the Committee Liquidation Trust under the Committee Liquidation Trust Agreement and the Plan, or as are deemed by the Committee Liquidation Trustee to be necessary and proper to implement the provisions of the Committee Liquidation Trust Agreement and effectuate the purpose of the Committee Liquidation Trust; and (x) dissolve the Committee Liquidation Trust in accordance with the terms of the Committee Liquidation Trust Agreement.

Notwithstanding anything to the contrary in Section III.C of the Plan, the Committee Liquidation Trust's primary purpose is pursuing and liquidating the Committee Liquidation Trust Assets and making Distributions to the Committee Liquidation Trust Beneficiaries, in accordance with this Plan and Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

### b.    Funding of and Transfer of Assets Into the Committee Liquidation Trust

On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred all right, title and interest in and to the Committee Liquidation Trust Assets to the Committee Liquidation Trust, for the benefit of the Committee Liquidation Trust Beneficiaries, and all such assets shall automatically vest in the Committee Liquidation Trust on such date, to be administered by the Committee Liquidation Trustee in accordance with the Plan and the Committee Liquidation Trust Agreement.  The Committee Liquidation Trustee shall be the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) solely with respect to the Committee Liquidation Trust Assets.  Except as set forth in Section III.I of the Plan, the Committee Liquidation Trust Assets shall be transferred to the Committee Liquidation Trust free and clear of all Liens, Claims, encumbrances or interests.  Such transfer shall be exempt from any stamp, real estate transfer,

-24-

other transfer, mortgage reporting, sales, use or other similar tax.  As of the Effective Date, the Debtors shall have no interest in the Committee Liquidation Trust Assets.

The Committee Liquidation Trustee shall have the authority to create additional sub-accounts in Trust Accounts and sub-trusts within the Committee Liquidation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Committee Liquidation Trust.

The act of transferring the Committee Liquidation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Committee Liquidation Trust as if the asset or right was still held by the applicable Debtor.

### c. Committee Liquidation Trustee

The initial Committee Liquidation Trustee shall be such individual or entity as shall be selected by the Creditors' Committee and disclosed in the Plan Supplement.  The powers, rights and responsibilities of the Committee Liquidation Trustee shall be specified in the Committee Liquidation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Section III.C.1 of the Plan.  Other rights and duties of the Committee Liquidation Trustee and the Committee Liquidation Trust Beneficiaries shall be as set forth in the Committee Liquidation Trust Agreement.

### d. Committee Liquidation Trust Agreement

Prior to the Effective Date, the Debtors and the Committee Liquidation Trustee shall execute and deliver the Committee Liquidation Trust Agreement.

The Committee Liquidation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Committee Liquidation Trustee and/or other parties.  Any such indemnification shall be the sole responsibility of the Committee Liquidation Trust and payable solely from the Committee Liquidation Trust Assets.

### e. Reports to be Filed by the Committee Liquidation Trustee

Following the Effective Date, the Committee Liquidation Trustee, on behalf of the Committee Liquidation Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Committee Liquidation Trust Agreement) an annual report regarding the administration of property subject to its ownership and control pursuant to the Plan.

### f. Fees and Expenses of the Committee Liquidation Trust

From and after the Effective Date, Committee Liquidation Trustee Expenses shall be paid from the Committee Liquidation Trust Assets in the ordinary course of business, in accordance with the Plan and the Committee Liquidation Trust Agreement.  Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Committee Liquidation Trustee, on behalf of the Committee Liquidation Trust, may employ and pay in the ordinary course of business, any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Committee Liquidation Trustee, are necessary to assist the Committee Liquidation Trustee in the performance of the Committee Liquidation Trustee's duties under the Plan and the Committee Liquidation Trust Agreement, subject to any limitations and procedures established by the Committee Liquidation Trust Agreement.

### g. Limitation of Liability

Neither the Committee Liquidation Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or

-25-

Committee Liquidation Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Committee Liquidation Trust.  The Committee Liquidation Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee.  The Committee Liquidation Trustee may, in connection with the performance of his, her or its functions, in the Committee Liquidation Trustee's sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing.  Notwithstanding such authority, the Committee Liquidation Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Committee Liquidation Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud.  Persons dealing with the Committee Liquidation Trustee shall look only to the Committee Liquidation Trust Assets to satisfy any liability incurred by the Committee Liquidation Trustee to such person in carrying out the terms of the Plan or the Committee Liquidation Trust Agreement, and the Committee Liquidation Trustee shall have no personal obligation to satisfy such liability.

<strong>h.      Indemnification</strong>

The Committee Liquidation Trust shall indemnify the Committee Liquidation Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Committee Liquidation Trust Indemnified Parties (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Committee Liquidation Trust Indemnified Parties in connection with the acceptance, administration, exercise and performance of their duties under the Plan or the Committee Liquidation Trust Agreement, as applicable.  An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct.  In addition, the Committee Liquidation Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Committee Liquidation Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Committee Liquidation Trust or the implementation or administration of the Plan if the Committee Liquidation Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Committee Liquidation Trust.  To the extent the Committee Liquidation Trust indemnifies and holds harmless any Committee Liquidation Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Committee Liquidation Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Committee Liquidation Trust Expenses.  The costs and expenses incurred in enforcing the right of indemnification in this Section shall be paid by the Committee Liquidation Trust.  This provision shall survive the termination of the Committee Liquidation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Committee Liquidation Trustee.

<strong>i.      Insurance</strong>

The Committee Liquidation Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Committee Liquidation Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Committee Liquidation Trustee, which insurance coverage may, at the sole option of the Committee Liquidation Trustee, be extended for a reasonable period after the termination of the Committee Liquidation Trust Agreement.

<strong>j.      Dissolution of the Committee Liquidation Trust</strong>

In no event shall the Committee Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion made within the six month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the

-26-

end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Committee Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Committee Liquidation Trust Assets.

**k.    Records**

The Committee Liquidation Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Committee Liquidation Trust Assets and objections to Disputed Claims to the extent such Disputed Claims concern General Unsecured Claims.

**l.    Tax Treatment; No Successor in Interest**

The Committee Liquidation Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and in part as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section l.468B-9.  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Committee Liquidation Trust will be treated (i) in part as the transfer of assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Committee Liquidation Trust Assets, subject to any liabilities of the Debtors or the Committee Liquidation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Committee Liquidation Trust in exchange for the beneficial interests in the Committee Liquidation Trust, and (ii) in part as the transfer of assets by the Debtors to one more Disputed Claims Reserves.

**i.    Liquidation Purpose of the Committee Liquidation Trust**

The Committee Liquidation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Committee Liquidation Trust.  Accordingly, the Committee Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Committee Liquidation Trust Assets, make timely distributions to the Committee Liquidation Trust Beneficiaries and not unduly prolong its duration.  The Committee Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Committee Liquidation Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Committee Liquidation Trustee expressly for such purpose.

The Committee Liquidation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Committee Liquidation Trust Beneficiaries treated as grantors and owners of the Committee Liquidation Trust.  For all U.S. federal income tax purposes, all parties (including the Debtors, the Committee Liquidation Trustee and the Committee Liquidation Trust Beneficiaries) shall treat the transfer of the Committee Liquidation Trust Assets by the Debtors to the Committee Liquidation Trust, as set forth in the Committee Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Committee Liquidation Trust Assets, followed by a transfer by such Holders to the Committee Liquidation Trust.  Thus, the Committee Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Committee Liquidation Trustee shall make a good faith determination of the fair market value of the Committee Liquidation Trust Assets as of the Effective Date.  This valuation shall be used consistently by all parties (including the Debtors, the Committee Liquidation Trustee and the Committee Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Committee Liquidation Trust Assets.

