**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re:<br><br>GUE Liquidation Companies, Inc. *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19–11240 (LSS)<br><br>(Jointly Administered)<br><br>**Hearing Date: October 23, 2019 at 2:00 p.m. (ET)**<br>**Objection Deadline: October 16, 2019** |
|---|---|

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING DISCLOSURE STATEMENT AND SEEKING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of GUE Liquidation Companies, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this objection (the "Objection") to *Debtors' Motion for Entry of an Order (I) Approving Disclosure Statement, (II) Approving Form and Manner of Service of Notice Thereof, (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Chapter 11 Plan of Liquidation, (IV) Scheduling Hearing on Confirmation of Chapter 11 Plan of Liquidation, and (V) Granting Related Relief* (the "Motion").[2] In support of this Objection, the Committee respectfully states:

---

[1] The Debtors in these cases are: GUE Liquidation Companies, Inc.; Bloom That, Inc.; GUE Liquidation Delivery, Inc.; FlowerFarm, Inc.; FSC Denver LLC; FSC Phoenix LLC ; GUE Liquidation, Inc.; GUE Liquidation.CA, Inc.; GUE Liquidation.COM Inc.; GUE Liquidation Group, Inc.; GUE Liquidation Mobile, Inc.; GUE Liquidation Giftco, LLC; Provide Cards, Inc.; GUE Liquidation Commerce LLC; and GUE Liquidation Creations, Inc.

[2] Docket No. 716. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Plan of Liquidation for the Debtors* (the "Plan"). Docket No. 714.

**PRELIMINARY STATEMENT**

1. While the Committee supports the goal of promptly winding down these cases through confirmation of plan of liquidation, there are several gating issues with the Plan that must be addressed prior to solicitation. At the outset of these cases, the Debtors negotiated a $15.5 million wind-down budget that the Debtors represented would be sufficient to satisfy all administrative expenses and wind down the estates. Based upon this representation, the Committee commenced negotiations with the Lenders to resolve potential challenges the Committee has against the Lenders. The Committee is happy to report that such negotiations have been successful, resulting in an agreement for the Lenders to fund a post confirmation trust to provide a recovery for unsecured creditors notwithstanding the Lenders' deficiency claims.

2. Notwithstanding, the Debtors' prior representations regarding the sufficiency of the wind-down funds, the Plan now creates the prospect that the Debtors will need to invade the Committee's settlement with the Lenders to satisfy a currently unquantifiable amount of administrative and priority claims. The settlement with the Lenders, however, is premised on the settlement funds solely being available for the trust to reconcile unsecured claims and make distributions to unsecured creditors. The Plan, therefore, threatens to blow up the Committee's settlement with the Lenders, creating the prospect that the Plan is unconfirmable.

3. The disclosure statement, however, is silent as to these issues. The disclosure statement is devoid of any meaningful analysis regarding the extent of administrative and priority claims and the sources and amount of funds available to satisfy such claims. At this point, the unreconciled administrative and priority claims are double the wind-down funds and there is a real possibility that governmental entities will file significant priority tax claims before the December 2 governmental bar date. Without certainty regarding the sources of recovery and disclosure about the funding gap that may exist, creditors are unable to cast informed votes on the Plan.

4. The Plan compounds the confusion and misleads administrative and priority creditors into believing that the Committee settlement fund will be available to satisfy their claims. This fundamental disagreement makes solicitation untenable. The Debtors cannot both send creditors a disclosure statement that describes the Committee's settlement with the Lenders and solicit votes on a Plan that guts the heart of the settlement. The disclosure statement, however, is silent as to the potential impact the Plan will have on consummating the Committee settlement with the Lenders. The Debtors therefore have a feasibility issue that must be resolved prior to solicitation of the Plan. If the Debtors do not have sufficient funds to satisfy administrative and priority claims absent recourse to the Committee settlement funds, which would cause the settlement to unravel based upon such recourse, the Plan cannot be confirmed.