The right and power of the Committee Liquidation Trustee to invest the Committee Liquidation Trust Assets, the proceeds thereof or any income earned by the Committee Liquidation Trust, shall be limited to the right

and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code.  The Committee Liquidation Trustee may expend the Cash of the Committee Liquidation Trust (A) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Committee Liquidation Trust during liquidation, (B) to pay the respective reasonable administrative expenses (including, but not limited to, any Taxes imposed on the Committee Liquidation Trust) and (C) to satisfy other respective liabilities incurred by the Committee Liquidation Trust in accordance with the Plan and the Committee Liquidation Trust Agreement (including, without limitation, the payment of any Taxes).

### ii.    Disputed Claims Reserves

Committee Liquidation Trust Assets reserved for Holders of Disputed Claims, to the extent such Disputed Claims concern General Unsecured Claims, shall be treated as one or more Disputed Claims Reserves.  The Committee Liquidation Trustee has the discretion to treat each such Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment).  The Committee Liquidation Trustee shall be the administrator of such Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all Tax reporting and withholding required by such Disputed Claims Reserves.

### m.    Settlement of General Unsecured Claims

Except as otherwise provided in the Plan or the Committee Liquidation Trust Agreement, on and after the Effective Date, the Committee Liquidation Trustee may compromise or settle any General Unsecured Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Committee Liquidation Trust Expenses without application to the Bankruptcy Court.

### n.    Sales of Assets by Committee Liquidation Trust

The Committee Liquidation Trustee may conduct any sales or liquidations of non-Cash Committee Liquidation Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court.  Upon the sale, liquidation, transfer or other disposition of the Committee Liquidation Trust Assets by the Committee Liquidation Trustee, the Committee Liquidation Trustee shall deposit the proceeds of all such sales, liquidations, transfers or dispositions into one or more of the Trust Accounts.

### 4.    Corporate Actions

### a.    Constituent Documents of the Debtors

Consistent with Section III.A.1 of the Plan, the Debtors will cease to exist on the Effective Date, and all existing articles of organization and similar constituent documents will be canceled, effective as of the Effective Date.  Accordingly, no new articles of organization or other constituent documents will be necessary.

### b.    Directors and Officers

Effective as of the Effective Date, all directors and officers of the Debtors shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.

### c.    Corporate Action

Except as otherwise provided in Section III.A.1 of the Plan, the Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions (or other transactions), or the Effective Date if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without

any requirement of further action by the Debtors, the Liquidation Trustees or any other Person:  (i) the establishment of the Liquidation Trusts; (ii) the appointment of the Liquidation Trustees to act on behalf of the Liquidation Trusts; (iii) the transfer of the Liquidation Trust Assets into the Liquidation Trusts, as set forth in the Plan; (iv) the distribution of Cash pursuant to the Plan; (v) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (vi) the adoption, execution and implementation of the Liquidation Trust Agreements; and (vii) the other matters provided for under the Plan involving the corporate structure of any Debtor or corporate action to be taken by or required of any Debtor or Liquidation Trustee.  On the Effective Date, the Provide Deferred Compensation Plan will be terminated, and Nolan Financial Group will release to eligible participants all amounts held for the benefit of such participants on account of the Provide Deferred Compensation Plan.

### 5. No Revesting of Assets

To the extent not otherwise distributed in accordance with the Plan, the property of the Debtors' Estates shall not revest in the Debtors on or after the Effective Date but shall instead vest in the applicable Liquidation Trust to be administered by the Liquidation Trustees, as applicable, in accordance with the Plan and the Liquidation Trust Agreements.

### 6. Creation and Maintenance of Trust Accounts

#### a. Creation of Trust Accounts

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the applicable Liquidation Trust or, if applicable and appropriate, a Third Party Disbursing Agent.  Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the applicable Liquidation Trust Agreement.  The Liquidation Trustees are authorized to establish additional Trust Accounts after the Effective Date, consistent with the terms of the Liquidation Trust Agreements, as applicable.

#### b. Additional Funding of Trust Accounts

After the funding of the Trust Accounts on the Effective Date, the Trust Accounts will be funded, as applicable, by Cash proceeds obtained through litigation or the disposition of Liquidation Trust Assets.

#### c. Closure of Trust Accounts

Upon obtaining an order of the Bankruptcy Court authorizing final Distribution and/or closure of the Debtors' Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with the Plan and the applicable Liquidation Trust Agreement, and the Trust Accounts may be closed.

### 7. Preservation of Causes of Action

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidation Trustees, as applicable, will retain and may enforce any claims, demands, rights and Causes of Action that any Estate may hold against any Person to the extent not released under the Plan or otherwise, including any Avoidance Actions.  The Liquidation Trustees (solely to the extent provided in the Plan and the Liquidation Trust Agreements) may pursue any such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of their respective Liquidation Trust Beneficiaries.

A nonexclusive schedule of currently pending actions and claims brought by one or more Debtors is attached as Exhibit F.  Except as otherwise provided in this Section, in accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any right of action or claim on Exhibit F shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that any Debtor or Estate may hold against any Entity.

-29-

8.      **Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in (a) any contract, instrument or other agreement or document entered into or delivered in connection with the Plan or (b) any of the asset sales effectuated during the pendency of the Debtors' Chapter 11 Cases, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article II of the Plan, all notes, instruments, certificates and other documents evidencing Claims or Interests shall be deemed canceled and surrendered and of no further force and effect against the Debtors or the Liquidation Trusts, without any further action on the part of any Debtor, the Liquidation Trusts or the Liquidation Trustees.

9.      **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all Liens on the property of any Debtor's Estate shall be fully released and discharged, and all of the right, title and interest of any Holder of such Liens shall be released and discharged upon such Holder receiving its Distribution in accordance with the terms of the Plan.

10.     **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Liquidation Trusts and the Liquidation Trustees are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan and the Dissolution Transactions, in each case, in the name of and on behalf of the Debtors or the Liquidation Trusts, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

11.     **Substitution in Pending Legal Actions**

On the Effective Date, the Debtor Liquidation Trustee, solely in his or her capacity as the trustee for the Debtor Liquidation Trust, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (a) pending contested matters or adversary proceedings in the Bankruptcy Court, (b) any appeals of orders of the Bankruptcy Court and (c) any state court or federal or state administrative proceedings pending as of the Petition Date; provided, however, that the Committee Liquidation Trustee, solely in his or her capacity as the trustee for the Committee Liquidation Trust, shall be deemed to be substituted as the party to (a) any pending Avoidance Action and (b) any such litigation in which the Debtors are a defendant and not a counter-claimant or third-party plaintiff that may give rise solely to a General Unsecured Claim.  The Liquidation Trustees, and their respective professionals, as applicable, may, but are not required to, take such steps as are appropriate to provide notice of such substitution.

C.      **Treatment of Executory Contracts and Unexpired Leases**

1.      **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Plan, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease (a) identified on Exhibit G hereto (which shall be Filed as a Plan Supplement) as an Executory Contract or Unexpired Lease designated for assumption and assignment to the Debtor Liquidation Trust, (b) that is the subject of a separate motion or notice to assume or reject Filed by a Debtor and pending as of the Confirmation Hearing or (c) that previously expired or terminated pursuant to its own terms.