5. Further, contrary to well-settled Third Circuit law, the Debtors propose broad releases in favor of various insiders, including the Debtors' former and current officers and directors who have not made a substantial contribution under the Plan. These releases render the Plan unconfirmable and deprive creditors of potential additional sources of value without any demonstrable value being provided by such insiders.

6. As a result, while the Committee supports the prompt resolution of these cases, the Debtors should not be permitted to waste estate resources by soliciting a plan that cannot be confirmed. Instead, the more prudent course is to defer approval of the disclosure statement until such time as the Debtors can demonstrate sufficient funding for the plan. If, however, the Court is inclined to allow the Debtors to pursue solicitation of this Plan, the Disclosure Statement must be amended to address the Committee's concerns. In order to receive adequate information, creditors must be provided sufficient information to assess the treatment they are being afforded and the recovery they can expect to receive under the Plan.

## BACKGROUND

7. On June 3, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

8. On June 12, 2019, the Office of the United States Trustee for Region 3 appointed a seven member Committee consisting of: (i) United Parcel Service, Inc.; (ii) Atlas Flowers, Inc. d/b/a Golden Flowers; (iii) Farm Direct Corp.; (iv) Veritiv Corporation; (v) Ad Results Media, LLC; (vi) Legacy Staffing Solutions LLC; and (vii) Packaging Corp. of America.[3] The Committee selected Kelley Drye & Warren LLP as its lead counsel and Benesch, Friedlander, Coplan & Aronoff LLP as Delaware counsel. The Committee also selected Province, Inc. as its financial advisor.

### I. DIP Financing and Sale Process

9. The Debtors filed bankruptcy to pursue a going-concern sale of their business segments. To fund these cases and the sale process, the Debtors sought approval of a $94.5 million DIP facility with their existing lenders (the "Lenders"). Prior to the Committee's formation, the Court granted interim approval of the DIP facility (the "Interim DIP Order").[4] In addition to the DIP financing approved in the Interim DIP Order, the Lenders committed to negotiate in good faith to determine what amounts may reasonably be required to wind-down the Debtors' estates and to provide in the Final DIP Order for the minimum amount of such funding upon consummation of the sales.[5]

10. On June 27, 2019, the Committee objected to final approval of the DIP facility, in part based upon the uncertainty regarding the Lenders' commitment to fund the wind-down of the

---

[3] Docket No. 118.

[4] Docket No. 60.

[5] *Id.* ¶ 17(b)(vi).

estates.[6] On July 1, 2019, the Debtors' replied to the Committee's objection, stating the Debtors and Lenders reached an agreement for the Lenders to carve-out a minimum $15.5 million from sale proceeds to fund a wind-down of the Debtors' estates, which amount is expected to provide for all administrative expenses, as well as sufficient amounts thereafter to properly wind down the Debtors' estates (the "Wind-Down Fund").[7]

11. In support of the reply, the Debtors submitted the amended and restated declaration of Alan D. Holtz, the Debtors' Chief Restructuring Officer.[8] In his declaration, Mr. Holtz similarly confirmed the $15.5 million is expected to provide funding for all administrative expenses, including amounts necessary to properly wind down the Debtors' estates.[9]

12. The Committee was not party to the negotiations between the Debtors and Lenders establishing the Wind-Down Fund. The Debtors, however, assured the Committee the Wind-Down Fund would be more than sufficient to fund a plan of liquidation.

13. As a result, on July 2, 2019, the Court entered the final DIP order authorizing the Debtors to enter into the DIP facility (the "Final DIP Order").[10] The Final DIP Order confirmed the Lenders' agreement to permit $15.5 million of collateral to be used to wind-down the Debtors' estates upon consummation of the sales.[11]

---

6 Docket No. 219.

7 Docket No. 284 ¶¶ 2, 5.

8 Docket No. 291.

9 *Id.* ¶ 6.

10 *See Final Order Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing, and (IV) Granting Related Relief.* Docket No. 311.

11 *See* Final DIP Order ¶ 17(b)(vi).