Except as otherwise previously approved by an order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and assignments and the rejections of such Executory Contracts and Unexpired

-30-

Leases as set forth in the preceding paragraph. Unless otherwise indicated herein, assumptions and assignments and rejections of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall vest in and be fully enforceable by the Debtor Liquidation Trust in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; provided that if an assignment is pending as of the Effective Date, the Debtor Liquidation Trustee shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to alter, amend, modify or supplement Exhibit G to the Plan in their discretion prior to the Effective Date on no less than five days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

## 2. Cure of Defaults for Executory Contracts and Unexpired Leases Assumed by the Debtor Liquidation Trust

With respect to any Executory Contract or Unexpired Lease assumed by the Debtor Liquidation Trust, any Cure Amount Claim shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Allowed amount of such Cure Amount Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to any particular Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the Allowed amount of any Cure Amount Claim; (b) the ability of the Debtor Liquidation Trust or another assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, no payments on account of the Cure Amount Claim shall be made until such dispute is resolved by a Final Order. At least 14 days before the Confirmation Hearing, the Debtors shall file and distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Amount Claims to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or the related amount of the Cure Amount Claim must be Filed, served and actually received by the Debtors on the later of: (a) three days before the date of the Confirmation Hearing; and (b) seven days after receiving notice of any amendment, modification or supplement to Exhibit G. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or Cure Amount Claim will be deemed to have assented to such assumption and assignment or Cure Amount Claim.

Payment of the Allowed Cure Amount Claim upon the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under such Executory Contract or Unexpired Lease occurring at any time prior to the effective date of the assumption and assignment. Any proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned and with respect to which the Allowed Cure Amount Claim has been paid shall be deemed disallowed and expunged without further notice, action, order or approval of the Bankruptcy Court.

## 3. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to the Plan must be Filed with the Claims and Noticing Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

-31-

Any proofs of Claim arising from the rejection of any Executory Contracts and Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Debtor or the Liquidation Trusts without the need for any objection by the Debtors or the Liquidation Trusts or further notice to or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of any Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article II of the Plan.

The Committee Liquidation Trust reserves the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

Holders of Claims arising from the rejection of Executory Contracts and Unexpired Leases with respect to which no proof of Claim is timely Filed will be forever barred from asserting a Claim against the Debtors, the Estates, the Liquidation Trusts or the property of any of the foregoing, unless otherwise expressly allowed by the Bankruptcy Court.

### 4.    Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into or assumed by a Debtor after the Petition Date (other than the Committee Settlement Term Sheet, Insurance Policies, Gateway TSA, PlanetArt TSA, FTD/ProFlowers APA, Gourmet Foods APA and Personal Creations APA, and all ancillary documents to the foregoing, and those contracts listed on Exhibit G) that were not assigned to the Debtor Liquidation Trust shall be considered repudiated by the applicable Debtor as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must File a Claim within 30 days of the Effective Date in accordance with the Plan or have their rights forever waived and released. For the avoidance of doubt, the Committee Settlement Term Sheet shall not be repudiated as of the Effective Date and shall remain in full force and effect.

### 5.    Insurance Policies

All rights of the Debtors under the Insurance Policies shall automatically become vested in the Debtor Liquidation Trust as of the Effective Date without necessity for further approvals or orders. To the extent that any such Insurance Policies are deemed Executory Contracts, then, unless such Insurance Policies have been rejected pursuant to an order of the Bankruptcy Court (including the Confirmation Order), notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume and assign to the Debtor Liquidation Trust, permit to "ride through" or ratify such Insurance Policies. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption and assignment pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interests of the Estates. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults existing as of the Confirmation Date with respect to any Insurance Policy assumed and assigned to the Debtor Liquidation Trust pursuant to Section IV.E of the Plan. Each applicable insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to these Chapter 11 Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for any insured Claims or Causes of Action. Nothing in the Plan shall impair the rights of the Debtor Liquidation Trust with respect to (or affect the coverage under) any Insurance Policy that provides liability coverage for officers, directors and other fiduciaries of the Debtors and their Affiliates.

### 6.    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Amount Claim to an applicable counterparty, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired on the Effective Date, the Debtor Liquidation Trustee shall have 30 days following entry of a Final Order resolving such dispute to determine whether to alter the treatment of such contract or lease hereunder.

D.        **Provisions Regarding Distributions**

1.        **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in Article V of the Plan, Distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Article II or Article V of the Plan shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtor Liquidation Trust.

2.        **Method of Distributions to Holders of Claims**

All Distributions to be made under the Plan shall be made by the Disbursing Agent or such Third Party Disbursing Agents as the Liquidation Trustees may employ in their sole discretion.  Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan, if approved by the applicable Liquidation Trustee.

3.        **Disbursing Agent**

a.        **Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to:  (i) make all Distributions contemplated in the Plan; (ii) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

b.        **Expenses Incurred on or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, consistent with Sections III.B.6 and III.C.6 of the Plan, the amount of any reasonable fees and out-of-pocket expenses incurred by a Disbursing Agent on or after the Effective Date (including Taxes) and any reasonable compensation to such Disbursing Agent for services rendered shall be paid in Cash by the Debtor Liquidation Trustee from the Debtor Liquidation Trust Assets or the Committee Liquidation Trustee from the Committee Liquidation Trust Assets in accordance with the terms of the applicable Liquidation Trust Agreement.

c.        **No Liability**

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (i) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

4.        **Disputed Claims Reserves**

a.        **Establishment of Disputed Claims Reserves**

On the Effective Date or as soon thereafter as is reasonably practicable, the Committee Liquidation Trustee shall establish a Disputed Claims Reserve for Disputed General Unsecured Claims, which reserve shall be administered by the Committee Liquidation Trustee.  The Committee Liquidation Trustee shall reserve, in Cash or other property, on account of the full asserted amount (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing in accordance with Article VI of the Plan) with respect to each such Disputed Claim.  For the avoidance of doubt, the Committee Liquidation Trustee may administer the Disputed Claims Reserve by book entry.

b.      **Maintenance of Disputed Claims Reserves**

To the extent that the property placed in the Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The property in the Disputed Claims Reserve shall be held in trust for the benefit of the Holders of General Unsecured Claims ultimately determined to be Allowed Claims. The Disputed Claims Reserve shall be closed by the Committee Liquidation Trust when all Distributions required to be made under the Plan to the Holders of General Unsecured Claims will have been made in accordance with the terms of the Plan. Upon closure of the Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in the Disputed Claims Reserve shall be distributed in accordance with the Plan or the Committee Liquidation Trust Agreement, as applicable.

5.      **Investment of Trust Accounts**

To assist in making distributions under the Plan, the Trust Accounts may be held in the name of the applicable Liquidation Trustee or in the name of one or more Third Party Disbursing Agents for the benefit of Holders of Allowed Claims under the Plan, or a secondary Trust Account may be created in the name of the Third Party Disbursing Agent for the purpose of making disbursements. The Liquidation Trustees shall invest, or shall direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to any limitations established by the Liquidation Trust Agreements; provided, however, that should a Liquidation Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may direct the Third Party Disbursing Agent not to invest such Cash. Distributions of Cash from accounts held by Third Party Disbursing Agents will include a Pro Rata share of any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto.

6.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

a.      **Delivery of Distributions**

Distributions to holders of Allowed Claims will be made by a Disbursing Agent: (i) at the addresses set forth on the respective proofs of Claim Filed by Holders of such Claims or request for payment of Administrative Expense Claim, as applicable; (ii) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (iii) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related proof of Claim; (iv) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (v) if clauses (i) through (iv) are not applicable, at the last address directed by such holder after such Claim becomes an Allowed Claim.

b.      **Undeliverable Distributions Held by Disbursing Agents**

i.      **Holding of Undeliverable Distributions**

If any Distribution to a Holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified by written certification of such Holder's then-current address. Subject to Section V.F.2.c of the Plan, Distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent until such time as a Distribution becomes deliverable. Subject to Section V.F.2.c of the Plan, while remaining in the possession of the applicable Disbursing Agent, undeliverable Distributions will be held for the benefit of the potential claimants of such Distributions.

ii.      **After Distributions Become Deliverable**

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date; provided, however, that the applicable Disbursing Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims allowed as of the record date will participate in such periodic Distribution. Notwithstanding the

-34-

foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

### iii.    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is 90 days prior to the Final Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, the Liquidation Trusts, the Liquidation Trustees or the property of any of the foregoing. In such cases, unclaimed Distributions will be maintained for redistribution to other claimants entitled to Distributions pursuant to the Plan.