14. Following the sale process, the Debtors sought authority to sell their 3 business segments to the respective winning bidders for each segment. The Court entered orders approving the 3 sales (the "Asset Sales") for a total sale price of $156.5 million.[12] The sale orders confirmed the funding of the Wind-Down Fund in accordance with the Final DIP Order.

15. In connection with the Asset Sales closing, the Debtors funded the Wind-Down Fund. Pursuant to the Gourmet Foods Sale Order, the Gourmet Foods Reserve of $6.7 million was created to pay certain obligations of the Debtors that were not assumed by the purchaser. Any unused funds in the Gourmet Foods Reserve will be used to satisfy the Debtors' obligations. The Debtors, with the consent of the Lenders, also established various reserves out of the sale proceeds (the "Reserves" and together with the Gourmet Foods Reserve, the "Additional Funds"), including reserves to pay various tax and employee obligations.

16. The remaining available sale proceeds were used to satisfy the outstanding DIP balance and pay down a portion of the $150 million prepetition indebtedness to the Lenders. Notwithstanding these payments, the Lenders continue to assert a deficiency claim against the estates exceeding $100 million.

## II. The Committee Investigation

17. Pursuant to the Final DIP Order, the Committee was originally provided until August 12, 2019 to investigate claims against the Lenders. This deadline was extended several times, and most recently until October 24, 2019, with the consent of the Lenders.[13]

18. Based upon this investigation, the Committee believes there are various claims and causes of action against the Lenders that would generate value for unsecured creditors. The

[12] Docket Nos. 490, 552 and 553

[13] *See Order Approving Stipulation By and Between Bank of America, N.A. and the Official Committee of Unsecured Creditors Further Extending the Challenge Deadline*. Docket No. 762.

Lenders dispute the Committee's assertions. However, in an effort to avoid the costs and uncertainty of litigation, the Committee and the Lenders commenced settlement negotiations and were ultimately able to reach a settlement, obviating the need for litigation. The terms of the settlement (the "Settlement") are still being documented but generally provide for:

- The Lenders to fund $4.2 million into a post-confirmation trust (the "Committee Settlement Amount");
- The Committee Settlement Amount to, among other things, fund reconciliation of unsecured claims and distributions to holders of allowed general unsecured claims;
- The Lenders' agreement that the Lenders will not receive any distributions from the Committee trust on account of their deficiency claims; and
- The Committee and Lenders to release each from any and all causes of action.

19. The Committee's settlement with the Lenders is contingent upon the Committee Settlement Amount only being available to fund the Committee trust and not being used by the Debtors to fund distributions to administrative or priority creditors.

## III. The Claim Bar Date, Plan and Disclosure Statement

20. The Court established October 7, 2019 as the deadline for filing general unsecured and administrative claims. As of the date of this Objection, the administrative claims pool is being reconciled and the deadline for governmental authorities to file potentially significant priority tax claims will not pass until December 2, 2019. As of the date of filing this Objection, unreconciled priority and administrative claims totaled approximately $30 million.

21. On September 18, 2019, the Debtors filed the Plan and associated *Disclosure Statement for Joint Plan of Liquidation for the Debtors* (the "Disclosure Statement"). The Debtors have requested a confirmation hearing in mid-December so that the Debtors can exit bankruptcy by the end of the year.

22. Prior to the Debtors' filing of the Plan, the Committee repeatedly informed the Debtors that any settlement with the Lenders would be contingent upon the Committee Settlement Amount not being used by the Debtors to fund administrative and priority claims. The Debtors have ignored this.

23. Buried in the provisions regarding unsecured creditors' treatment, the Debtors leave open the possibility of utilizing the Committee Settlement Fund to satisfy administrative and priority claims.[14] Neither the Plan nor the Disclosure Statement, however, provide any analysis of the expected administrative and priority claims pool or the source of funds to satisfy those claims on the effective date of the Plan. The Disclosure Statement includes brackets around the estimated aggregate allowed amount of Priority Claims, Other Secured Claims, and General Unsecured Claims.[15]

24. There is similarly no analysis of whether the Wind-Down Fund and the Additional Funds will be sufficient to satisfy administrative and priority claims and fund the plan process. In fact, the Disclosure Statement is devoid of any meaningful discussion of these funds or assurances regarding the Debtors' prior statements that the Wind-Down Fund will be sufficient to fund allowed administrative claims and the wind-down of the estates.