### 7.    Distribution Record Date

As of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### 8.    De Minimis Distributions

No Distribution of less than $100 shall be made by the Disbursing Agent. Each such Distribution shall revest in the Debtor Liquidation Trust or Committee Liquidation Trust, as applicable, for distribution to Holders of other Allowed Claims in the applicable Class in accordance with the Plan. Whenever a payment of a fraction of a dollar would otherwise be called for, the actual payment may reflect a rounding down to the nearest whole dollar.

### 9.    Compliance with Tax Requirements

In connection with the Plan, the Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding Taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate. The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution. The applicable Disbursing Agent shall provide advance written notice of such requirement to each Holder of a Claim affected thereby. The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide an executed Form W-9, Form W-8 or other tax form or documentation to the Disbursing Agent. If a Holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Debtor Liquidation Trust or Committee Liquidation Trust, as applicable, for

-35-

Distribution on account of other Allowed Claims pursuant to the Plan and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.

### 10.    Manner of Payment Under the Plan

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 11.    Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 120 days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued.  Any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Distribution shall be re-allocated as set forth in Section V.F.2 of the Plan, notwithstanding any federal or state escheat laws to the contrary.

### 12.    Setoffs

Except with respect to Claims released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim), counterclaims, rights and causes of action of any nature that such Debtor may hold against the Holder of such Claim; provided, however, that the failure to effectuate such a setoff shall not constitute a waiver or release by the applicable Debtor, the applicable Liquidation Trust or the Disbursing Agent of any Causes of Action that the Debtors or Liquidation Trusts may possess against the Holder of a Claim.

### 13.    Allocation Between Principal and Accrued Interest

Interest shall not accrue on any Holder's Claim entitled to a Distribution from Liquidation Trust Assets in respect of the period from the Petition Date to the date a final Distribution is made on such Claim.  To the extent that any Allowed Claim entitled to a Distribution from Liquidation Trust Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 14.    Distributions to Holders of Disputed Claims

Notwithstanding any other provision of the Plan:  (a) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (b) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date (including any Distribution such Holder would have been entitled to on the Distribution Date on which such Holder is receiving its initial Distribution) if such claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

-36-

15.    **Claims Paid or Payable by Third Parties**

a.    **Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives a Third Party Payment, the applicable Liquidation Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third Party Payment, and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of the Third Party Payment without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

b.    **Claims Payable by Insurance**

No Distributions shall be made on account of any Allowed Claim that is payable pursuant to an Insurance Policy until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that any of the Debtors' insurers agrees to satisfy in full or in part an Allowed Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

E.    **Disputed, Contingent and Unliquidated Claims**

1.    **Allowance of Claims**

After the Effective Date and as applicable, the Liquidation Trustees shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under the Plan.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

2.    **Prosecution of Objections to Claims**

a.    **Authority to Prosecute and Settle Claims**

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Liquidation Trustees, after the Effective Date and as applicable, shall have the sole authority to:  (i) File, withdraw or litigate to judgment, objections to Claims; (ii) settle or compromise any Disputed Claim (other than a Professional Fee Claim) without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court.

b.    **Pending Objections**

To the extent that the Debtors have Filed objections to General Unsecured Claims that remain pending as of the Effective Date, the Committee Liquidation Trustee shall be substituted as the objecting party without further action of the parties or order of the Court.  To the extent that the Debtors have Filed objections to any other Claims

-37-

that remain pending as of the Effective Date, the Debtor Liquidation Trustee shall be substituted as the objecting party without further action of the parties or order of the Court.

### c.    Application of Bankruptcy Rules

To facilitate the efficient resolution of Disputed Claims, the Liquidation Trustees shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to File omnibus objections to Claims.

### d.    Authority to Amend Schedules

The Debtor Liquidation Trustee will have the authority to amend the Schedules with respect to any Claim other than a General Unsecured Claim, and the Committee Liquidation Trustee will have the authority to amend the Schedules with respect to the General Unsecured Claims, and the Liquidation Trustees, as applicable, will have the authority to make distributions based on such amended Schedules (if no proof of Claim is timely Filed in response thereto) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the applicable Liquidation Trustee, in accordance with the Bar Date Order, will provide the Holder of such Claim with notice of such amendment and such Holder will have 30 days to File an objection to such amendment in the Bankruptcy Court.

### e.    Request for Extension of Claims Objection Bar Date

Upon motion to the Bankruptcy Court, a Liquidation Trustee may request one or more extensions to the Claims Objection Bar Date generally or with respect to a specific list of Claims.  The Claims Objection Bar Date will be tolled pending the Bankruptcy Court's ruling on such request.  Any extension granted by the Bankruptcy Court shall not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

### 3.    Estimation of Claims

The Debtors, prior to the Effective Date, and the Liquidation Trustees after the Effective Date, and as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the relevant Debtor or Liquidation Trustee (as the case may be) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

### 4.    Claims Subject to Pending Actions

Except as otherwise provided in the Plan, any Claims held by Entities against which a Debtor, the Committee Liquidation Trustee or another party in interest Files a complaint constituting an Avoidance Action, shall be deemed Disputed Claims pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due as a result, if any, have been turned over by that Entity to the Committee Liquidation Trust.

### 5.    Offer of Judgment

The Debtors, before the Effective Date, and the Liquidation Trustees, after the Effective Date and as applicable, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Disputed Claim must pay the costs incurred by the Debtors or a Liquidation Trustee, after the making of such offer, the Debtors or Liquidation Trustee, as

-38-

applicable, may set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order or approval of the Bankruptcy Court.

F.    **Confirmation of the Plan**

1.    **Conditions Precedent to Confirmation**

The Bankruptcy Court shall not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section VII.C of the Plan:

a)    The Disclosure Statement Order shall have been entered and shall not have been stayed, modified or vacated on appeal.

b)    The Committee Settlement Order shall be in full force and effect, and no stay thereof shall be in effect.

c)    The Plan and the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee and the Secured Parties.

2.    **Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section VII.C of the Plan:

a)    The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect.

b)    The Committee Settlement Order shall be in full force and effect, and shall not have been stayed, modified or vacated on appeal.

c)    The Debtor Liquidation Trust Agreement shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws, and the Trust Accounts pursuant to the Debtor Liquidation Trust Agreement shall be created and funded as set forth in the Plan.

d)    The Debtor Liquidation Trustee shall have been appointed and have accepted his or her appointment.

e)    The Committee Liquidation Trust Agreement shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws, and the Trust Accounts pursuant to the Committee Liquidation Trust Agreement shall be created and funded as set forth in the Plan.

f)    The Committee Liquidation Trustee shall have been appointed and have accepted his or her appointment.

g)    All other documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws.

h)    The Professional Fee Escrow Account shall be created and funded as set forth herein.

   i)   All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

   j)   All other actions required to be taken in connection with the Effective Date shall have occurred.