25. The Plan further proposes broad releases (the "Releases") of the Debtors' current and former directors and officers (the "Insiders"), which includes derivative claims and causes of action that could be asserted on behalf of the Debtors' estates. The Disclosure Statement does not provide any detail on the contributions these Insiders made to the cases and similarly fails to analyze the value of the claims that are being released.

---

[14] *See* Plan, Art. II.E.4.

[15] *See* Disclosure Statement, Art. I.D.

## OBJECTION

## I. THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION

26. Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information" regarding a plan before it may be sent to creditors for the purpose of soliciting votes to accept or reject the plan.[16]

27. Pursuant to section 1125(a)(1), "adequate information" means:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and of the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.][17]

28. "Adequate Information" has been described as "all information that is reasonably necessary to permit creditors and parties-in-interest to fairly and effectively evaluate the plan."[18] While what constitutes adequate information will be determined on a case-by-case basis, a disclosure statement should tell creditors "what [they are] going to get, when [they are] going to get it, and what contingencies there are to getting their distributions."[19] In its current form, the Disclosure Statement fails to provide this basic type of information to creditors.[20]

---

16 *See* 11 U.S.C. § 1125(b).

17 11 U.S.C. § 1125(a)(1); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed on the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy adequate information") (internal citations omitted).

18 *In re Robert's Plumbing & Heating, LLC,* Case No. 10-23221, 2011 WL 2972092, *2 (Bankr. D. Md. July 20, 2011).

19 *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *see also Oneida Motor Freight*, 848 F.2d at 417 (recognizing that what constitutes adequate information is determined on a case-by-case basis).

20 *In re Crowthers McCall Patterns, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("[a]t the heart of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper

29. First, the Disclosure Statement fails to provide sufficient information for creditors to understand what they will receive under the Plan. Notwithstanding the Debtors' prior statements to the contrary, the Disclosure Statement now creates uncertainty regarding whether the Wind-Down Fund and Additional Funds will be sufficient to fund administrative and priority claims. The Disclosure Statement, however, is devoid of any information regarding the Debtors' analysis of administrative and priority claim pools or the means for satisfying those claims. Instead, the Debtors seek to invade the Committee Settlement Fund to the extent the Wind-Down Fund and Additional Funds are insufficient to satisfy such claims.

30. Given that the administrative bar date has just passed and the governmental bar date will not pass until December 2, 2019, the Debtors themselves have insufficient information to proceed with the Plan. The Debtors may face significant priority tax claims, and the priority and administrative claims pool is still being reconciled. The unreconciled estimated administrative and non-tax priority claims pool is currently approximately $30 million and the Wind-Down Fund is insufficient to satisfy these obligations. In fact, given the uncertainty regarding the claims pool, it is unclear whether the addition of the Committee Settlement Fund would provide sufficient funds to pay administrative and priority claims in full.

31. While the Committee recognizes the reconciled claims will likely be significantly less, solicitation of the Plan at this time will only serve to deplete the Wind-Down Fund, which will decrease the funds available to satisfy these claims. Before casting their votes on the Plan, creditors are entitled to know if the Debtors have the funds needed to confirm the Plan.

---

disclosure statement that would enable a hypothetical reasonable investor … to make an informed judgment about the plan") (internal quotations and citations omitted).