### 3.  Waiver of Conditions to Confirmation or the Effective Date

Each condition to Confirmation set forth in Section VII.A of the Plan and the conditions to the Effective Date set forth in Sections VII.B.1, 2, 7, 8 and 10 of the Plan may be waived in whole or in part at any time by the Debtors, the Creditors' Committee and the Secured Parties without an order of the Bankruptcy Court. The conditions to the Effective Date set forth in Sections VII.B.3 and 4 of the Plan may be waived in whole or in part at any time by the Debtors and the Secured Parties without an order of the Bankruptcy Court. The conditions to the Effective Date set forth in Sections VII.B.5 and 6 of the Plan may be waived in whole or in part at any time by the Debtors and the Creditors' Committee without an order of the Bankruptcy Court.

### 4.  Effect of Nonoccurrence of Conditions to the Effective Date

The Debtors reserve the right to seek to withdraw the Plan at any time prior to the Effective Date. If the Plan is withdrawn pursuant to this Section: (a) each of the Plan and the Confirmation Order shall be null and void in all respects, including with respect to (i) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases and (ii) the releases described in Section VII.F.3 of the Plan; and (b) nothing contained in the Plan or the Confirmation Order shall (i) constitute a waiver or release of any Claims by or against, or any Interest in, any Debtor or (ii) prejudice in any manner the rights of the Debtors or any other party in interest.

### 5.  Nonconsensual Confirmation

Because Class 5 is conclusively presumed to have rejected the Plan, the Debtors request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, and the Plan shall constitute a motion for such relief. The Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or the Effective Date, to amend the Plan in accordance with Section IX.A of the Plan.

### 6.  Effect of Confirmation

#### a.  Dissolution of Official Committees

On the Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from any further authority, duties, responsibilities and obligations related to, or arising from, the Chapter 11 Cases, except that the Creditors' Committee shall continue in existence and have standing and capacity to prepare and prosecute applications for the payment of fees and reimbursement of expenses incurred by the Creditors' Committee or its respective Professionals.

#### b.  Exculpation

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, postpetition conduct within the Chapter 11 Cases, the Disclosure Statement, the Plan, the Committee Settlement, the Asset Sales or any Dissolution Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Committee Settlement, the Asset Sales, postpetition conduct within the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross**

negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing paragraph shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

        c.        **Releases**

        i.        **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Asset Sales, or any Dissolution Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Asset Sales, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing paragraph, the releases and discharges set forth in Section VII.F.3.a of the Plan: (A) do not release any post-Effective Date obligations of any party or Entity under the Plan, any Dissolution Transaction or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (B) do not affect the rights of Holders of Allowed Claims or Interests to receive Distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are: (A) in exchange for the good and valuable consideration provided by the Released Parties; (B) a good faith settlement and compromise of the claims released by the releases herein; (C) in the best interests of the Debtors and all Holders of Claims and Interests; (D) fair, equitable and reasonable; (E) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (F) a bar to any of the Debtors or their Estates asserting any claim released by the releases herein against any of the Released Parties.

        ii.        **Releases by Holders of Claims and Interests**

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such

Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the Plan, the Asset Sales, or any Dissolution Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Asset Sales, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan or the distribution of property under the Plan, or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing paragraph, the releases and discharges set forth in Section VII.F.3.b of the Plan:  (A) do not release any post-Effective Date obligations of any party or Entity under the Plan, any Dissolution Transaction or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (B) do not affect the rights of Holders of Allowed Claims or Interests to receive Distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are:  (A) in exchange for the good and valuable consideration provided by the Released Parties; (B) a good faith settlement and compromise of the claims released by the releases herein; (C) in the best interests of the Debtors and all Holders of Claims and Interests; (D) fair, equitable and reasonable; (E) given and made after reasonable investigation and after notice and opportunity for hearing; and (F) a bar to any of the Releasing Parties asserting any claim released by the releases herein against any of the Released Parties.

### d.    Injunction

Except as otherwise expressly provided in the Plan or for Distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to section VII.F.2 of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties or the Exculpated Parties (to the extent of the exculpation provided pursuant to section VII.F.2 of the Plan with respect to the Exculpated Parties):  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

### 7.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, (a) the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and (b) pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in

compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of any securities offered and sold under the Plan and any previous plan.

G.      **Miscellaneous Provisions**

1.      **Modification of the Plan**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented, if the proposed amendment, modification or supplement does not materially and adversely change the treatment of such Claim; provided, however, that any Holders of Claims who were deemed to accept the Plan because such Claims were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

2.      **Revocation of the Plan or Non-Occurrence of Confirmation Date or Effective Date**

The Debtors reserve the right to revoke or withdraw the Plan as to any (or all) of the Debtors prior to the Effective Date.  If the Plan is revoked or withdrawn as to any (or all) of the Debtors, or if the Confirmation Date or the Effective Date as to any (or all) of the Debtors does not occur, then the Plan shall be null and void in all respects solely with respect to such Debtors, and nothing contained in the Plan shall:  (a) prejudice in any manner the rights of any Debtor or any other party in interest; (b) constitute a waiver or release of any claims by or against, or any interests in, any of the Debtors or any other Entity; or (c) constitute an admission of any sort by any Debtor or any other Entity.  The revocation or withdrawal of the Plan with respect to one or more Debtors shall not require the re-solicitation of the Plan with respect to the remaining Debtors.

3.      **Conversion or Dismissal of Certain of the Chapter 11 Cases**

If the requisite Classes do not vote to accept the Plan or the Bankruptcy Court does not confirm the Plan with respect to any Debtor, such Debtor shall have the right to seek to have its Chapter 11 Case dismissed or converted or to liquidate or dissolve itself under applicable nonbankruptcy law or chapter 7 of the Bankruptcy Code.

4.      **Inconsistency**

In the event of any inconsistency among the Plan, this Disclosure Statement or any exhibit or schedule to this Disclosure Statement, the provisions of the Plan shall govern.  In the event of any inconsistency among the Plan and any document or agreement Filed in the Plan Supplement, such document or agreement shall control.  In the event of any inconsistency among the Plan or any document or agreement Filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

5.      **Exhibits and Schedules**

All exhibits and schedules to the Plan (including, but not limited to, the Plan Supplement) are incorporated into and constitute a part of the Plan as if set forth therein.

6.      **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the transfer of any property under the Plan (including transfers to and from the Liquidation Trusts), the making or delivery of any instrument of transfer pursuant to, in implementation of or as contemplated by, the Plan or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated by, the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.  Consistent with the foregoing, each recorder of

deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any stamp tax, transfer tax or similar tax or fee.

### 7.    Severability

If prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, at the request of the Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 8.    Successors and Assigns

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Person named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, representative, beneficiary or guardian, if any, of each Person.

## VI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A.    Confirmation Hearing

The Bankruptcy Court has scheduled the Confirmation Hearing for December 18, 2019 at 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.

Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the local rules and procedures of the Bankruptcy Court; (3) state the name, address, phone number and email address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth below no later than the Objection Deadline.  Unless an objection to the Plan is timely served and filed, it will not be considered by the Bankruptcy Court.

1.      **The Debtors**

Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Email:   hlennox@jonesday.com
         tawilson@jonesday.com

-and-

Brad B. Erens
Caitlin K. Cahow
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Email:   bberens@jonesday.com
         ccahow@jonesday.com

-and-

Daniel J. DeFranceschi
Brett M. Haywood
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Email:   defranceschi@rlf.com
         haywood@rlf.com

2.      **The Secured Parties**

James R. Langdon
MOORE & VAN ALLEN PLLC
100 N. Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Email:   jimlangdon@mvalaw.com

-and-

Mary F. Caloway
BUCHANAN INGERSOLL & ROONEY PC
919 North Market Street
Suite 990
Wilmington, Delaware 19801
Email:   mary.caloway@bipc.com

3.      **The Creditors' Committee**

Eric R. Wilson
Jason R. Adams
Lauren S. Schlussel
Maeghan J. McLoughlin
KELLEY DRYE & WARREN LLP

-45-

101 Park Avenue
New York, New York 10178
Email:    ewilson@kelleydrye.com
            jadams@kelleydrye.com
            lschlussel@kelleydrye.com
            mmcloughlin@kelleydrye.com

-and-

Jennifer R. Hoover
Kevin M. Capuzzi
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Email:    jhoover@beneschlaw.com
            kcapuzzi@beneschlaw.com

**B.    Requirements for Confirmation of the Plan[8]**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of the Bankruptcy Code.