32. Second, the Disclosure Statement cannot be approved because the Debtors, Committee, and Lenders are at odds over the treatment of the Committee Settlement Amount. The Committee Settlement was premised on the Debtors' assurances that the Wind-Down Fund and additional reserves would be sufficient to satisfy administrative and priority claims. In fact, the Settlement is conditioned upon the Committee Settlement Amount being used solely to fund a Committee Liquidation Trust. The Plan violates this construct and provides that the Committee Settlement Amount may be used to satisfy administrative and priority claims ahead of general unsecured claims. The Committee is not prepared to go forward with the Settlement if the Plan continues to provide for the potential invasion of the Committee Settlement Amount.

33. The Debtors, therefore, are at a crossroads – they cannot incorporate the Settlement between the Lenders and the Committee into the Disclosure Statement and then solicit a Plan that defies the Settlement terms.[21] The disposition of the Committee Settlement Amount is a fundamental issue that must be resolved in advance of solicitation. To allow the Debtors to solicit a Plan with materially inaccurate sources of recovery would undermine the purpose of section 1125(a).

34. Third, the Disclosure Statement does not provide any analysis as to why the Debtors believe the release of the Insiders is appropriate in these cases under governing law. Nor does the Disclosure Statement provide any information to support the Releases. Courts within the Third Circuit do not grant third-party plan releases lightly, and the plan proponent bears the burden of establishing the appropriateness of the non-debtor releases.[22] The Disclosure Statement must set

[21] The Disclosure Statement contains a bracket for the Settlement as the Settlement was entered into after the Disclosure Statement was filed.

[22] *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

forth why the Debtors believe the Releases are appropriate and provide specific facts to support the legality of such release under the Third Circuit's guidelines.

35. The Plan authorizes the Committee Liquidation Trustee to pursue non-released Avoidance Actions, but deprives it of the right to pursue the released claims against the Insiders. The Disclosure Statement does not describe the Debtors' investigation of the claims that may exist against the Insiders or the decision to release such claims. There is similarly no discussion regarding the impact on unsecured recoveries, including the potential that creditors could receive enhanced recoveries, if the Committee is authorized to pursue Avoidance Actions against the Insiders.

36. Lastly, the Debtors should not be authorized to solicit votes on a Plan that may not be feasible given the apparent inability to satisfy administrative and priority claims. While the Debtors are eager to emerge from chapter 11 by the end of 2019, they have not articulated a meaningful reason for rushing the solicitation and confirmation process.

37. The Committee, therefore, submits that proceeding with solicitation of the Plan at this time is inappropriate and will unnecessarily deplete the estates' resources. Instead, approval of the Disclosure Statement should be deferred until the governmental bar date has passed and the full scope of priority tax, non-priority, and administrative claims are established. The short delay will allow the Debtors to establish the universe of claims and allow creditors to assess whether the Debtors have the ability to satisfy administrative and priority claims on the effective date as required by the Bankruptcy Code.

38. To the extent, however, the Court determines that proceeding with solicitation at this time is appropriate, the Disclosure Statement must be revised to provide additional information regarding the Debtors' estimation of claims and the availability of funds to satisfy such claims.

## II. THE PLAN VIOLATES THE SETTLEMENT

39. Since the outset of these cases, the Committee has diligently investigated and pursued a consensual resolution of its potential claims against the Lenders in order to expeditiously wind down these estates. The Committee's efforts were successful and, with the cooperation of the Lenders, reached the settlement described above, subject to ongoing documentation. As part of the Settlement, the Lenders will fund the Committee Settlement Amount, which will be held in the Committee Settlement Trust. The funding for the Committee Settlement Amount is not property of the estates. As a result, the Committee Settlement Amount is, therefore, not property of the estates.

40. The Debtors do not have the right or the ability to use the Committee Settlement Amount, which will be put into the Committee Liquidation Trust for the benefit of general unsecured creditors. Unlike the Wind-Down Fund and the Additional Funds, the Committee Settlement Amount is not being carved out of the proceeds of the Asset Sales. The Lenders are funding the Committee Settlement Amount through independent, unrelated collateral.