**1.    Feasibility[9]**

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless contemplated by the plan.  The Plan provides for the liquidation and distribution of the Debtors' remaining assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

**2.    Best Interests of Creditors – Liquidation Analysis**

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7.

The Debtors believe that the Plan satisfies the best interests of creditors test because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be at least as great as the recoveries expected to be available in a hypothetical chapter 7 liquidation, as discussed more fully below.

---

[8]    The descriptions contained herein are only a summary of certain confirmation requirements; they are not exhaustive of all confirmation requirements and should not be construed as such.

[9]    The Debtors' feasibility analysis will be contained in the Plan Supplement.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established under the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are paid next. Unsecured creditors are paid from any remaining liquidation proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid in full.

Substantially all of the Debtors' businesses have been liquidated through the various sale transactions discussed above, and the Plan effects a liquidation of the remaining assets of the Debtors' Estates. Although a chapter 7 liquidation would achieve a substantially similar outcome, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation. Liquidating the Debtors' Estates under the Plan would likely provide Holders of Allowed Claims with a larger, more timely recovery due to the potential for delay and administrative friction that would result from converting to a chapter 7 liquidation at this stage of the Chapter 11 Cases.

In particular, delays caused by the chapter 7 trustee becoming familiar with the remaining assets would result in the Debtors' Estates incurring additional expenses, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' businesses that the Debtors and their Professionals have in proposing the Plan.

In addition to the expected delays, recoveries would be further reduced (in comparison with those provided for under the Plan) by the expenses that would be incurred in a chapter 7 liquidation, including the additional expenses incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' Estates and assets and these specific Chapter 11 Cases, in order to complete the administration of the Estates. See, e.g., 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims. Moreover, the conversion to chapter 7 would also require the establishment of a new bar date for filing claims that would be at least 90 days following conversion. See Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors' Estates could materially increase upon conversion, thereby further reducing creditor recoveries compared to those available under the Plan.

In light of the foregoing, the Debtors believe that the Plan provides their creditors with a significantly superior recovery compared to what they could reasonably expect to realize in a hypothetical chapter 7 liquidation.

### C.    Alternative Plans

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described therein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

-47-

or (2) cures any default, reinstates the maturity of such claim or interest as such maturity existed before such default and compensates the holder of such claim or interest for any damages incurred.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of those actually voting cast their Ballots in favor of acceptance.  Only Holders of Claims in the Voting Classes (i.e., Classes 2 and 4) will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or reject a plan.

**E.      Requirements of Section 1129(b) of the Bankruptcy Code**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (1) the plan otherwise satisfies the requirements for confirmation under section 1129(a) of the Bankruptcy Code and (2) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for "cramdown," or non-consensual Confirmation of the Plan, pursuant to section 1129(b) of the Bankruptcy Code.

**1.      Fair and Equitable Test**

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement.

**a.      Secured Claims**

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; (ii) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (iii) each holder of a secured claim receives the indubitable equivalent of its secured claims.  Under the Plan, the holders of Class 2 Allowed Secured Lender Claims will retain their liens and receive the proceeds thereof, except to the extent that they have permitted the Debtors or the Debtor Liquidation Trust to use such proceeds to wind-down the Debtors' estates or pay claims required to be paid in full under the Plan, or to the extent that such holders have agreed to allow such proceeds to be transferred to the Committee Liquidation Trust for payment of the expenses of such trust and distribution to holders of Allowed Class 4 General Unsecured Claims.  As a result, the Plan is fair and equitable as to Class 2 Allowed Secured Lender Claims.

**b.      Unsecured Claims**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest on any property.

RLF1 22059067v.1

Under the Plan, no holder of any claim or any equity interest junior to the General Unsecured Claims (Class 4) will receive or retain any property.  All Interests are being cancelled.  As a result, the Plan is fair and equitable as to Class 4 Allowed General Unsecured Claims.

### c.    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either:  (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

Under the Plan, there is no class of interests junior to Class 5 Interests (which are being cancelled under the Plan and deemed to have rejected the Plan as a result thereof).  As such, the Plan is fair and equitable as to Class 5 Interests.

### 2.    Unfair Discrimination

A chapter 11 plan does not "discriminate unfairly" if a dissenting class is treated substantially equal with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests.  The Debtors carefully designed the Plan to ensure that recoveries on account of Claims in a particular Class against each of the Debtors did not result in unfair discrimination among similarly situated Classes.  The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.

## VII.    PLAN-RELATED RISK FACTORS

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Risk Factors Related to Certain Bankruptcy Considerations

### 1.    The Debtors May Not Be Able to Secure Confirmation of the Plan

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (b) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  As described in Section VI.B.1 of this Disclosure Statement, the Debtors believe that the Plan is feasible because the Debtors believe that the Plan can pay all administrative, priority and priority tax claims in full, but the Court could find otherwise.

Additionally, there can be no assurance that the requisite acceptances to confirm the Plan will be received. In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class.  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of

the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determines that the Tabulation Rules and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

Finally, all of the conditions to confirmation of the Plan must be satisfied.  The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

### 2.    Sufficient Votes to Confirm the Plan May Not be Received

In the event that the votes received are sufficient in number and amount to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received and the Bankruptcy Court does not confirm the Plan, the Debtors may seek to pursue another strategy to wind down the Estates, such as an alternative chapter 11 plan, a dismissal of these Chapter 11 Cases, a conversion to a chapter 7 case(s) or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

### 3.    Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, including with respect to the deemed consolidation of the Debtors as described in Section I.B of this Disclosure Statement.

Further, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection or is not yet Allowed.  Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 4.    The Effective Date May Not Occur

Although the Debtors believe that the Effective Date could occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 5.    The Debtors May Modify the Plan to Remove Consolidation of Estates

A party in interest may object to the deemed consolidation of the Debtors' Estates described in Section I.B, and the Court may, with or without any such objection, not approve such deemed consolidation.  In that event, the Debtors may modify the Plan so as to no longer provide for the consolidation of the Estates for the purposes of implementation, voting, achieving Confirmation, calculating and making Distributions on Claims and filing post-Confirmation reports, resulting in the Estates being administered and liquidated separately.

-50-

B.    **Risk Factors That May Affect Recoveries Available to Holders of Allowed Claims Under the Plan**

1.    **The Amount of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims**

The Distributions available to Holders of Allowed Claims in Class 4 under the Plan can be affected by a variety of contingencies, including, without limitation, (a) the aggregate amount of Allowed Class 4 Claims, (b) the amount of Allowed Class 1 and Priority Tax Claims and (c) the amount of Allowed administrative claims that will accrue after the Petition Date and before Confirmation and thereby reducing the amount of distributions available for other Holders of Allowed Claims.  The Debtors cannot determine with any certainty at this time the number or amount of such Claims that will ultimately be Allowed, and thus the projected recoveries for Class 4 Claims disclosed in this Disclosure Statement are highly speculative.

2.    **Any Valuation of Any Assets to be Distributed Under the Plan is Speculative**

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative.  Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors.