41. The Debtors must look to property of their estates, including the Wind-Down Fund and the Additional Funds to satisfy administrative and priority claims. The Plan and Disclosure Statement mislead creditors into believing that the Committee Settlement Amount will provide an additional avenue of recovery. However, the Committee Settlement Fund cannot be used to fund recoveries for non-general unsecured creditors and the Debtors should not be authorized to solicit a Plan that contradicts the terms of the Settlement. To the extent the Debtors continue to pursue a plan that seeks to utilize the Committee Settlement Fund, the Debtors will effectively unwind the Settlement, rendering the Plan unconfirmable.

## III. THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE RELEASES RENDER THE PLAN PATENTLY UNCONFIRMABLE

42. A court should deny approval of a disclosure statement that describes a patently unconfirmable plan, regardless of the adequacy of its disclosures. As the Third Circuit has recognized, "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."[23] Courts will not allow the dissemination of an unconfirmable plan "because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed."[24]

43. The Releases are impermissible under controlling Third Circuit case law. In order to determine whether a debtors' release of non-debtor third parties, including directors and officers are appropriate under a plan, the Third Circuit has applied the non-exhaustive, 5 factor test set forth in *Master Mortgage*, which evaluates:

1) the identity of interest between the debtor and third-party such that a suit against the non-debtor is a suit against the debtor and will deplete the estate's resources;

2) the substantial contribution to the plan by the non-debtor;

3) the necessity of the release to the reorganization to the extent that, without the release, there is little likelihood of success;

---

23 *In re American Capital Equipment, LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (citation omitted); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures.") (citations omitted).

24 *Phoenix Petroleum*, 278 B.R. at 394; *see also In re Allied Gaming Management, Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994).

4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

5) the payment of all or substantially all of the claims of the classes impacted by the injunction.[25]

Although no single factor is dispositive, courts in this district have focused the analysis on whether the parties to be released have provided a substantial contribution to the plan.[26] Courts do not grant third-party plan releases lightly, and the Plan proponent bears the burden of establishing the appropriateness of the non-debtor releases.[27]

44. This Court has only approved debtor's releases of non-debtor third parties if the non-debtors provided substantial value to the restructuring.[28] The Debtors have not articulated,

---

25 *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994); *see also In re Abeinsa Holding, Inc.*, 562 B.R. 265, 282 (Bankr. D. Del. 2016) (applying the 5-factor *Master Mortgage* test to debtors' proposed release of third parties); *In re Washington Mutual*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (the "factors articulated in *Master Mortgage* form the foundation" for the analysis of whether a debtor's release of third parties is appropriate); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (applying the five-factor *Master Mortgage* test to debtors' release of third parties).

26 *See In re Washington Mutual*, 442 B.R. at 349-50 (approving releases of parties that had waived significant claims against the debtors' assets and the estates but concluding that "there is no basis whatsoever for the Debtors to grant a release to directors and officers or any professionals…current or former . . . [because] there has been no evidence presented of any 'substantial contribution' made to the case by the directors, officers, or professionals, justifying releases for those parties."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-07 (Bankr. D. Del. 2001) (finding that officers' and directors' restructuring efforts and management functions, for which they were already compensated, did not constitute contribution of assets to the reorganization and denying release as to prepetition conduct).

27 *See In re Zenith Elecs. Corp.*, 241 B.R. at 110 (releases by the debtor against third parties may be provided under certain limited circumstances); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 43 (Bankr. D. Del. 2000) (noting that it is the debtors' burden to establish that releases are appropriate).

28 *See In re Exide Technologies*, 303 B.R. 48, 73-74 (Bankr. D. Del. 2003) (denying (a) releases as to the lenders because funding for unsecured creditors was insufficient and release would bar creditors' committee investigation against lenders and (b) releases of the prepetition claims against current and former directors and officers due to limited evidence of contribution and opposition by and minimal distribution to unsecured creditors); *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284-85 (Bankr. D. Del 2016) (approving broad releases of non-debtor third parties because (a) there would be little to no recovery for unsecured creditors without certain released parties' financial contributions and agreement not to share in plan distributions and (b) creditors' committee supported releases); *In re Spansion*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (approving releases of non-debtor third parties because the released parties "were actively involved in negotiating and formulating the Plan").

and the Committee is unaware of, any substantial contribution by the Insiders warranting the Releases. The Insiders are not providing cash, assets, or anything of tangible value under the Plan and have not performed any extraordinary services that would constitute a contribution. The Insiders have played no role in negotiating or formulating the Plan (other than negotiating for their own releases) and have had a limited, if any, ongoing management role because the Debtors sold their assets shortly after the Petition Date.