3.    **The Debtors Cannot Guarantee the Timing of Such Recoveries**

The timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

4.    **Certain Tax Implications of the Debtors' Bankruptcies**

Holders of Allowed Claims should carefully review Section VIII of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of the Plan," for a description of certain tax implications of the Plan and the Debtors' Chapter 11 Cases.

C.    **Risks Relating to Securities Laws**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (1) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (2) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  To the extent that the rights to Distributions from the Liquidation Trusts are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities law.

1.    **Non-Transferability**

Holders of Claims in Class 4 also should be aware that their rights to Distributions from the Committee Liquidation Trust are not transferable.  Therefore, there will not any trading market for such rights, nor will those rights be listed on any public exchange or other market.  The lack of liquidity of the rights to Distributions from the Committee Liquidation Trust may have a negative impact on their value.

2.    **Uncertainty of Value**

In addition to the prohibition on the transfer of rights to distributions from the Committee Liquidation Trust as discussed above, the value of such rights will depend on various significant risks and uncertainties, including,

-51-

without limitations, (a) the success of the Committee Liquidation Trust in securing resolutions on a favorable basis with respect to claims the Committee Liquidation Trust is pursuing; (b) the effect of substantial delays in liquidating claims and other contingent assets and liabilities; and (c) the effects of any changes in tax and other government rules and regulations applicable to the Committee Liquidation Trust. All of these risks are beyond the control of the Committee Liquidation Trust. The amount of any recovery realized by the Committee Liquidation Trust and its beneficiaries will vary depending upon the extent to which these risks materialize. In addition, the resolution of the claims held by the Committee Liquidation Trust may require a substantial amount of time to be resolved and liquidated. The associated delays could reduce the value of any recovery.

D.      **Disclosure Statement Disclaimer**

1.      **The Financial Information Contained in This Disclosure Statement Has Not Been Audited**

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.      **Information Contained in This Disclosure Statement Is For Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      **This Disclosure Statement Was Not Reviewed or Approved by the SEC**

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.      **This Disclosure Statement May Contain Forward Looking Statements**

This Disclosure Statement may contain "forward looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended. Statements containing words such as "may," "believe," "anticipate," "expect," "intend," "plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitations, information regarding the Debtors' expectations with respect to future events. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those risks described under the caption "Plan-Related Risk Factors" in Section VII of this Disclosure Statement.

5.      **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**

***This Disclosure Statement is not legal advice to you.*** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed

evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests or any other parties in interest.

### 7. Failure to Identify Potential Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Liquidation Trustees may object to Claims or Interests after Confirmation or the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies objections to such Claims or Interests.

### 8. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

### 9. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. No Representations Outside This Disclosure Statement are Authorized

No representations concerning or relating to the Debtors, these Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

### E. Liquidation Under Chapter 7

If no plan can be confirmed, these Chapter 11 Cases may be converted to a case(s) under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation could have on the recoveries of Holders of Claims and the Debtors' Estates is set forth in Section VI.B.2 hereof, entitled "Best Interests of Creditors – Liquidation Analysis."

## VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to certain Holders of Allowed Claims that are U.S. Holders (as defined below).  The following summary is based on the Internal Revenue Code of 1986 (as amended, the "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, administrative rules and pronouncements as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  This summary addresses certain U.S. federal income tax consequences only to Holders of Claims that are entitled to vote (i.e., Holders of Secured Lender Claims and Holders of General Unsecured Claims) and it does not address the U.S. federal income tax consequences to the Debtors, to Holders of Interests or to Holders of Claims that are not entitled to vote on the Plan.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances.  In addition, this summary addresses only U.S. federal income taxes.  Thus, the following discussion does not address foreign, state or local tax consequences, or any estate, gift or other non-income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims that are subject to special treatment under the IRC (such as Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims as compensation, S corporations, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships and Holders of Claims who are themselves in bankruptcy).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and the activities of the partnership.  If you are a partner or other investor in a partnership holding an Allowed Claim, you should consult your tax advisors.

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC).

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out.  Furthermore, this discussion assumes that Holders of Allowed Claims only hold Claims in a single Class.  This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan.  Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service (the "IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement.  The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holders of an Allowed Claim will differ and will depend on factors specific to each such Holder, including (A) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (B) the origin of the Holder's Allowed Claim; (C) whether the Holder reports income on the accrual or cash basis method; (D) whether the Holder receives distributions under the Plan in more than one taxable year; (E) whether the Holder has previously included in income any accrued but unpaid interest with respect to the surrendered Allowed Claim; and (F) whether the Holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim.  The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim.  Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local and foreign income and other tax consequences of the Plan.

A.    **U.S. Federal Income Tax Consequences to Holders of Allowed Claims**

1.    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Secured Lender Claims and U.S. Holders of Allowed General Unsecured Claims**

In accordance with the Plan, each Holder of an Allowed Secured Lender Claim or Allowed General Unsecured Claim will be entitled to receive distributions as detailed in Sections V.A.3.b and V.A.3.d above, respectively.  As discussed in Section V.I above, on the Effective Date, the Debtors will generally transfer the Debtor Liquidation Trust Assets to the Debtor Liquidation Trust, which was established for the purpose of, among other things, liquidating such assets and making distributions to Holders of Allowed Secured Lender Claims, and will generally transfer the Committee Liquidation Trust Assets to the Committee Liquidation Trust, which was established for the purpose of, among other things, liquidating such assets and making distributions to Holders of Allowed General Unsecured Claims.  The Liquidation Trusts are intended to be treated for U.S. federal income tax purposes as liquidating trusts described in Treasury Regulation section 301.7701-4(d) and, to the extent applicable, as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section 1.468B-9.  The remainder of this discussion assumes that this treatment is correct.  It is possible that the IRS could require an alternative characterization of the Liquidation Trusts, which could result in different (and possibly adverse) tax consequences to the Liquidation Trusts or Holders of Allowed Secured Lender Claims or Allowed General Unsecured Claims.

Except to the extent of the Disputed Claims Reserves, the Liquidation Trusts are not expected to be treated as taxable entities for U.S. federal income tax purposes.  Accordingly, except to the extent distributions are made to Holders of Allowed Secured Lender Claims or Allowed General Unsecured Claims as of the Effective Date (as described below), (a) the Debtors will be deemed to have distributed to (i) the Holders of Allowed Secured Lender Claims an undivided interest in their Pro Rata shares of the Debtor Liquidation Trust Assets, subject to any liabilities of the Debtors assumed by the Debtor Liquidation Trust and any liabilities of the Debtor Liquidation Trust itself and (ii) the Holders of Allowed General Unsecured Claims an undivided interest in their Pro Rata shares of the Committee Liquidation Trust Assets, subject to any liabilities of the Debtors assumed by the Committee Liquidation Trust and any liabilities of the Committee Liquidation Trust itself, and (b) such Holders will be deemed to have contributed such assets (subject to such liabilities) to the applicable Liquidation Trust in exchange for beneficial interests in such Liquidation Trust.