45. The Debtors similarly cannot satisfy the remaining *Master Mortgage* factors.

- There is no identity of interest between the Debtors and the Insiders that would reduce the estates' resources if claims were asserted against the Insiders. Rather than depleting assets, the preservation of these claims for the benefit of creditors will only enhance recoveries.[29]

- The Releases are also not necessary to effectuate the Plan.[30] The Insiders' consent is not necessary for approval of the Plan. The Debtors ceased all operations, and sold all of their assets within 3 months of the Petition Date. The Debtors remaining assets (if any) can be liquidated and the Debtors successfully wound-down without the Releases or the further participation of the Insiders.

- The Committee, as a representative for all unsecured creditors, opposes the Releases.[31] The Releases would effectively bar the Committee Liquidation Trust from investigating and, if appropriate, pursuing claims that could provide an additional source of recovery for unsecured creditors.

- Finally, the Plan does not, and will not, provide for payment of substantially all of the creditors' claims. Unsecured creditors will only receive a fractional recovery out of the Committee Settlement Amount.

---

[29] While the Insiders and other proposed released parties may establish an identity of interest with the Debtors where the "charter (or bylaws) provide that those parties will be indemnified by the Debtors for certain claims," establishing an identity of interest with nothing more "is insufficient to justify the release. To hold otherwise would eliminate the other four factors and would justify releases of directors and officers in every bankruptcy case. That is not the law." *Washington Mutual*, 442 B.R. at 349-50 (*citing In re Continental Airlines*, 203 F.3d 203, 216 (finding that debtor might face future indemnity claim does not make release and permanent injunction of claims against the debtor's directors and officers "necessary" to the reorganization).

[30] *Washington Mutual*, 442 B.R. at 349-50 (*citing In re Continental Airlines*, 203 F.3d 203, 216 (finding that debtor might face future indemnity claim does not make release and permanent injunction of claims against the debtor's directors and officers "necessary" to the reorganization).

[31] *See In re Abeinsa Holding, Inc.*, 562 B.R. at 285 (approving the debtors' release when creditors' committee supported the release "because that entity has the greatest incentive to limit the Debtors' Release to preserve any potential claims").

46. As the Debtors are unable to satisfy any of the *Master Mortgage* factors, the Releases are inappropriate, rendering the Plan unconfirmable. The Disclosure Statement should not be approved and the Debtors should not be allowed to waste estate funds to solicit a Plan with Releases that cannot be approved under controlling Third Circuit case law.

## RESERVATION OF RIGHTS

47. The Committee reserves its right to object to any amendments the Debtors may make to the Disclosure Statement. The Committee further reserves all of its rights to object to confirmation of the Plan and to supplement this Objection at any time prior to the hearing on the Motion.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court deny the Motion and grant such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
October 16, 2019

BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP

By: */s/ Jennifer R. Hoover*
Jennifer R. Hoover (No. 5111)
Kevin M. Capuzzi (No. 5462)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Tel: (302) 442-7010
Fax: (302) 442-7012
Email: jhoover@beneschlaw.com
kcapuzzi@beneschlaw.com

-and-

KELLEY DRYE & WARREN LLP

Eric R. Wilson (admitted *pro hac vice*)
Jason R. Adams (admitted *pro hac vice*)
Maeghan J. McLoughlin (admitted *pro hac vice*)
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

*Counsel to the Official Committee of Unsecured Creditors of FTD Companies, Inc., et al.*