Subject to the discussion below in the last paragraph of this Section VIII.A.1 regarding distributions made as of the Effective Date, each U.S. Holder of an Allowed Secured Lender Claim or Allowed General Unsecured Claim (each such Holder is referred to in this discussion as a "Beneficial Owner") will recognize gain or loss upon receipt of such Pro Rata share equal to the difference between the "amount realized" by such Beneficial Owner and such Beneficial Owner's adjusted tax basis in his, her or its Claim.  The amount realized is equal to the fair market value of such Beneficial Owner's Pro Rata share of the applicable Liquidation Trust Assets (subject to any applicable liabilities), less the amount (if any) allocable to accrued but unpaid interest, as discussed below under the heading "—Accrued Interest."  Any such gain or loss realized by a Beneficial Owner generally should constitute capital gain or loss to such creditor, unless such Claim is not a capital asset in the hands of such Beneficial Owner.  If an Allowed Secured Lender Claim or Allowed General Unsecured Claim, as applicable, is a capital asset and it has been held for more than one year, the Beneficial Owner will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations.  The tax basis of the applicable Liquidation Trust Assets

deemed received in the exchange will equal the amount realized by the Beneficial Owner (as described above) and the holding period for such assets will begin on the day following the exchange. For the avoidance of doubt, U.S. Holders of Allowed Secured Lender Claims or Allowed General Unsecured Claims are not intended to be treated for U.S. federal income tax purposes as receiving Liquidation Trust Assets that are contributed to any Disputed Claims Reserves until such time as distributions are made from such Disputed Claims Reserves, in which case (and at which time) U.S. Holders of Allowed Secured Lender Claims or Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the Disputed Claims Reserves, if any.

For U.S. federal income tax purposes, it is intended that each Beneficial Owner be treated as an owner of the applicable Liquidation Trust and, thus, will be subject to tax on such Beneficial Owner's Pro Rata share of taxable income or gain, if any, of the applicable Liquidation Trust, regardless of whether the corresponding Cash proceeds are distributed to each Beneficial Owner. Accordingly, each Beneficial Owner will be required to include in its annual taxable income, and pay tax to the extent due on, its allocable share of each item of income, gain, loss, deduction or credit recognized by the applicable Liquidation Trust, including interest or dividend income earned on bank accounts and other investments, and the applicable Liquidation Trustee will allocate such items to the Holders using any reasonable allocation method. If the applicable Liquidation Trust sells or otherwise disposes of a Liquidation Trust Asset in a transaction in which gain or loss is recognized, each Beneficial Owner that is entitled to a distribution from such Liquidation Trust Asset, or the proceeds thereof, will be required to include in income gain or loss equal to the difference between (a) the Beneficial Owner's Pro Rata share of the Cash or property received in exchange for the applicable Liquidation Trust Asset sold or otherwise disposed of and (b) the Beneficial Owner's adjusted basis in its Pro Rata share of the applicable Liquidation Trust Asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Each Beneficial Owner will be required to report any income or gain recognized on the sale or other disposition of an applicable Liquidation Trust Asset whether or not the applicable Liquidation Trust distributes the sale proceeds currently and may, as a result, incur a tax liability before the Beneficial Owner receives a distribution from the applicable Liquidation Trust Asset.

Notwithstanding the foregoing, distributions made as of the Effective Date to U.S. Holders of Allowed Secured Lender Claims or Allowed General Unsecured Claims are intended to be treated for U.S. federal income tax purposes as made directly from the Debtors to such Holders of such Allowed Claims. Generally, where a U.S. Holder receives only Cash in respect of an Allowed Claim, such a Holder would recognize taxable gain or loss in an amount equal to the difference between the amount of the Cash received and such Holder's adjusted tax basis in its Allowed Claim. Any gain or loss recognized would be capital or ordinary, depending on the status of the Allowed Claim in the U.S. Holder's hands. Generally, any gain or loss recognized by a U.S. Holder of an Allowed Claim would be a long-term capital gain or loss if the Allowed Claim is a capital asset in the hands of such Holder and such Holder has held such Allowed Claim for more than one year, unless such Holder had previously claimed a bad debt deduction or such Holder had accrued market discount with respect to such Allowed Claim. See the discussions below under the headings "—Bad Debt or Worthless Securities Deduction" and "—Market Discount." The deductibility of capital losses is subject to limitations. To the extent any portion of a U.S. Holder's recovery is allocable to interest on such Holder's Allowed Claim that was not previously included in such Holder's income, such portion would be treated as interest income to such Holder. See the discussion below under the heading "—Accrued Interest."

### 2. Accrued Interest

A U.S. Holder of an Allowed Claim generally will recognize ordinary income to the extent that such Holder receives Cash or property that is allocable to accrued but unpaid interest that such Holder has not yet included in its income. If an Allowed Claim includes interest, and if the U.S. Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the U.S. Holder must allocate the Plan consideration between principal and interest. The Plan provides that all distributions to a U.S. Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, shall apply to any interest accrued on such Claim after the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder, and attributable to principal under the Plan, is properly allocable to interest. U.S. Holders of Allowed Claims are urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is

-56-

less than the amount that the U.S. Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### 3.    Post-Effective Date Cash Distributions

Because certain U.S. Holders of Allowed Claims may receive Cash distributions after the Effective Date, the imputed interest provisions of the IRC may apply and cause a portion of the subsequent distributions to be treated as interest.  Additionally, because U.S. Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the U.S. Holder may be deferred.  All U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

### 4.    Market Discount

If a U.S. Holder of an Allowed Claim purchased the Claim for an amount that is less than its stated redemption price at maturity, the amount of the difference may be treated as "market discount" for U.S. federal income tax purposes, unless the difference is less than a specified *de minimis* amount.  Under the market discount rules, the U.S. Holder is required to treat any gain on the sale, exchange, retirement or other disposition of the Allowed Claim as ordinary income to the extent of the market discount that the U.S. Holder has not previously included in income and which is treated as having accrued on the Allowed Claim at the time of its payment or disposition.

### 5.    Bad Debt or Worthless Securities Deduction

A U.S. Holder who receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165(g) of the IRC. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed.  U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 6.    Medicare Surtax

Subject to certain limitations and exceptions, U.S. Holders who are individuals, estates or trusts may be required to pay a 3.8% Medicare surtax on all or part of that U.S. Holder's "net investment income," which includes, among other items, dividends on stock and interest (including original issue discount) on debt, and capital gains from the sale or other taxable disposition of stock or debt.  U.S. Holders should consult their own tax advisors regarding the effect, if any, of this surtax on their receipt of distributions pursuant to the Plan.

### B.    Backup Withholding and Information Reporting

Generally, information reporting requirements will apply to all payments or distributions under the Plan and by the Liquidation Trusts, unless you are an exempt recipient.  Additionally, a U.S. Holder may be subject to backup withholding at applicable rates, unless the U.S. Holder (1) is a person exempt from backup withholding and, when required, demonstrates this or (2) provides a correct taxpayer identification number ("TIN") on IRS Form W-9 (or a suitable substitute form) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules.  A U.S. Holder may become subject to backup withholding if, among other things, the U.S. Holder (1) fails to properly report interest and dividends for U.S. federal income tax purposes or (2) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN.  A U.S. Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS.

-57-

C.    **Importance of Obtaining Professional Tax Assistance**

**The foregoing is intended to be only a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.  The U.S. federal, state, local and foreign income and other tax consequences of the Plan are complex and in some cases uncertain.  Such consequences may also vary based on the individual circumstances of each Holder of an Allowed Claim.  Accordingly, each Holder of an Allowed Claim is strongly urged to consult with his, her or its own tax advisor regarding the U.S. federal, state, local and foreign income and other tax consequences of the Plan.**

## IX.    RECOMMENDATION AND CONCLUSION

The Debtors believe that the confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated:  September 18, 2019

Respectfully submitted,

GUE Liquidation Companies, Inc. (*f/k/a* FTD Companies, Inc.), on its own behalf and on behalf of its Debtor-subsidiaries

By:    */s/ Alan D. Holtz*
Name:    Alan D. Holtz
Title:    Chief Restructuring Officer

-58-

## EXHIBIT A

**Joint Plan of Liquidation for the Debtors**

**EXHIBIT B**

**Tabulation Rules**